**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**ALEXSEJ GUBAREV, XBT HOLDING S.A. and**
**WEBZILLA INC.**
      **Plaintiffs**

**v.**

**BUZZFEED INC. and**
**BEN SMITH**
      **Defendants**

**Case No.**

**0:17-cv-60426-UU**

---

**DECLARATION OF S F LOBLE**

---

**I, Steven Frederick Loble** of Summit House House, 12 Red Lion Square, London WC1R 4QH, Solicitor and a Litigation Director with W Legal Limited of the same address state that:

1. Save as otherwise indicated I make this affidavit based on my own knowledge of the facts set forth herein.

**Introduction**

2. I am a Solicitor of the Senior Courts.  I have an M.A. degree in law from the University of Cambridge and 35 years of experience as a lawyer in private practice.  My field of practice is international and commercial litigation.  I have been involved in many cases involving the obtaining of evidence for proceedings in the United States of America.  I have been asked to provide this affidavit in relation to the issue of Mr Steele's refusal to answer certain questions during his examination and have been referred to pages 121-126 of the transcript of his examination.

3. Attached hereto as Exhibit 1 is a true and correct copy of my biography.

**My rôle**

4. I represented the Plaintiff in obtaining an order for Christopher Steele to give evidence in England in this action.  His Examination took place on 18 June 2018.

5. Mr Steele was represented throughout by US and English Counsel and the Foreign and Commonwealth Office (the UK equivalent of the State Department) were also represented, as they had been at both Court hearings relating to the obtaining of the Order which led to the Examination of Mr Steele.

6. The application for an order against Mr Steele was not run of the mill.  The Senior Master who deals with most of the applications for evidence for foreign proceedings is very experienced in such cases. In a subsequent case she differentiated that case from this one as follows,

> "It is clear from the authorities, in particular *Credit Suisse* per Simon J. at §15, endorsed by Jay J. in *Gubarev* at §57, that it would be an exceptional case where in such circumstances this court would: " *embark on a close consideration of issues of relevance on what is likely to be limited material and a less clear understanding of the issues than the requesting court.* " *Gubarev* was such an exceptional case, involving issues of national security and the safety of intelligence agents and other sources. This case is not exceptional, and I do not consider that the areas of questioning can be described as oppressive where the Respondent has the protection of the Fifth Amendment privilege and the settlement order.

7. After exchange of written evidence, which is the usual way of dealing with interlocutory matters, the argument took a whole day, and judgment was reserved (taken under advisement) and delivered 7 weeks later.  The Defendant appealed the scope of the order and the appeal, after papers were filed took a day to argue and the decision was reserved but expedited and delivered 4 days later.  Copies of both judgments are attached as Exhibits 2 and 3.

8. I set out below the fundamental rules relating to the taking of evidence for foreign, including US, proceedings.

**English Law does not permit discovery for foreign proceedings**

9.  The Evidence (Proceedings in other Jurisdictions) Act 1975 was passed partly to give effect to the Hague Convention. The Act goes further than necessary for the purposes of the Convention and should be read in conjunction with Part 34 of the English Civil Procedure Rules (CPR)to ascertain the boundaries within which evidence can be obtained pursuant to the Convention, or for foreign proceedings generally, and the procedure for obtaining such evidence. The procedure under The Hague Convention is the same for any country which is a party to it and indeed for any country which requests judicial assistance from the English Court.

**Distinction between evidence for trial or for pre-trial purposes**

10. The notes to the English Civil Procedure Rules state,

> "Under s.2(3), the English Court is prohibited from making an order requiring any particular steps to be taken unless they are steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the English Court, whether or not they are proceedings of the same description as those to which the application for the order relates. This provision, which applies both to oral and documentary evidence recognises and gives effect to the distinction between evidence in the nature of proof to be used for the purposes of the trial and evidence in the nature of pre-trial disclosure to be used for the purposes of leading to a train of inquiry which might produce direct evidence for the trial. This distinction was in the mind of the draftsman of the Act of 1975 and was made the subject of an express declaration by Her Majesty's Government when ratifying the Hague Convention that the United Kingdom would "not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents" (see Cmnd. 6727 (1976)); see 34.21.6(below)."

11. I set out below an extract from a recent case which summarises the factors which the English Court must consider when dealing with an application for an Order for a witness to give evidence in England for use in foreign proceedings pursuant to a letter of request.

> "30. The court's jurisdiction to order an examination derives from Sections 1 and 2 of the 1975 Act. It may make such an order only if satisfied that:

i) the application is made in pursuance of a request issued by and behalf of the requesting court;

ii) the evidence to which the application relates is to be obtained for the purposes of civil proceedings instituted before the requesting court ( Section 1(a) and 1(b) ).

31. Once those jurisdictional requirements have been satisfied, the court has a discretion to make such orders: " *as may appear to the court to be appropriate for the purposes of giving effect to the request in pursuance of which the application is made.* " ( Section 2(1), (2) (a) ). Section 2(3) requires that no steps can be taken other than " *steps which can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the English court* ".

32. The law on the exercise of the court's discretion is well established by the authorities. The English court will give effect to a request to the extent that it can for reasons of judicial comity: *Seyfang* ; *Rio Tinto Zinc* . The starting point of the English court in relation to letters of request from foreign states under the 1975 Act is that they should be given effect to as far as possible: *Rio Tinto Zinc Corporation* and *In re State of Norway's Application* at page 470B; *Smith v Philip Morris* per Andrew Smith J. at §33.

33. However, the court's powers cannot be used in aid of a "fishing expedition". There are numerous authorities which confirm that the examination must be confined to eliciting evidence for trial and cannot extend to US style oral discovery by deposition: The *State of Minnesota* per Lord Woolf at paragraph 13; *Rio Tinto Zinc Corporation* page 635 per Lord Diplock; *In re State of Norway's Application* [1987] (No. 1) per Lord Kerr LJ at page 482; *Refco Capital Markets Ltd* per Waller LJ at 1; *First American* per Sir Richard Scott VC at 1160H, 1164C, 1165D-E, 1166D-H, 1167E- 1168C; *Gredd* per Stanley Burnton J. at §27(3), (4), (5).

34. If the width of the topics for questioning is too wide, or uncertain or vague, it may be refused on the grounds that it is oppressive to the witness: *First American* per Sir Richard Scott VC at 1167F-H. This might also lead to the inference that: " *the letter of request was designed to elicit information which might lead to the obtaining of evidence rather than to establish allegations of fact, and that would amount to an impermissible fishing expedition* ." *Smith v Philip Morris* per Andrew Smith J. at §§37- 40.

35. If the request is considered to be too wide ranging, the court retains a discretion whether to grant the request and can "blue pencil" but not redraft the request. The court has no power to redraft a question or supplement the request on the basis it considers expedient to do so: *State of Minnesota -v- Philip Morris* at §§50-51.

36. The English court should rely on the requesting court's determination of the issue of relevance of the evidence sought to the issues for trial: *In re Asbestos Insurance Coverage Cases [ 1987] 1 QB 331* at page 339G.

37. There are limited circumstances where the court can consider the relevance of the evidence sought, where the relevance of the topics for examination in the request are not considered by the requesting court: *Gubarev* per Jay J. at §§ 54-59. In *Gubarev* Jay J. referred at § 55 to the comment of Stanley Burnton J in *Gredd* that:

> "...orders for letters of request are normally made by the US judge without any real scrutiny. The order is normally made and the terms sought by the applicant without any (or any significant) amendment, and without the judge being informed of the significant differences between US federal procedure and of these courts".

38. Jay J also referred at paragraph 57 to that issue as addressed by Simon J in *Credit Suisse* where the latter states at paragraph 15:

> "It seems to me, however, that [Counsel] is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance. If it has, then it is hardly in the interest of comity that the court to whom the request is made should embark upon on a close consideration of questions of relevance on what is likely to be limited material and a less clear understanding of the issues than the requesting court. If, on the other hand, the requesting court has plainly not considered the question of relevance where it is clear, even on a broad examination, that the evidence is not relevant then the Vice-Chancellor's first question must be addressed". *Aureus Currency Fund L P and ors v Credit Suisse Group AG and ors, Mitesh Parikh* [2018] EWHC 2255 (QB)

12. In this case the English Court considered that it had to examine carefully the proposed subject matter of the Examination, as it had been invited so to do by the Florida Court.

> "112. Finally, the Florida court itself appears to accept that this court may impose limitations on the ambit of the evidence sought, by the words in the Order of 15 August 2017, dismissing Mr Steele's motion to intervene to oppose the Request:
>
>> "Mr Steele seeks to intervene on the grounds that his deposition is prohibited by British law. This Court presumes, however, that the Senior Master of the Court of Judicature, Queen's Bench Division, will limit the scope of the Request pursuant to British law ...... The Court, therefore, denies Mr Steele's request to intervene, trusting that his rights under British law will be protected by the British Court." **[2/13/246]** (judgement of Senior Master Fontaine, Exhibit 2).

**Sensitivity to the position of sources**

13. The notes to the Civil Procedure Rules state,

> "In *Rio Tinto Plc v Vale SA* [2015] EWHC 1865 (QB) without notice orders were made under Pt 34 against three corporate investigation firms requiring them to disclose information about business intelligence reports they had supplied to a mining company. The firms applied to vary the orders to allow them to redact documents and limit witness evidence so as to protect their sources. They claimed that considerable risk attached to the passing of information which tended to expose corruption by officials, and that their sources had supplied the information on condition that their identities would not be disclosed. The application was granted. In principle, the court would accede to a letter of request so far as was proper, practicable and permissible under English law. However, a relevant, though not decisive, consideration was whether the respondent to the request would, by giving evidence or providing the documents, be breaching a confidence. The court had to balance the public interest in preserving any confidentiality against that in enabling the fair resolution of the foreign proceedings, *Science Research Council v Nasse* [1980] A.C. 1028, followed. A critical factor in the balancing exercise was the importance of the information to the foreign proceedings. In fact, the sources' identities were peripheral to the issues in those proceedings, and the US court would not be materially impeded or disadvantaged if they were not provided."

14. In this case the Senior Master was very conscious of this point – see paragraphs 46, 112, 126-127 and 130 of her judgment.  Jay J also considered this carefully – see paragraphs 65-67 of his judgment.

**The relevant questions and refusal to answer**

15. The FCO indicated that it would take about 3 weeks to decide in any particular instance if the government would issue a certificate preventing answers being given in relation to particular topics.  I anticipate that it would have taken at least that long, if not longer, for Mr Steele to consult the Crown via his employer (FCO, MI6 and probably various other entities and individuals within the government).

16. If permission to answer particular questions were not given, and this were to be challenged by the Plaintiff, or, possibly, the Defendants, the FCO would no doubt have issued a certificate pursuant to section 3(3) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, which reads,

"3      Privilege of witnesses.

(3) Without prejudice to subsection (1) above, a person shall not be compelled by virtue of an order under section 2 above to give any evidence if his doing so would be prejudicial to the security of the United Kingdom; and a certificate signed by or on behalf of the Secretary of State to the effect that it would be so prejudicial for that person to do so shall be conclusive evidence of that fact."

17. The issue of a certificate is conclusive and no further application to override that certificate will be entertained by the Court.  Had Mr Steele been required to seek permission to answer some specific questions, the Examination would have had to be adjourned and realistically, if no certificate were issued by the Secretary of State, would have had to be reconvened several weeks later.  The US attorneys would have had to return to London, at great expense, and it would have been severely impractical. Mr Steele could well have argued that it would be oppressive.  In any event, I anticipate that the Secretary of State might well have granted a certificate.

18. In summary, it is in my opinion doubtful that the questions the set out on pages 121-126 or indeed any other questions, would have been answered subsequently by Mr Steele.

Signed under the pains and penalties of perjury

……………………………………………..
**Steven Loble**
28 January 2020

7

# Exhibit 1



## BIO OF STEVEN LOBLE

**EDUCATION:**       1984       M.A. (Cantab)
                     1980       B.A. (Cantab)

                     1977-1980   Pembroke College, University of Cambridge

                     1969-1979 Royal Grammar School,  Newcastle-Upon-Tyne

**LANGUAGES:**       German & French - fluent
                     Italian – conversational

**Steven Loble** has been in practice as a solicitor in London for 35 years.

He has acted in over 50 reported cases and has wide experience of international and commercial litigation.

Many of Steven's clients are based outside the United Kingdom. With years of experience acting for foreign clients, he has substantial expertise in dealing with the issues which arise in cross-border litigation - choice of law, jurisdictional disputes, enforcement of judgments, obtaining depositions in the United Kingdom, dealing with questions of foreign law and sovereign immunity.

Steven speaks German, French and Italian.

Recent work includes the following: –

- Acting for a Fortune 500 Company and obtaining summary judgment in a case in which the judge said, "In my view, the time has come for the claim against ENP to be put out of its misery."

- Acting for the Plaintiffs in US litigation and obtaining an order for Christopher Steele, a former MI6 officer, to give evidence in England for use in US proceedings. That case was subsequently described by the English Court as "an exceptional case, involving issues of national security and the safety of intelligence agents and other sources."

- Obtaining an order for a foreign exchange trader, whose former employer paid penalties in excess of $100 million to financial regulators in the US, to give evidence in England for claims in the US which had already resulted in settlements with a number of defendants for in excess of $2 billion.



**The Directories**

Steven is one of only three UK lawyers ranked as a leading lawyer for US litigation work by Chambers' Global Directory 2015, 2016 and 2017.

**Chambers Global Directory 2017** lists Steven under USA - Litigation - Foreign Expert Based in UK and states,

"UK-based Steven Loble of W Legal is highly regarded for his cross-jurisdictional litigation work and is frequently called upon by major US companies for advice and assistance. Clients describe him as both the "consummate professional" and "responsive.""

Steven is also listed under UK - Dispute Resolution - Foreign Expert for USA, and describes him as follows, "Steven Loble of W Legal is active in international disputes, with particular experience acting for US companies.'

"Steven Loble is an experienced litigator in London. He primarily acts for international clients on multi-jurisdictional matters, and his caseload includes significant work for major US entities."

"Steven Loble experience acting for US companies.  He primarily acts for foreign clients and is noted for ability on multi-jurisdictional matters. His caseload includes work for major US clients." (2016)

"Steven Loble concentrates on commercial disputes involving international parties. He advises US clients on areas such as enforcement proceedings in the UK, and is also an expert on US discovery and trial requirements". (2015)

"Steven Loble speaks German, French and Italian and is very knowledgeable about the intersection of US and UK law. He is often sought out by big US clients and government agencies for complex transatlantic cases, including securities matters. Sources say he is "technically excellent" and "a very good negotiator."" (2014)

"London-based consultant Steven Loble has substantial cross-border litigation experience." Legal 500, 2015.

Chambers Global Directory 2012

"Steven Loble offers a wide-ranging international dispute resolution practice. He speaks German, French and Italian, as well as "offering extraordinary expertise in the intersection of

2



US and UK law." In addition, he is "a hard-working and accessible individual, and as clients we are very happy with the results that he has achieved."

Chambers Global Directory 2011

"Steven Loble has many overseas clients and is frequently involved in preparing for and enforcing foreign judgments. Sources praise his "extraordinary depth of experience and ability to manage multiple legal systems." He was recently involved in obtaining UK evidence for a securities class action in New York. He speaks German, French and Italian."

Steven is described in the 2010 edition of Legal 500 as "extremely knowledgeable and efficient ".

**Experience**

Representative work includes:

- representing Citigroup and several of its subsidiaries, together with 5 senior management ex-employees in depositions in England in a claim for $2 billion relating to complex claims arising out of derivative products

- a case which clarified the rules on Part 36 offers to settle

- obtaining evidence in a number of cases brought against banks in the United States for facilitating terrorism by maintaining accounts for terrorist organisations

- advising a foreign regulator in relation to a case against an English company which is alleged to be in breach of the regulations of the foreign country and bringing proceedings to enforce a judgment for $100 million

- acting for an investment bank in relation to the Lehman Brothers' bankruptcy

- other credit-crunch related litigation.

**CAREER:**

Steven has been a partner in large English and US law firms as well as running his own litigation boutique for some years.  He is now a Litigation Director at W Legal Limited

**AREAS OF EXPERTISE:**

Commercial litigation and international litigation dealing primarily with conflicts of laws, jurisdiction, public international law, commercial disputes with a foreign element, aviation, banking, securities and derivatives, contractual disputes, international judicial assistance, obtaining evidence for foreign proceedings, warranty claims, tortious matters, restitution, injunctions, involved in three of the leading local authority swaps cases, including the first case to be tried; general advisory work in relation to public and private international law.

3



**OTHER INFORMATION:**

**Speaking:**

University of the Pacific, McGeorge School of Law, London Institute of Comparative Advocacy; Tulane Law School, New Orleans 1993; International Law Association, New York, 1998; American Bar Association; Hawkesmere, CLT, AIJA, Legal Week Litigation Forum September. Commercial Litigators' Forum - New York Chapter, New York May 2012; American Bar Association International Section Meeting - Washington D.C. April 2013; Deutscher Anwaltverein (German Bar Association) - Düsseldorf June 2013

**Publications:**

Obtaining Evidence in England and Wales for use in United States Transnational Law, Volume I, No.1 1988; Evidence in International Arbitration published by Graham & Trotman/Martinus Nijhoff 1994 (chapter on England and Wales), ILSA Journal of Int'l & Comparative Law Vol 4:489, various firm publications, profiled in "The Lawyer" March 2004, Singapore Bar Association, American Bar Association, American Bar Association website.

**Memberships:**

Association International des Jeunes Avocats , American Bar Association, Royal Automobile Club.



**STEVEN LOBLE – LIST OF CASES**
(Sample cases – not exhaustive)

**Reported Cases**

| Name | Description |
|---|---|
| Adams v. Cape Industries (Trial and Court of Appeal) | Described in Dicey & Morris, "The Conflict of Laws" as the leading modern case on enforcement of foreign judgments. It is also one of the leading cases on piercing the corporate veil. |
| Gurtner & Others v. Beaton & Others (Trial and Court of Appeal) | Acted for Swiss curling team involved in an air crash. Proved that agricultural chemicals company was, in fact, an air transport undertaking and thus liable without proof of negligence. |
| Litrell v. USA (First Instance and Court of Appeal) | Important case of sovereign immunity on behalf of US Government. |
| USA v. Inkley (First Instance and Court of Appeal) | Attempt to enforce US judgement failed as bail bond was held to be a public law rather than a private law obligation |
| USA v. Amey Roadstone | Acted for United States in case where US spy plane was hit by a tractor after landing at a base. Sued construction company and plant hire company. Won at first instance. |
| Westdeutsche Landesbank v. Islington London Borough Council (Trial, Court of Appeal and House of Lords) | Acted for Islington in local authority interest rates swaps litigation. Islington were unsuccessful save in relation to winning an argument in the House of Lords that compound interest was not payable. Having said that, my advice proved to have been correct at every stage. |
| Kleinwort Benson Limited v. Sandwell Borough Council | |
| Morgan Grenfell v. Hatfield District Council (Islington London Borough Council Third Party) (Trial) | |

5



| | |
|---|---|
| Citibank v. Brown Shipley, Midland Bank v. Brown Shipley (Trial) | Case involving fraudulent obtaining of bankers' drafts. |
| Richard Saunders & Partners (Firm) v. Eastglen Limited (Trial) | This is the case in which Queen's Bench Division first ordered exchange of witness statements pursuant of R.S.C. 0.38.  Professional negligence case. |
| Kecskemeti v. Rubens Rabin (Trial) | Professional negligence case against solicitors related to negligent drafting of will. |
| DFC Financial Services Ltd v. Coffey & Others (Privy Council) | Acted as Privy Counsel Agents for New Zealand law firm. |
| Gatoil v. NIOC | Attempt to bring proceedings in England although there was an arbitration clause.  This was unsuccessful but the client did not want to arbitrate in Teheran, being a Lebanese Christian. |
| Desert Sun Loan Corporation v. Daniel Hill (Court of Appeal and Trial) | Went to the Court of Appeal after unsuccessful summary judgment application and obtained order that leave to defend be conditional in claim to enforce American judgment.   Won at trial when the Court decided Defendant had submitted to the jurisdiction of the Arizona Court and its judgment was therefore enforceable in England. |
| Libyan Asset Freeze | Advising USA in connection with Libyan asset freeze and ensuring that US banks properly defended claims brought by Libyan banks. |
| Czarnikow-Rionda Sugar Trading Inc. v. Standard Bank London Ltd. and Others | Acted for bank in trying to stop payment being made where payee was alleged to have acted fraudulently. |
| Casio Computer Co. v. Sayo & Others (1st | Acted for one of multiple Defendants in major fraud case. Decisions at first instance and CA on complex and novel |



| | |
|---|---|
| instance and Court of Appeal) | points under Brussels Convention.  Petition for leave to appeal refused by HL. |
| Grosvenor 52 International Limited v Julian Holy | Successfully appealed Master's refusal to grant summary judgment on liability in solicitor's negligence case.  Matter went to trial on damages. |
| United States of America v. Philip Morris First Instance and Court of Appeal (Commercial Court Judge sat as Examiner) | Acted for the United States of America in relation to the defendant tobacco companies' alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The amount claimed was at least $289 billion (approximately £175 billion).  The litigation was one of the largest civil cases ever brought in a United States court. |
| | Successfully obtained an order that a senior litigation partner in a major City firm give evidence about BAT's document destruction policies, defeated an appeal to the Court of Appeal by the witness and BAT and prepared for and instructed leading and junior counsel to conduct the examination.  Dealt with post-examination editing of transcripts and videotape under direction of the Court.  Dealt with costs.  For technical reasons, witness was awarded some costs.  USA was awarded costs. On hearing of preliminary issues relating to witness' costs, obtained finding that bills were disproportionate and that he was unlikely to recover more than 40%.  Settled on terms that USA paid 40% of witness' costs and witness/BAT paid 80% of USA's costs. |
| | Won on a complex VAT issue, resulting in the client not having to pay VAT on costs orders in favour of the witness. |
| Windh v Land Rover | Represented plaintiff in California proceedings in an action for negligent design against Land Rover.  Obtained order for two witnesses to give evidence in England for CA proceedings.  Application for permission to appeal and argument on appeal were heard together by consent.  After 2-day hearing, application for permission to appeal by Defendant was refused. |
| Wade v Active Navigation | Successfully sued employer for failing to incept proper level of death in service benefits for senior level employee. |



| | |
|---|---|
| Willcox v Willcox | Acted in case relating to Part 36 offer in unfair prejudice petition relating to a company. |
| Gubarev v Buzzfeed First instance and appeal | Acted for Russian tech entrepreneur and his companies in compelling evidence for use in US proceedigns from Christopher Steele who wrote the infamous "Trump dossier". |
| Aureus Currency Fund LP v Credit Suisse Group AG | Obtaining an order for a foreign exchange trader, whose former employer paid penalties in excess of $100 million to financial regulators in the US, to give evidence in England for claims in the US which had already resulted in settlements with a number of defendants for in excess of $2 billion. |
| Crown House Technologies Ltd v Cardiff Commissioning Ltd | Successfully applied for strike out/summary judgment on behalf of Fortune 500 defendant in long-running case. |

**Unreported Cases**

| | |
|---|---|
| Britt v USA | Tort claim against USA.  USA claimed sovereign immunity and the claim was withdrawn due to strength of affidavits on US law. |
| Butte Mining | Acting for Butte Mining in connection with complex litigation in the US involving anti-suit injunctions in England, giving expert evidence on affidavit for use in proceedings in Federal Court in Montana. |
| Co-Op Handels AG | One of Germany's biggest bankruptcies.  Acting for Co-Op in connection with claims brought by a Kuwaiti bank.  Lost at trial (clients were contractually bound by contract with creditors to fight case, even though advised they would lose). |
| Solicitors | Restrictive covenant case, setting aside injunction against lawyers for leaving law firm and having claims for damages dropped with a substantial contribution being paid to costs. |
| Individual | Acted for one of four brothers in partnership dispute. Result of the case - the client was bought out of the |



partnership for $45 million and the family trusts were partitioned.

| | |
|---|---|
| Individual | Litigation for Kenyan Asian businessman with his former joint venture partner.  There were proceedings in Kenya, Uganda and Tanzania, as well as England. |
| Major company | Successfully extracted key employee from one of client's major competitors.  No proceedings were instituted. |
| Individual | Obtained a settlement of $450,000 for the general counsel of a media company whose contract of employment was terminated before it began. |
| De Lorean | Acted as agent of The Treasury Solicitor (now the Government Legal Department) in collecting evidence in England for fraud trial of John Z. De Lorean in the USA. |
| De Lorean | Acting for the British government nominee directors of the De Lorean Sports Car Company who were brought in by Lotus's third party in proceedings brought by the receiver of the De Lorean Sports Car Company. |
| Individual | Professional negligence claim against major law firm in relation to tax on sale of a company.  Settled before trial. |
| Individual | Medical negligence case.  Settled a few days before trial for 90% more than client would have accepted. |
| Obtaining evidence | Obtained orders in a large number of cases for witnesses to give evidence for foreign proceedings on instructions from numerous US law firms, including major firms. |
| Public company | Acted for two witnesses the subject of an Order to give evidence for use in US proceedings.  Instructed by a public company, which was a party to the US proceedings.  Made application to set aside Order.  Adverse party consented to set aside the Order, but did not agree to pay costs. Court made order for costs after contested hearing. |
| Claim against a government | Government had default judgment entered against it (before instructing solicitors).  Made application to set aside default judgment, set aside service, and set aside Order giving permission to serve out of the jurisdiction. |



Claimant consented to application and paid contribution to client's costs.

Solicitors                  Acted in arbitration in relation to partnership dispute on the resignation of one partner from the firm, involving construction of partnership agreement and valuation of assets.

# Exhibit
# 2

# Aleksej Gubarev, XBT Holdings SA, Webzilla Inc v Buzzfeed Inc, Ben Smith, Christopher Steele

 **Positive/Neutral Judicial Consideration**

**Court**
Queen's Bench Division

**Judgment Date**
21 March 2018

Case No: CR 2017 - 664

High Court of Justice Queen's Bench Division

**[2018] EWHC 512 (QB), 2018 WL 01411208**

Before : Senior Master Fontaine

Date: 21/03/2018

Hearing dates: 5 February and 16 March 2018

**Representation**

Mr Gavin Millar QC and Mr Edward Craven (instructed by RPC ) for the Applicant.
Miss Hannah Brown QC (instructed by W Legal ) for the Plaintiffs.
Mr Alex Bailin QC and Mr Ben Silverstone (instructed by Taylor Wessing ) for the Defendants.
Mr Julian Blake (instructed by the Government Legal Department for the Foreign and Commonwealth Office intervening ).

**Approved Judgment**

Senior Master Fontaine:

1.  The applications before me relate to a Letter of Request dated 8th August 2017, ("the Request") from the United States District Court for the Southern District of Florida (Miami Division) ("the Florida court"), pursuant to section 2 of the Evidence (Proceedings in other Jurisdictions) Act 1975 . Pursuant to the Request, and the application of the US Plaintiffs' dated 3rd November 2018, made without notice, I made an order dated 9th November 2017 ("the November 2017 order") without a hearing, for evidence to be taken by way of oral examination of the Applicant ("Mr Steele") under CPR 34.18 . By way of an application notice dated 1st December 2017 Mr Steele applies to set aside or vary that order.

2.  There is also before me an application by the US Defendants dated 9th January 2018, to vary the November 2017 order, if that order is not set aside. Finally, there is an application dated 4th December 2017 on behalf of the Foreign and Commonwealth Office ("the FCO"), who have intervened as a party with an interest in the proceedings. The FCO do not seek their application to be dealt with until I have determined the applications of both Mr Steele and the US Defendants.

3.  The following witness statements were before the court:

**For the Applicant Mr Steele:**

Witness statement of Nicola Cain dated 1st December 2017;

Witness statement of Edward Lucas dated 30th November 2017.

**For the US Plaintiffs**

First witness statement of Steven Frederick Loble dated 3rd November 2017 Second witness statement of Steven Frederick Loble dated 16th January 2018.

**For the US Defendants**

Witness statement of Katherine M Bolger dated 20th December 2017

**For the FCO**

First witness statement of Lewis Neal dated 30th November 2017

Second witness statement of Lewis Neal dated 1st February 2018

4.  In this judgment I refer to documents referred to in the evidence by the bundle reference, as follows: **[bundle number/ tab number/page number]** .

**Background to the applications – summary of information in the evidence**

5.  The November 2017 order was made on the application of the three US Plaintiffs in defamation proceedings which are currently pending before the Florida court ("the Florida proceedings"). The US Plaintiffs in those proceedings are an individual, Mr Aleksej Gubarev, and two companies owned by or associated with him, XBT Holdings SA and Webzilla Inc. The US Defendants are the US publishing company BuzzFeed Inc and its editor Mr Ben Smith. In the Florida proceedings the US Plaintiffs complain of allegedly defamatory statements in documents published by the US Defendants on 10 January 2017 "(the dossier)". The dossier consists of a number of memoranda produced by Mr Steele and/or his company, Orbis Business Intelligence Ltd ("Orbis").

6.  Mr Steele and Orbis are defendants in defamation proceedings in the Queen's Bench Division brought by the US Plaintiffs, as claimants (save that Webzilla Inc is not a claimant, and the second and third claimants are Webzilla BV and Webzilla Limited), issued on 3rd February 2017 under Claim No. HQ17D00413 ("the QB proceedings"). The QB proceedings have reached the stage of service of the claim form and particulars of claim, and service of the defence and a reply. The QB proceedings are brought in respect of the same publication of the dossier by the US Defendants.

© 2020 Thomson Reuters.

7.  Mr Steele was a Crown Servant between 1987-2009, rising to the position of Counsellor in the Foreign and Commonwealth Office. During that time he acquired expertise in the affairs of Russia/Commonwealth of Independent States. He is bound by contractual and Official Secrets Act obligations.

8.  After he left the FCO, Mr Steele founded Orbis in partnership with Mr Christopher Burrows, another retired Senior FCO Crown Servant. Orbis is a corporate intelligence consultancy, which specialises in providing strategic insight and advice, intelligence and investigative services to a range of clients. Mr Steele is a Director of Orbis.

9.  Between June and early November 2016, Orbis was engaged by Fusion GPS ("Fusion"), a consultancy based in Washington DC, providing research, strategic intelligence and due diligence services to clients. Mr Steele and Orbis had developed a prior working relationship with Fusion over a number of years. Fusion engaged Orbis to prepare a series of confidential memoranda based on intelligence concerning alleged Russian efforts to influence the United States Presidential election, and possible links between Russia and the then Presidential candidate, and later President, Donald Trump. The parties describe these memoranda as the "pre-election memoranda", being those prepared before the 2016 US Presidential election, and "the December memorandum", a further memorandum dated 13th December 2016 prepared by Mr Steele of his own initiative, after the US Presidential election. The pre-election memoranda and the December memorandum, sixteen documents in total, constitute the dossier, as referred to in the Florida proceedings. The dossier was supplied to Fusion on terms that it was subject to an obligation not to disclose it or any of it to third parties without the agreement of Orbis and/or Mr Steele.

10.  Mr Steele, concluding that the intelligence reported on in the December Memorandum was of considerable importance to the national security of the US and the UK, and therefore needed to be analysed further, investigated and verified, provided a copy of the same to a senior UK government national security official acting in his official capacity; and a copy to Fusion by enciphered email, with an instruction to Fusion to provide a hard copy to Senator John McCain of the United States, via Mr David Kramer, a former US State Department civil servant and an associate of Senator McCain.

11.  On 10th January 2017 the US Defendants published an online article entitled "These Reports Allege Trump has Deep Ties to Russia" ("the Article"), accompanied by a link to the dossier. It is not known who provided the dossier to the US Defendants. Mr Steele's evidence is that he was "horrified and remains horrified that the US Defendants published the dossier at all, let alone without substantial redactions." He considers that this may have compromised the sources of his intelligence, putting their lives, their families and their livelihoods at risk. He says that for former Crown Servants with the experience and background of the Directors of Orbis, such publication of such raw intelligence reports in this way is simply unthinkable (Cain Paragraph 44) **[1/3/10]** .

12.  The US Plaintiffs' claim in the Florida proceedings concerns the publication of paragraph 3 of the December memorandum (described as Company Intelligence Report 2016/166), which states as follows:

> "[Redacted] reported that over the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "alerting operations" against the Democratic Party leadership. Entities linked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. In Prague, COHEN agreed contingency plans for various scenarios to protect the operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency. It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces. *[additional sentence in parenthesis not relied upon]* " **[2/11/127]**

© 2020 Thomson Reuters.

13.  The complaint by the US Plaintiffs was filed on 2nd March 2017, following a letter before action dated 28th January 2017. The US Defendants' defence was filed on 29th June 2017. The US Plaintiffs applied to the Florida court by motion for the issue of a Letter of Request pursuant to the Hague Convention of 18th March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("the Hague Evidence Convention") in relation to oral evidence sought from Mr Steele in this jurisdiction for use at trial. The Request **[2/12/230 – 240]** was issued in identical terms to the motion by the US Plaintiffs, and the draft order and November 2017 order are in the same terms.

14.  On 10th August 2017 Mr Steele filed a non-party motion of intervention in the Florida proceedings objecting to the Letter of Request on grounds that:

> "The deposition sought is impermissible and unlawful on multiple grounds, not the least of which is that the self-same Plaintiffs have a direct defamation action pending against Mr Steele in the United Kingdom in which the requested deposition is strictly prohibited. Plaintiffs thus are seeking to employ this Court in an end-run around their limitations in their parallel UK action". **[2/13/242 – 243]**

15.  The motion was refused by order of the Florida court dated 15th August 2017 **[2/13/245 – 247]** . Her Hon. District Judge Ursula Ungaro stated in the said order:

> "Mr Steele seeks to intervene on the grounds that his deposition is prohibited by British law. This Court presumes, however, that the Senior Master of the Court of Judicature, Queen's Bench Division, will limit the scope of the Request pursuant to British law …… The Court, therefore, denies Mr Steele's request to intervene, trusting that his rights under British law will be protected by the British Court." **[2/13/246]**

**Chronology of the application by the US Plaintiffs under CPR 34.17**

16.  In correspondence between W Legal and RPC, the solicitors acting for, respectively, the US Plaintiffs and Mr Steele, RPC requested that the application for an order pursuant to the Request be dealt with at a hearing on notice. However, that course, obviously a sensible one where there is a dispute between the party who seeks the examination and the witness, as to whether or not the application should be granted and/or in what terms it should be granted, was not followed by the US Plaintiffs. Rather, W Legal lodged the application to be dealt with on a without notice basis, and without a hearing. Consequently, the order was made in the terms sought, there being no obvious grounds before the court at that time on which to refuse the application in the terms sought.

© 2020 Thomson Reuters.

17.  On 14th November 2017, the Government Legal Department ("GLD") acting on behalf of the FCO, wrote to Mr Steele's solicitors RPC indicating that it was considering seeking a certificate under section 3(3) of the 1975 Act. Section 3(3) of the 1975 Act gives protection against compulsion to give evidence prejudicial to the security of the United Kingdom.

18.  On 20th November 2017 RPC wrote to the Plaintiffs' solicitors, W Legal pointing out a number of concerns about the terms of the November 2017 order, and in particular the width of Schedule A to that order, which sets out the topics and ambit of the oral examination. The US Plaintiffs' solicitors were notified of Mr Steele's intended application to set aside the November 2017 order. Following a telephone discussion on 22nd November 2017, W Legal sent to RPC a draft of an alternative Schedule A to see whether Mr Steele would agree to be examined on that alternative formulation. That proposal could not be agreed.

**The Law**

19.  The court's jurisdiction is derived from the Evidence (Proceedings in Other Jurisdictions) Act 1975 ("the 1975 Act").

20.  All parties referred the court to a number of authorities, as follows:

*In re State of Norway [1987] QB 433*

*Rio Tinto Zinc Corporation -v- Westinghouse Electric [1978] AC 547*

*CH (Ireland) Inc -v- Credit Suisse Canada [2004] EWHC 626 (QB)* at [14] and [17]

*First American Corp -v- Al Nahyan [1999] 1 WLR 1154*

*United States of America v Philip Morris Inc [2003] EWHC 3028 (Comm)*

*United States of America v Philip Morris Inc [2004] 1CLC 811*

*State of Minnesota -v- Phillip Morris Inc [1998] I.L.Pr 170*

*Gredd -v- Busson [2003] EWHC 3001*

*Genira Trade -v- Refco [2011] EWCA Civ 1733, [2002] C.P. Rep. 15*

*Micro Technologies LLC v Autonomy Inc and Hussain [2016] EWHC 3268 (QB)*

*Dombo Beheer B.V. The Netherlands (1994) 18 EHRR 213*

*Sanoma v the Netherlands [2011] EMLR 4*

*Land Rover North America Inc -v- Windh [2005] EWHC 432 (QB)*

*Rio Tinto Zinc plc v Vale SA [2015] EWHC 1865 (QB)*

*Secretary of State for Trade and Industry v Crane [2001] 1 BCLC 222*

**Mr Steele's Application – Summary of Submissions on his behalf**

21.  The application to set aside the November 2017 order is made on both jurisdictional and discretionary grounds. Mr Millar QC for Mr Steele drew the court's attention to the width of the topics of the proposed examination in the original Schedule A to the November 2017 order.

22.  Paragraph 1 seeks evidence on Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition, despite the fact that he will be a witness of fact and not an expert witness. Paragraphs 2-14 list topics of examination in relation to the entire dossier, although only one paragraph of the December Memorandum is complained of in the Florida proceedings. Paragraph 4 seeks evidence from Mr Steele of steps he took to obtain information for the dossier, which would inevitably be a substantial and wide-ranging investigation, given the extent of the material in the dossier. Paragraph 7 seeks Mr Steele's sources of information for the dossier, even though it must have been apparent that the answers would involve a wide-ranging examination and could put potential intelligence sources at great risk. Paragraphs 12-13 relate to provision of the dossier by Mr Steele to others, even though his defence in the QB proceedings, signed by a statement of truth, provides this information. Further the November 2017 order provides for a seven hour examination, with six hours being allotted to the Plaintiffs' US trial counsel and one hour to the US Defendants' trial counsel, which it is said demonstrates the extent of the questioning sought, despite the narrow limits of the allegations in the US proceedings.

**Jurisdictional Grounds**

*Evidence sought for an impermissible purpose*

23.  Mr Millar relies on the judgments in a number of authorities to support the position that investigatory examinations and fishing expeditions will not be permitted by the English Court, on either jurisdictional grounds because they do not come within the 1975 Act or on discretionary grounds because they are oppressive, namely:

*In re State of Norway [1987] QB 433* at 481F, 482 E – F, 483G, 491F

*First American Corp -v- Al Nahyan [1999] 1 WLR 1154* at 1165 D – E, 1165H – 1166A

*Gredd -v- Busson [2003] EWHC 3001* at §27 (3) (9)

*Rio Tinto plc v Vale S.A. [2015] EWHC 1865 (QB)*

*Rio Tinto Zinc Corporation -v- Westinghouse Electric 1978 AC 547* at §37 -- 38

24.  It is submitted that the court is able to infer from the wide-ranging evidence sought in the Request, far beyond what is required for the purposes of the Florida proceedings, that the US Plaintiffs' intention is not primarily to obtain evidence for trial, but to conduct a wide ranging investigation in order to attack the credibility of Mr Steele and his sources. There has been no attempt in the Florida proceedings to analyse how the evidence sought is relevant to the issues between the parties in the Florida proceedings. The inference that can be drawn is that the US Plaintiffs want a public platform to attempt to discredit the dossier as valueless. This would increase the pressure on Mr Steele not to defend the QB proceedings and could put the well-being of his sources in jeopardy. The court should therefore infer that the application is brought for an impermissible purpose and that the court therefore has no jurisdiction.

25.  The defence of the US Defendants' in the Florida proceedings relies on the following grounds –

i)  no personal jurisdiction;
ii)  publication is protected by fair report privilege;

© 2020 Thomson Reuters.

*Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)*

    iii)  publication is protected by neutral report privilege;

    iv)  publication is protected by the First and Fourteenth Amendments to the US Constitution (Free Speech Defence);

    v)  the Plaintiffs are public figures and cannot meet their burden to prove actual malice by clear and convincing evidence;

    vi)  [the remaining defences relate to damages]. **[2/11/193-194]** .

26.  There is no basis for Mr Steele being able to give evidence as to the US Defendants' state of mind or to any of the other defences.

27.  Further, although the US Plaintiffs have now made concessions and will agree to a more limited form of order, and have agreed to give various assurances, the description of the topics for examination as redrafted are so far different from the topics requested to be ordered for examination by the US Court that this court has no jurisdiction to make an order amended in that form unless an amended Letter of Request is sought.

*Breach of Article 6 Rights*

28.  It is submitted that the result of the November 2017 order is to violate Mr Steele's fair trial rights in the QB proceedings under Article 6 of the European Convention on Human Rights , as set out in the Human Rights Act 1998 . It is accepted that it is a matter of fact and degree whether matters of procedure can affect Article 6 rights. However, it is submitted that on the basis of the principles outlined in the case of *Dombo Beheer B.V. -v- The Netherlands (1994) 18 EHRR 213* , that the November 2017 order has the effect of violating Mr Steele's right to a fair trial because it results in an inequality of arms. Under the CPR both parties exchange their witness statements at the same time, after disclosure and inspection of documents, so that neither party can tailor their evidence in the light of having seen the other party's evidence first. If the order remains as drafted the US Plaintiffs will have the advantage in the QB proceedings of hearing Mr Steele being examined, cross-examined and re-examined on issues that arise in the QB proceedings.

29.  Further, if the court rules in favour of the Claimants in the QB proceedings, awarding them damages for the publication of the words complained of in the December Memorandum, Mr Steele and Orbis are very likely to issue proceedings for a contribution against the US Defendants under the Civil Liability (Contribution) Act 1978 . There has been correspondence with the US Defendants about the possibility of pursuing such a claim as an additional claim in the current QB proceedings, although this has not yet happened. The US Defendants are, therefore, aware of the possibility of future litigation between Mr Steele and themselves in respect of the publication of the December Memorandum. Thus, the US Defendants also would have the advantage in such contribution proceedings of having had Mr Steele's evidence on examination, cross-examination and re-examination ahead of such proceedings.

30.  Mr Steele faces losing the "level playing field" protection given by the CPR where the trial is the first opportunity for the opposing party to cross-examine. It is submitted that the US Plaintiffs' reliance on the case of *Secretary of State for Trade and Industry -v- Crane [2001] 1 BCLC 222* is not comparable either on the facts in respect of the ruling. This was not a case under the 1975 Act, but rather whether civil proceedings under s. 6 of the Company Directors Disqualification Act 1986 should be stayed pending the outcome of criminal proceedings against the directors. In that case the right of silence in criminal proceedings was a factor in the determination, whereas there is no parallel right in civil proceedings. In any event, there is no application in the QB proceedings for a stay as there was in that case.

31.  Mr Millar QC for Mr Steele relies on similar cases in related context where judges have emphasised "the desirability of avoiding a dress rehearsal of the cross-examination", where a Court is invited to order the pre-trial examination of a person who may be subsequently cross-examined at a trial in the case. (For example, *In re Castle -v- New Homes Ltd 1979 1 WLR 1075* per Slade J at 10/83, and *In Re: Frank's Ex Parte Gittins 1892 1 QB 646* per Gordon Williams J at 647-648). This reflects the inherent oppressiveness of requiring one party, but not the other, to submit to detailed cross-examination many months before the trial.

32.  It is submitted that the court could not fairly dismiss Mr Steele's legitimate concerns on the basis of unsubstantiated speculation by the US Plaintiffs about the evidence Mr Steele would or would not give at the examination.

**Discretionary Grounds**

33.  If the court considers that it does have jurisdiction to make the order on behalf of Mr Steele it is submitted that the court should refuse to exercise its discretion so to do on the following grounds.

© 2020 Thomson Reuters.

Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)

*Oppression – evidence on issues included in the QB proceedings*

34.  It is submitted that the case pleaded by the US Plaintiffs as Claimants in the QB proceedings puts in issue a wide range of factual matters, which are also likely to be the subject of the examination, cross-examination and re-examination in the US proceedings. For example:

i)  the extent to which the information in the memoranda comprising the dossier as published was based on intelligence, the terms on which any such intelligence was supplied to Mr Steele/Orbis and the steps the US Defendants took to check any such intelligence;

ii)  the history and nature of the relationship between Mr Steele and Orbis, on the one hand, and Fusion, on the other;

iii)  the identity of and motives of Fusion's client, on whose behalf it instructed Orbis to prepare the pre-election memoranda;

iv)  the circumstances in, and the terms on, which Mr Steele and Orbis prepared the pre-election memoranda for Fusion, including the extent of the US Defendant's knowledge of the matters referred to at (iii) above;

v)  the extent to which Mr Steele and Orbis treated the pre-election memoranda and the December memorandum as confidential;

vi)  provision by the Defendants of the pre-election memoranda to the FBI;

vii)  the extent to which, and the purposes for which, Fusion and its client and Mr Steele engaged with the media in relation to the contents of the memoranda;

viii)  the circumstances in which Mr Steele and Orbis prepared the December memorandum;

ix)  the basis and terms on which Mr Steele transmitted a copy of the December memorandum to Fusion/Senator McCain in December 2016;

x)  whether Senator McCain or his representative, David Kramer, was responsible for the dissemination of the December memorandum to the media; and

xi)  the identity of the source of the allegations made against the US Plaintiffs in the December memorandum.

35.  It is submitted that the court's findings in respect of these contested issues will be central to its determination of liability in the QB proceedings. It should be noted that in the Florida proceedings, the publication of exactly the same paragraph in the December memorandum is complained of.

36.  Various authorities have emphasised " *the desirability of avoiding a dress rehearsal of the cross examination* ": see *In re Castle New Homes Ltd* per Slade J. at 1083 and *In re Franks, ex p Gittins* per Vaughan Williams J. at 647-648 (see above Paragraph 31). This reflects the inherent oppressiveness of requiring one party, but not the other, to submit to detailed cross examination many months before the trial of a claim.

*Oppression – the Request constitutes a fishing expedition*

37.  It is submitted that the Request was not subject to any form of judicial scrutiny, it is formulaic in content and says nothing about the legal issues in respect of which it is said the evidence sought is relevant witness evidence. There is no analysis of the topics listed in Schedule A to explain what evidence Mr Steele can give in respect of each topic relevant to the issues in the US proceedings.

38.  In Mr Loble's Second Witness Statement at paragraph 34 it is stated that "the key evidence" sought is:

"the extent to which, if at all, Mr Steele verified the allegations against the Plaintiffs". **[1/10/70]**

Mr Steele's evidence in relation to that issue will not assist the US Plaintiffs as whatever steps were taken will not demonstrate the truth or falsity of the allegations, and will be completely irrelevant to the decision by the US Defendants to publish the dossier.

39.  It is further not explained how the evidence sought which goes beyond that "key evidence" is relevant to the Florida proceedings. The original drafting of Schedule A to the Request makes it clear that what the US Plaintiffs are seeking is an impermissible fishing exercise ranging well beyond what is relevant to the issues in the Florida proceedings. The order

cannot be saved by the recent proposed amendments in draft Amended Schedule A, because the areas of questioning still go too far beyond what is required, and also constitute a wholesale rewriting of the Letter of Request which is not permitted.

40.  It is submitted that the rapid concessions made by the US Plaintiffs in November 2017 tacitly acknowledge that their application far exceeded what is permitted under the 1975 Act, and it is noteworthy that they have made no attempt to justify the breadth of the topics in Schedule A to the November 2017 order.

41.  The US Plaintiffs' representatives have stated that the key factual issues in the Florida proceedings are:

i)  whether the publication of the allegations by the US Defendants was made "negligently, without reasonable care as to their truth or falsity: with knowledge of their falsity; and/or with reckless disregard for the truth or falsity of the allegations";
ii)  whether the allegations made in relation to the Plaintiffs in the December 2016 Memorandum are true.

(Second Witness Statement of Steven Loble, Paragraph 10 **[1/10/61]** .

42.  The matters upon which Mr Steele will be required to testify under the November 2017 order go well beyond those issues. As to (i), Mr Steele will be unable to testify as to the state of mind of the US Defendants, with whom he had no contact about the publication in question. As to (ii), it is clear that the significant majority of the 14 subject matters listed in Schedule A to the November 2017 order have little or no bearing upon the truth or falsity of the allegations about the US Plaintiffs. It is of relevance that Mr Steele has chosen in the QB proceedings not to plead a defence of truth, as this indicates that he cannot advance a case based on admissible evidence as to the conduct of the US Plaintiffs/Claimants, to the effect that the allegations against them in the relevant passage of the December memorandum are true.

43.  Questions 11 to 14 of the original Schedule A seek to question Mr Steele about his provision of the dossier to officials with responsibility for US and UK national security. It is unclear how this will elicit any relevant probative evidence concerning the truth of the allegations about the US Plaintiffs, or the state of mind of the US Defendants. Mr Loble asserts at paragraph 26(iv) (3) of his second witness statement that:

> "The circumstances of the provision of the dossier to various parties identified in topics 6-9 *[of draft amended Schedule A, originally topics 11 to 13 and an additional question not included in the Request]* including whether cautions were given to such parties about the unverified nature of the allegations in the dossier and warnings not to publish the same without independent verification. This evidence will go to the lack of care exhibited by Buzzfeed." **[1/10/66]**

44.  It is submitted that this is a classic example of a speculative fishing expedition as:

i)  There is no pleaded allegation in the Florida proceedings that Mr Steele did not provide any "caution" when transmitting the December memorandum; and
ii)  Whether or not he provided such caution is irrelevant to the truth of the allegations or to the US Defendants' state of mind and conduct in its decision to publish the December memorandum.

45.  Even if the order made is not in contravention of Mr Steele's Article 6 rights it is submitted that it is oppressive because:

i)  For all the reasons above the wide-ranging nature of the topics advanced, most of which have no relevance to what the US Plaintiffs state to be the key issues in the Florida proceedings, indicate that the examination is intended to be a speculative fishing expedition designed to discredit Mr Steele; and
ii)  It gives the Claimants a "dry run" at cross-examination of Mr Steele prior to exchanging the parties' witness statements in the QB proceedings. Although, the Plaintiffs say that they could elicit the same information by serving a Request for Further Information in the QB proceedings, the Plaintiffs have already served a Request and this has been answered. It is not necessarily the case that the court would order Mr Steele to provide further information in response to a further Request under Part 18 . In any event, information elicited by a Request for Further Information is not comparable to a three-hour examination, a three- hour cross-examination and a one-hour re-examination (which is now sought).
iii)  There is a risk to the confidentiality of Mr Steele/Orbis' sources for the intelligence in the dossier.

© 2020 Thomson Reuters.

iv)  Contractual confidentiality and national security reasons.

*Oppression - Risk to Sources*

46.  Ms Cain at Paragraphs 40-44 of her Statement **[1/3/16]** gives evidence that the reports prepared by Mr Steele which comprise the dossier were not intended for public consumption and they were written accordingly. It is critical to Orbis and its directors that there is no possibility whatsoever of anyone ever identifying its sources. The dossier was sent to Fusion by encrypted email under obligations of confidentiality. The distribution to Senator McCain was sent by the same method but by Fusion and via Mr Kramer. It is therefore imperative that the court does not sanction any course of action which would further increase the already significant risks of harm that the individuals face by virtue of unauthorised publication of the dossier by the US Defendants.

47.  Mr Millar QC relies on the witness statement of Mr Lucas, a leading expert on the Russian Federation, and the interplay between security intelligence, corruption and abuse of power. At paragraph 26 of that statement he states that he:

> "…is in no doubt that the Russian authorities wish to establish the sources of the Orbis dossier
> through the defamation litigation, arising out the publication of the dossier by Buzzfeed" **[1/3A/20F]**
> .

48.  At Paragraph 27 Mr Lucas states his view that the sources of information contained in the dossier would face a grave risk of sanctions "from long jail sentences in harsh conditions, to beatings and murder" **[1/3A/20F]** . He substantiates this by reference to a number of specific examples of the harsh and violent treatment meted out to those who have been perceived to have colluded with Russia's enemies (paragraphs 10-24 **[1/3A/20C -20F]** ).

49.  Although the US Plaintiffs and the US Defendants have now confirmed in open court that they are not seeking to identify Mr Steele's sources of information it is submitted that this is a bad point because:

i)  The inclusion of paragraph 7 (Mr Steele's sources of information) in Schedule A to the November 2017 order reflects a clear wish on the part of the US Plaintiffs to identify Mr Steele's sources, notwithstanding the obvious risks to them. The belated offer to remove paragraph 7 does not change this obvious fact. It is also telling that the proposed revised draft of Schedule A does not contain any provision that prohibits questions from being asked which are likely or indeed intended to result in the identification of confidential sources.

ii)  The continued existence of the desire to identify Mr Steele's confidential sources is explicitly reflected in the Claimants' Reply in the QB proceedings which states that:

> "…..it may be necessary for the Defendants *[sic Claimants]* to make an application for disclosure
> of the identity of any source of the Allegations made against the Claimants in the December
> memorandum" (Reply Paragraph 39 **[2/11/162]** ).

iii)  Even if paragraph 7 is removed from Schedule A, it is self evident that Mr Steele's answers to questions concerning the remaining subject matters covered by Schedule A, for example, his "preparation of the dossier", his "solicitation of information for the dossier", and his "work to verify allegations of the dossier", might reveal identification of sources even if the answers do not involve him in naming any individuals. Evidence about these issues is likely to provide information that would increase the already significant risk of identification of the sources. In the context of protection of journalistic sources, and interference with Article 10 rights, the threshold considered by the ECHR recognises the risks of "jigsaw identification" as a result of compelled answers/disclosure. The court should ask whether the information sought is capable of identifying sources in the same way as a direct question would be: *Sanoma -v- Netherlands [2011] EMLR 4* at [65] and [72].

© 2020 Thomson Reuters.

50.  The High Court has previously held that questioning that seeks disclosure of the identities of confidential sources in an examination under section 2 of the 1975 Act would be:

> "disproportionate and unfair … bearing in mind the very real risks that could arise for the sources themselves and … the impact that such enforced disclosure might have on the Respondents' business and business reputations" ( *Rio Tinto Plc -v- Vale SA [2015] EWHC 1865 (QB)* per Andrews J at [47]).

51.  This is consistent with the court's positive obligations under Articles 2 and 3 of the ECHR to protect the lives and bodily integrity of individuals who are known to be at risk of serious harm at the hands of third parties, and its positive obligations under Article 8 of the ECHR to ensure respect for private and family life. It is submitted that the risk to Mr Steele's confidential sources can only be eliminated by setting aside the order.

*Oppression - Confidentiality and National Security*

52.  In addition to the factors above there is a significant chance that Mr Steele's examination could trespass into sensitive areas of national security and/or require Mr Steele to provide information which he is not at liberty to divulge without the explicit consent of the FCO. In this regard, the GLD has indicated that it will consider seeking a certificate under Section 3(3) of the 1975 Act. It is notable that the US Plaintiffs in the Florida proceedings have not expressly disavowed any interest in inquiring into any disclosure to a competent official or body for the legitimate purpose of national security: see Paragraph 21(a) of the Defence **[2/11/130]** and Paragraph 19.1 of the Reply in the QB Proceedings **[2/11/154]** .

**Mr Steele's Alternative Application to Vary the Order**

53.  In the alternative it is submitted that if the court does not set aside the order it must be varied to ensure that:-

i)  The scope of the examination is limited to:

a)  the steps that Mr Steele took to verify the allegations about the US Plaintiffs contained in the words complained or pleaded in the US Complaints; and
b)  Buzzfeed's acquisition of the December memorandum;

ii)  Mr Steele will not be compelled to disclose any confidential information; and
iii)  Mr Steele's right to a fair trial in the QB proceedings is properly respected.

54.  If the scope of the examination is limited as in (i) (a) above this would limit the scope of irrelevant questioning and would reflect the US Plaintiffs' position that:

> "The thrust of the [intended] questioning is whether or not the contents of the relevant paragraph of the dossier, which is attached to the Schedule, were verified or not." **[2/11/221]** .

55.  The order, if not set aside, must as an absolute minimum be varied so that the terms of Schedule A to the November 2017 order are modified so as include the new provisions identified in the draft order to Mr Steele's application namely:

i)  The duration of the examination permitted is substantially reduced to a total of no more than 3 hours, so as to reduce the scope for a roving inquisition;

ii) There is an express provision that prevents any questions from being asked which would require the disclosure of any confidential information including (but not limited to) information that would in the ordinary course:-

a) require the consent of Mr Steele's former Crown employer before disclosure;
b) increase the existing risk of confidential intelligence sources being identified; or
c) risk disclosure of information concerning processes of intelligence gathering known to Crown servants.

iii) There is an express provision that prevents any question from being asked that would require the disclosure of any legally privileged information; and
iv) Mr Steele's legal representatives be permitted to attend the examination in order to advise Mr Steele and object to the asking of any questions that are not permitted by the order.

**In relation to the application of the US Defendants**

56. It is submitted that with regard to the US Defendants' application, the Court has no duty to assist the US parties, and its only duty is to the Florida Court in its response to the Request issued at the request of the US Plaintiffs. If the US Defendants want to achieve a different form of order they would need to apply to apply for their own Letter of Request. Their intervention is an opportunistic attempt at fishing and the Court has no jurisdiction to make the order that they seek.

**Summary of the US Plaintiffs' Submissions**

57. The key factual issues in the US proceedings are:

i) whether the publication of the defamatory allegations by the US Defendants was made "negligently without reasonable care as to their truth or falsity; without knowledge of their falsity; and/or with reckless disregard for the truth or falsity of the allegations";
ii) whether the allegations made in relation to the US Plaintiffs are true (US complaint **[2/11/170-174]** ).

58. In the QB proceedings the key issue is whether Mr Steele/Orbis were responsible for the publication of the defamatory statement. Thus, the factual enquiry in the English proceedings will not focus on the truth or falsity of the defamatory allegation which is presumed to be false, and the QB Defendants have not contended otherwise. (This is contrary to the position in the Florida proceedings where the US Plaintiffs have the burden of proving that the allegations are false).

59. Following the service of the order there was correspondence between the US Plaintiffs' solicitors and Mr Steele's solicitors as a result of which the US Plaintiffs agreed to the following: -

i) they would not seek to identify Mr Steele's sources;
ii) to restrict the subject matter of the examination, excluding from the list of topics at Schedule A the identity of Mr Steele's sources, and to limit the questions relating to all topics except the first (Mr Steele's background) to the specific paragraph in the December Memorandum which contains the defamatory statement;
iii) to amend the order to reflect the above agreement.

Despite Mr Steele not agreeing to the amended order the US Plaintiffs remain content that the court should amend the November 2017 order to reflect that proposal.

*Relevance*

60. The court had jurisdiction to make the order under the 1975 Act.

Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)

61.  The court's starting point should be that it will ordinarily give effect to a request for assistance from a foreign court in obtaining evidence so far as it is proper and practicable and to the extent permissible under English law, to reflect judicial and international comity: CPR 34.21.2 ; *Rio Tinto Zinc v Westinghouse* per Lord Denning at 560H.

62.  The Request confirms that:

> "the Court considers that the evidence sought is directly relevant to the issues in dispute, and it is not discovery within the meaning of Article 23 of the Hague Evidence Convention, that is, discovery intending to lead to relevant evidence for trial." **[2/12/230]**

and

> "For the reasons set forth above, the United States District Court … believes that the witnesses … will be able to provide evidence directly relevant to the main issues between the parties, and without which the ends of justice could not properly be met. The United States District Court … believes that this information is not available from any other source". **[2/12/238]**

63.  The trial in the Florida proceedings is now likely to start in August 2018.

64.  In the ordinary way and in the absence of evidence to the contrary the court should be prepared to accept the statement of the Florida court in the Request that the evidence is required for the purposes of the Florida proceedings and that the evidence is directly relevant to the issues at trial: CPR 34.21.2 ; *Rio Tinto Zinc v Westinghouse* per Lord Diplock at 634A and following and Lord Keith at 654G; *First American* per Sir Richard Scott at 1165B - C, 1166F.

65.  It is clear that Mr Steele has knowledge of the matters in issue at the trial and he does not suggest otherwise, and indeed is the person who has most knowledge of the majority of relevant matters.

66.  The evidence that Mr Steele is being asked to give is directly relevant to the issues in dispute in the Florida proceedings and the list of topics in the US Plaintiffs' draft amended Schedule A. The Florida court has confirmed in the Request that without Mr Steele's evidence the ends of justice cannot properly be met.

67.  Mr Steele's defence in the QB proceedings does not address the key issues in the Florida proceedings, namely the lack of verification of the information contained in the dossier, and in any event would be likely to be inadmissible as hearsay (Loble 2 paragraph 26(ii)) **[1/10/66]** .

68.  It is submitted that the court should not go behind the statement of the Florida court with regard to the relevance of the evidence sought, and that the criticisms of the Florida court made on behalf of Mr Steele are wrong because the truth of the defamation statements in the US proceedings are in issue, and the US Plaintiffs have the burden of proving the falsity of those statements. The Florida court was persuaded that Mr Steele has relevant evidence to the issues in the case. The US Defendants did not contest the US Plaintiffs' application for the Request **[1/5/23, Paragraph 8]** which is unsurprising because they also consider Mr Steele's evidence to be relevant.

69.  The reasons why the US Plaintiffs were prepared to compromise and vary the topics for examination in Schedule A was not because they did not consider they were relevant, but for reasons of pragmatism. It should be noted that the Florida court had already determined the issue of relevance and so dismissed Mr Steele's motion to dismiss the Letter of Request. In addition, on Mr Steele's behalf it was said that the examination would be prohibited by English law which is untrue. The Florida court simply held that the English court would protect Mr Steele against any questioning which is contrary to the law in the United Kingdom. There is no evidence to suggest that the Florida court is wrong.

© 2020 Thomson Reuters.

70. It is submitted that the submissions on behalf of Mr Steele ignore the fact that in the Florida proceedings the truth of the publication is in issue, so it is necessary to understand the circumstances in which the allegations came to be made. It is clear from the US Plaintiffs' complaint in the Florida proceedings that they consider the information included in the dossier was "unverified" and as the US Plaintiffs are seeking to prove a negative i.e., that the allegations and the publication are untrue, it is important to have evidence from the person who wrote the dossier. The US Plaintiffs will have to seek to undermine the creditability of the allegations in that part of the dossier. The dissemination of the dossier, and when Mr Steele first published the December Memorandum to third parties, are also matters relevant to the issue of culpability of the US Defendants and their state of mind when they published.

71. The US Plaintiffs submit that the topics for examination as in the proposed redrafted order and draft amended Schedule A are not unfair to Mr Steele. In paragraph 1 of Schedule A Mr Steele's background is relevant to the likelihood of his evidence being true or false. Paragraphs 2-5 are applicable to a limited period of time between about October and December 2016, and are limited to paragraph 3 of the December Memorandum. They are not topics that are vague or uncertain and do not suggest a roving enquiry. On the contrary they are clear and discrete topics. With regards to paragraphs 6 to 9, these all relate to the provision of documents to third parties, relevant to the issues of publication by the US Defendants. In summary, the Plaintiffs have acted reasonably in response to requests by Mr Steele as to his concerns about protecting his sources and national security issues.

*Protection of Sources*

72. The US Plaintiffs have already and prior to the issue of Mr Steele's application confirmed that the examination will not seek to identify Mr Steele's sources of information and have removed this paragraph from the topics in the draft Amended Schedule A. The US Plaintiffs are content that this express confirmation be recorded in the court's order on Mr Steele's application.

73. In any event, it in fact appears to be the case of much of the damage (in terms of risk to sources) has already been done by reason of the preparation of the dossier and its publication.

*National Security*

74. Neither Mr Steele nor the FCO have provided any information as to what issues of national security would be engaged by the proposed questioning, and the FCO have not yet sought a section 3(3) Certificate under the 1975 Act. The US Plaintiffs' representatives have asked the FCO to identify which of the topics were of concern to the FCO in the hope of finding accommodation for those concerns, but no substantive response was received, save for confirmation that the FCO intends to consider whether to issue a section 3(3) Certificate "in the event that it becomes necessary to do so following the determination of Mr Steele's application". [2/14/323]. Thus the US Plaintiffs have had no assistance on this point.

75. In any event, the topics which are listed in the draft Amended Schedule A have already been the subject of extensive publicity in the context of the entire dossier, both from information ultimately coming from Mr Steele and more recently in the publication of Mr Simpson's evidence to Congress.

76. Mr Steele has been content to talk to journalists about the dossier; by way of example:-

i) articles in Mother Jones dated 31st October 2016 **[2/14/313]** , and 13th January 2017 **[2/14/315, 316, 317]** ; from those articles it is apparent that pre-election memos have been provided to a journalist at Mother Jones, David Corn **[2/14/312-314** and **315-317]** ;
ii) article in the Guardian dated 12th May 2017 **[2/14/268-271]** ;
iii) extract from "Collusion – Secret Meetings, Dirty Money and how Russia helped Donald Trump win" by Luke Harding **[2/14/309-311]** . Information was given by Mr Steele to Mr Luke Harding, a Guardian journalist, for this book. The book traces Mr Steele's career as an 'MI6 Officer' and records the off the record meetings which Mr Steele had with a number of American journalists from the New York Times, The Washington Post, Yahoo! News, the New Yorker and CNN.
iv) extracts from evidence provided by Mr Glenn Simpson to the Senate Judiciary Committee of the US Senate, Washington DC on 22nd August 2017. **[2/15/415, 418, 476, 533, 539, 559 and 601]** .

Thus, a substantial amount of information was given by Mr Steele to journalists to create interest so that the press would put pressure on the FBI to investigate, so a considerable amount of the material has been put into the public domain.

*Abuse of Process*

© 2020 Thomson Reuters.

77. The allegation in Ms Cain's witness statement at paragraph 52(a) **[1/3/18]** that the US Plaintiffs' motive is to pressurise Mr Steele/Orbis and their sources by gaining access to highly confidential information, leaving those involved in putting the dossier together exposed to attack outside the courtroom, is without foundation and should be withdrawn. The Florida court has confirmed, and it is obvious the evidence sought is directly relevant to the issues in the Florida proceedings and that is the motive for the US Plaintiffs wishing to examine Mr Steele.

78. In any event, the purpose of the instruction of Fusion, which hired Orbis, was to obtain information to undermine the Trump Presidential campaign (see Washington Post Article **[2/14/1259]** ) so the specific purpose for which Orbis/Mr Steele was hired was to collect information to be used publicly: see Loble 2 Paragraph 27(ii), (i), (3) and (4) **[1/10/67-68]** and extracts from Mr Simpson's evidence at **[2/15/533, 539, 599]** .

*Article 6 ECHR*

79. It is submitted that an assertion that the order amounts to a breach of Mr Steele's ECHR Article 6 rights, because he may be examined prior to disclosure, exchange of witness statements and cross-examination in the QB proceedings is misconceived because: -

i) the order has been obtained because Mr Steele's evidence is directly relevant in the Florida proceedings and cannot be obtained in any other way;
ii) the key evidence (as to whether the allegations were verified) is of no or marginal relevance to the English proceedings;
iii) the remainder of the topics relate to the provision of the dossier to third parties which will be potentially relevant in the QB proceedings, but there is no breach of Mr Steele's Article 6 rights in being required to be examined on the same topics pursuant to the order. Mr Steele has no right to silence in the English proceedings. On the contrary, he will be required to state the evidence he wishes to give ahead of trial in a witness statement. Moreover, he could be required to provide further information on the relevant issues prior to the date for exchange of witness statements should an application for further information be made, particularly as the issues are peculiarly within his or Orbis' knowledge and not that of the Claimants in the QB proceedings. The suggestion that to require Mr Steele to answer questions on the topics in the draft Amended Schedule A will give the Claimants in the QB proceedings "an unwarranted advantage" and create an "inequality of arms" in the English proceedings is misconceived. See *Secretary of State v Crane* and *Rio Tinto Zinc v Westinghouse* , Lord Wilberforce at 611G-H.

80. No further variation to the order is therefore necessary or appropriate. The Examiner will ensure that the examination is conducted fairly and in accordance with the order and the CPR . In the event that Mr Steele objects to answering any questions the provisions of paragraph 4.5 of CPR 34 APD.4.5 will apply or CPR 34.20 if an objection is based on privilege.

81. With regard to Mr Steele's alternative argument that the time limit for the examination should be three hours, Mr Loble's evidence is that the attorneys for the US Plaintiffs do not expect the examination to take the six hours allowed for, but given the costs associated with obtaining the order and attending the examination it would be unwise to impose an artificially limited time in which to conduct the examination. The revised timetable has been agreed between the US Plaintiffs and the US Defendants, so that they have equal time between them for questions. Finally, the US Plaintiffs are content for the order to recite that Mr Steele should be permitted to have legal representation at the examination for the purpose solely of taking any proper objection that might be taken to questions put to him in the course of examination should he wish to do.

*Oppression*

82. The fact that Mr Steele will be giving evidence at an earlier time in relation to matters which will be canvassed in the QB proceedings does not matter if it is relevant to the US proceedings. This much is clear from the authorities, see *Rio Tinto Zinc v Westinghouse* in the judgment of Wilberforce LJ at page 611G and *Micro Technologies* at Paragraphs 52, 54. The clear area of distinction is where fraud is alleged, and this not a fraud case.

83. Mr Steele's evidence is likely to be exculpatory of him and it is likely to reflect that which he has already said in his Statements of Case in the QB proceedings. In any event, the English approach to litigation is "cards on the table", and the information will be in his witness statement in the QB proceedings in due course in any event.

*Generally*

84.  As the US trial is now in August 2018 and in the QB proceedings a CMC has not yet been held, the US proceedings will proceed more quickly and Mr Steele may be assisted by hearing Mr Gubarev's evidence in the Florida proceedings. Again, if there are to be contribution proceedings against the US Defendants Mr Steele may be helped by the evidence in the US trial, and in any event, such proceedings would not be dealt with until after the QB proceedings have been determined.

*In relation to the US Defendants' application*

85.  It is submitted that the US Defendants' application demonstrates internal inconsistency because on the one hand: -

i)  it is neutral on Mr Steele's application to set aside the order;
ii)  it seeks an order that the US Defendants' English counsel and solicitors be permitted to attend the examination to advise the US Defendants and object to the asking of any questions not permitted by the order.

86.  On the other hand, the US Defendants seeks to vary the Amended Schedule A as proposed by the US Plaintiffs but to re-expand the ambit of topics 5-9 to relate to the entire dossier, not just the relevant paragraph within the December Memorandum.

87.  Otherwise the US Plaintiffs are neutral on the US Defendants' application.

**Summary of the US Defendants' submissions on Mr Steele's application and their own application**

88.  The US Defendants are neutral in respect of Mr Steele's application to set aside the November 2017 order.

89.  If that order is not set aside the US Defendants seek to vary the order as follows:

i) to permit them to ask questions relating to the dossier as a whole, (as is sought in the Request) and not merely paragraph 3 of the December Memorandum;
ii) to clarify that the US Defendants will not ask questions which would require the disclosure of any confidential source or method of information gathering by Mr Steele;
iii) to ensure that the questioning time of Mr Steele is equally divided between US Plaintiffs and the US Defendants and not unduly time restricted overall; and to permit the Defendants' English legal team to attend the examination of Mr Steele.

90.  The US Defendants submit that although both the US Plaintiffs and Mr Steele have raised issues in correspondence as to the US Defendants' entitlement to be heard in relation to the order of November 2017, no formal objection has been raised to the US Defendants' participation since their application has been issued. In any event, such an objection would be untenable because:

i)  the right of a party to the foreign proceedings to challenge an order made under the 1975 Act is established: see White Book paragraph 34.21.18; *Land Rover North America Inc -v- Windh [2005] EWHC 432 (QB)* ;
ii)  further the November 2017 order expressly provides that: "the parties and the witness are at liberty to apply to the Senior Master or in her absence another Master" **[1/9/56]** .
iii)  the order confers on the US Defendants a right to question Mr Steele in accordance with the right to cross-examine provided for in the Request to which the November 2017 order gives the effect. The US Defendants are entitled are to be heard before any order is made by which those rights are modified or curtailed. In circumstances where the examination procedure is intended to replicate the giving of evidence at the trial in the Florida proceedings, any suggestion that the US Defendants can have no say in the conduct of the examination would be misguided.

91.  The proposed amendments to the November 2017 order and Schedule A as submitted by the US Plaintiffs are more extensive than the US Defendants accept is appropriate. Their primary submission in relation to both the proposed variations to the order by the US Plaintiffs and by Mr Steele is that neither accords with the principle that, in exercising its powers under the 1975 Act, the English court should give effect to the request of the foreign court so far as possible and proper. See *Rio Tinto Zinc Corporation -v- Westinghouse Electric* at pages 611H-612A, 618D-E, 634A-C and 654C. Both sets of proposals

© 2020 Thomson Reuters.

*Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)*

represent an unjustified departure from the terms of the Request. The US Defendants' application is brought with the aim of ensuring that proper effect is given to the Request and that modifications are made only in so far as is necessary.

92.   The English court should be extremely slow to depart from the views of the US Court as to the relevant issues and appropriate topics for questioning. There must be a proper evidential basis before the English court can begin to consider going behind the finding of the requesting court as to the reasons which justify the making of the Request (see *Rio Tinto* at page 634B). The English court ought not to embark on any exercise which restructures or recasts the original Request so that it becomes different in substance from the original Request. (See *White Book Commentary* at 34.2.1.2 - General Principles for complying with foreign request for evidence).

93.   In any event, it is plain that the issues in the Florida proceedings justify questioning on a broader scope of subjects than that proposed by Mr Steele, those issues include the following: -

i)   whether the alleged defamatory allegations about the US Plaintiffs contained in the dossier published by the US Defendants are true;
ii)   whether the dossier is a fair and true report of an official proceeding;
iii)   whether the US Defendants acted with malice, irresponsibly or negligently in publishing the dossier;
iv)   whether the publication of the dossier as a whole is protected as neutral reportage.

94.   The conduct of both the US Defendants and Mr Steele in relation to the whole of the dossier is therefore clearly an issue in the Florida proceedings. Subject to issues of source protection and confidentiality, the parties are entitled to question Mr Steele on his employment background at least in general terms, and on his verification of allegations in the dossier and on the steps he took in providing it to others.

95.   The revised Schedule A proposed by Mr Steele would mean that the relevant issues concerning the US Defendants' and Mr Steele's conduct *vis a vis* the dossier would not be fairly explored. It would be unduly restrictive to permit questioning of Mr Steele solely about his verification and distribution of paragraph 3 of the December Memorandum in circumstances where the US court would be required to assess the propriety of the US Defendants' decision to publish the dossier as a whole, in the light of the public interest reasons which favoured the publication of the dossier and the steps taken by Mr Steele to verify its contents and disseminate it to other third parties. To allow questioning on a single paragraph of the dossier notwithstanding that the steps taken by the US Defendants were informed by the contents of the dossier as whole, would be artificial and insufficient.

96.   However, the US Defendants are content to agree to variations to the November 2017 order that seek to clarify that Mr Steele will not be asked about his confidential sources or information, and/or to avoid duplication in the list of subjects. The US Defendants do take issue with the proposed narrowing of paragraphs 5-9 of Schedule A so that they only refer to Paragraph 3 of the December Memorandum of the dossier. It is submitted that questions relating to the verification of the dossier as a whole and the steps taken by Mr Steele to disseminate it are relevant to the Florida proceedings, and the parties should be permitted to pose such questions to Mr Steele. The US Plaintiffs seems to have accepted this position in part: see Loble 2 Paragraphs 26(3) [1/10/66] and Paragraph 34(iii), (v) **[1/10/71]** .

97.   The US Defendants' proposed variations to the draft order seek to balance Mr Steele's concerns to protect confidential sources and methods of information gathering with the need to give effect to the Request and ensure that the relevant issues are addressed in the examination. The US Defendants suggest a general restriction of any questions which would require the disclosure of confidential information, and a focusing of the subject in Schedule A. Paragraphs 5-9 of the Schedule A in the

US Defendants' draft order preserves the right of the parties to question Mr Steele on certain matters relating to the dossier as a whole, not simply on the single paragraph which refers to the US Plaintiffs.

98.   The following variations are agreed by the US Plaintiffs in relation to the conduct of the examination but not by Mr Steele. The duration of the examination is intended as far as possible to replicate the procedure of giving of evidence in the US proceedings. The US Defendants propose that the US Plaintiffs should be entitled to examine in chief and the US Defendants permitted to cross-examine Mr Steele for up to three hours each, and the US Plaintiffs should be permitted to re-examine Mr Steele for up to one hour. Adequate time will need to be set aside to ensure that Mr Steele's evidence is properly explored. There should also be parity between the US Plaintiffs and the US Defendants as to the duration of their questioning, and it is submitted that Mr Steele's proposal of just 30 minutes for cross-examination is inadequate. The US Defendants also seek permission for their English counsel and solicitors to attend the examination as the procedure is required to be conducted in accordance with English law and practice.

**Discussion**

*Jurisdiction*

99.   The starting point is the well known quotation by Lord Denning in *Westinghouse* at 560H:

> "It is our duty and our pleasure to do all we can to assist that Court, just as we would expect the United States to help us in like circumstances. "Do unto others as you would be done by".

100.   See also Simon J (as he then was) in *Credit Suisse* at §14, where he quoted Kerr LJ's judgment in *State of Norway* at page 470B:

> "The Court should strive to give effect to the request of the Foreign Court unless it is driven to the clear conclusion that it cannot properly do so".

101.   The authorities make it clear that the English court should try to give effect to a letter of request from a foreign court, for reasons of judicial and international comity ( *Rio Tinto v Westinghouse* at 560H; *Genira Trade v Refco* at §28).

102.   The court's jurisdiction to make an order pursuant to a letter of request from a country or territory outside the United Kingdom is granted by the 1975 Act. With regard to a request for oral evidence by way of examination the only restrictions imposed on the court's jurisdiction are under:

i)   Section 2(3) - no requirement for any particular steps to be taken unless they are steps that can be required to be taken by way of obtaining evidence for the purposes of civil proceedings inn this court;
ii)   Sections 3 (1) and (2) in respect of privileged evidence; and
iii)   where a certificate is issued under section 3(3) .

103.   Thus, under section 2(3) a witness cannot be compelled to give evidence if the court is satisfied that the evidence sought is not primarily for the purposes of trial (see *Credit Suisse* , Simon J. §14 and the authorities referred to). Mr Steele relies on this section of the 1975 Act, contending that the court has no jurisdiction to make the order because it can infer an impermissible purpose from the width of the topics upon which the US Plaintiffs have sought to examine Mr Steele, namely

© 2020 Thomson Reuters.

Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)

that the US Plaintiffs want to conduct a wide ranging investigation to attack the creditability of Mr Steele and his sources and to discredit the dossier as a whole.

**Relevant Evidence**

104.  I must first consider whether the intended witness can reasonably be expected to have relevant evidence to give on the topics mentioned in the Schedule, described in *First American* , at 1165D, by the Vice-Chancellor as the first question for consideration. I note also that Simon J. in *Credit Suisse* at §14, in what he described as the fourth guiding proposition to be gleaned from the authorities, stated:

> "If the letter of request states that a particular person is a necessary witness then the English court should not itself embark upon an investigation as to whether the requesting court is correct for the purpose of determining in advance whether the evidence is relevant and admissible."

105.  In my judgment it is obvious that the author of the paragraph complained of in the Florida proceedings would be a relevant witness in defamation proceedings which are entirely based on the allegations in that paragraph, in a jurisdiction where the Plaintiffs have to prove that the allegations are false. I accept Mr Millar's submissions that the evidence as to what, if any, verification was carried out in respect of the information contained in that paragraph, will not necessarily answer the question of whether that information is true or false, but it may very well inform and assist the Florida court, and the parties, in relation to that issue. It is evidence relevant to that issue. It is invidious for this court to attempt to assess the relevance of Mr Steele's evidence in respect of defences relied upon by the US Defendants which are not available in English law defamation proceedings, and as I have concluded that Mr Steele is a relevant witness on the issues that the US Plaintiffs seek to prove to the Florida Court, I do not have to do so, save that if I decide that the order should not be set aside but varied, which I deal with later in this judgment.

106.  I further conclude that the evidence is required for trial, and not for 'oral discovery' (as described in Simon J.'s 'fifth proposition' in *Credit Suisse* at §14). See *Gredd v Busson* at §27(4):

> "Particularly pertinent will be the stage at which the order is sought and the extent to which the party seeking the order is able to demonstrate that the information sought is relevant to the issues in the foreign proceedings in the sense of being capable of being adduced at trial in support of those issues."

And at §27(9):

> "The fact that the evidence sought is described in wide or general terms is not inconsistent with its being sought for the trial."

The evidence shows that the trial was originally fixed for 19 March 2018 but I am informed that it is now listed for August 2018. See by analogy *Land Rover v Windh* at §23(ii).

107.  It is clear from the authorities that it is impermissible to use the Act "for the purpose of wide-ranging and unfocused enquiries in the hope that something will turn up": *Credit Suisse* Simon J. at §14, or the "roving inquiry" described by Lord Justice Kerr in *State of Norway* at 482F. See also Sir Richard Scott's comments in *First American* at 1165D and 1166D.

© 2020 Thomson Reuters.

Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)

108.  It is indeed unfortunate that such a wide-ranging Request was sought, combined with the fact that in none of the documents in the Florida proceedings is there any analysis of how each topic for examination relates to and is relevant to the issues in the trial. That causes a particular problem for this court, given the clear guidance in the authorities that relevance is primarily within the remit of the foreign court, for obvious reasons. (See *Westinghouse* , Lord Keith page 654F-G; *Asbestos Insurance Coverage Cases [1985] 1WLR 331* Lord Fraser page 339; and *Credit Suisse* , Simon J. §14).

109.  This problem was addressed by Simon J. in *Credit Suisse* at §14, when he quoted Sir Richard Scott's observations in *First American* at 1165D-E:

> "In summary, in considering the letters of request in this case the court should, in my opinion, ask first whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics mentioned in the amended schedule of requested testimony, and second whether the intention underlying the formulation of those topics is an intention to obtain evidence for use at the trial or is some other investigatory, and therefore, impermissible intention".

And went on to say at §15:

> "It seems to me, however, that Mr Howard QC, Counsel for the Claimant, is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance. If it has, then it is hardly in the interests of comity that the court to whom the request is made should embark on a close consideration of questions of relevance on what is likely to be more limited material and a less clear understanding of the issues than the requesting court. If, on the other hand, the requesting court has plainly not considered the question of relevance or it is clear, even on a broad examination, that the evidence is not relevant then the Vice-Chancellor's first question must be addressed."

110.  I note also the comments of Stanley Burnton J. (as he then was) in *Gredd v Busson* at §27(7) and (8):

> "(7)  This court will take into account anything in the evidence before it that indicates that the party that obtained the order for the letter of request appreciated and took into account the differences between United States and English procedural rules.
>
> (8)  Similarly, the court will take into account evidence that the US judge appreciated and took into account those differences. In this connection, this court appreciates that orders for letters of request are normally made by the US judge without any real scrutiny. The order is normally made in the terms sought by the applicant without any (or any significant) amendment and without the judge being informed of the significant differences between US federal procedure and of these courts."

111.  I have been taken in some detail to the statements of case in the Florida proceedings and in my judgment it is apparent, despite the assertion in the Request that the Florida court considers the evidence of Mr Steele as sought to be relevant to the issues in the case, that the requesting court has not in fact considered the question of the relevance of the individual topics for examination to the issues between the parties independently, but has accepted the list of topics requested by the US Plaintiffs without question. I reach this conclusion because there is no evidence in those court documents that it has done so, and neither

© 2020 Thomson Reuters.

Gubarev V Buzzfeed Inc, 2018 WL 01411208 (2018)

of the parties to the Florida proceedings sought to suggest otherwise. Further, it appears that much of the evidence sought in the topics for examination is not in fact relevant to the issues in the US proceedings. That much is clear from the US Plaintiffs' ready concession to delete many of the topics for examination in Schedule A to the November 2017 order, and to further limit that order and Schedule A beyond what was requested by the Florida court (although I note that the US Plaintiffs state that this was done by reason of pragmatism, and make no concession that the topics for examination are not all relevant). Save for primarily one issue, (whether certain of the topics should be restricted to paragraph 3 of the December Memorandum or left as stated in the Request, in respect of the entirety of the dossier), the US Defendants also accept such deletions and limitations.

112. Finally, the Florida court itself appears to accept that this court may impose limitations on the ambit of the evidence sought, by the words in the Order of 15 August 2017, dismissing Mr Steele's motion to intervene to oppose the Request:

> "Mr Steele seeks to intervene on the grounds that his deposition is prohibited by British law. This Court presumes, however, that the Senior Master of the Court of Judicature, Queen's Bench Division, will limit the scope of the Request pursuant to British law …… The Court, therefore, denies Mr Steele's request to intervene, trusting that his rights under British law will be protected by the British Court." [2/13/246]

113. As I have concluded that Mr Steele does have relevant evidence to give and that the evidence is sought for use at trial, I do not consider that the width of the examination sought in the Request, reflected in the November 2017 order, necessarily deprives the court of jurisdiction, although this also is a matter for consideration in the exercise of the court's discretion; see the observations of Sir Richard Scott in *First American* at page 1163H - 1164:

> "If oral evidence is being sought for the purpose of use at trial and if there is good reason to believe that the intended witness has knowledge of matters in issue at the trial so as to be likely to be able to give evidence relevant to those issues, I do not understand how an application to have the intended witness orally examined can be described as "fishing". It cannot be necessary that it be known in advance what answers to the questions the witness can give. Nor can it be necessary that the answers will be determinative of one or other of the issues in the action. Section 2(2) of the Act of 1975 bars the court from making an order for oral testimony to be taken pursuant to a letter of request unless the order is of a type that could have been made for the purpose of obtaining oral testimony for domestic litigation. In the case of a witness who there is reason to believe has relevant evidence to give, a subpoena served on the witness in order to obtain his evidence for trial could not be set aside on the ground that it was "fishing". In a comparable case, a court would not be deprived by section 2(2) of power to accede to a letter of request. The question whether, as a matter of discretion, the court would be prepared to make an order pursuant to the letter of request, and if so what order, would be another matter. But there would be no jurisdictional reason why the court should not make the order sought."

*Mr Steele's Rights under Article 6 ECHR*

114. In *Micro Technologies* Morris J. at §120 stated:

> "…the question whether an order for examination would infringe Mr Hussain's rights under Article 6 ECHR is a question of law and not one for the discretion of the Court as to whether to give effect to a letter of request under the 1975 Act."

115. The case of *Dombo Beheer* establishes the general principle that a party's Article 6 rights to a fair trial may be breached if national authorities do not ensure that the requirements of a "fair hearing" are met, and that "the requirement of 'equality of arms' in a sense of a 'fair balance' between the parties" applies both in civil and criminal proceedings. At paragraph 1(b) of the summary it is stated:

> "It implies that each party must be afforded a reasonable opportunity to present his case including his evidence under conditions that do not place him at a substantial disadvantage *vis-à-vis* his opponent."

116. The issue of whether a fair balance is preserved when making an order for examination of a witness who is also a party to English proceedings covering the same issues has been considered in authorities namely: *Westinghouse* in the judgment of Lord Wilberforce at 611G-H:

> "Unless a case of bad faith is made against Westinghouse (which is expressly disclaimed) it is impossible to deny that the letters rogatory were issued for the purposes of obtaining evidence in the Richmond proceedings. The fact, if it be so, that evidence so obtained may be used in other proceedings and indeed may be central in those proceedings is no reason for refusing to allow it to be requested: all evidence, once brought out in court, is in the public domain, and to accept the argument would largely stultify the letters rogatory procedure".

117. In *First American* Sir Richard Scott stated at page 1168F-G:

> "I would not refuse to give effect to these letters of request on the ground that the main purpose underlying them was not to obtain evidence for the existing action but was to obtain evidence for a contemplated action against Price Waterhouse,"

118. I accept the submissions of the US Plaintiffs that it is clear from the authorities that any requirement for Mr Steele to give evidence in foreign proceedings prior to, and on the same issues as he would be giving in the QB proceedings does not, without more, breach his Article 6 rights.

*Discretion*

**Oppression**

119. Although this ground relies partly on the same matters as the jurisdictional arguments, setting aside on this ground is a matter of discretion rather than of jurisdiction.

120. I reach the conclusion that the requirement to give evidence at an earlier stage than in the QB proceedings is not of itself oppressive, absent issues of allegations of fraudulent conduct.

© 2020 Thomson Reuters.

121.  It is clear from the authorities that the mere fact that Mr Steele will be required to give evidence which he might also give in the QB proceedings, and at an earlier stage, does not of itself, unless fraud is alleged, make the request oppressive (see *First American* at 1168F-G and *Micro Technologies* at §154).

122.  In *First American* the issue of oppression was considered and in the headnote at page 1154 it is stated:

> "as a matter of discretion a request for oral testimony should only be acceded to where there was sufficient ground for believing that an intended witness might have relevant evidence to give on topics which were relevant to the issues in the action; that in all but the clearest cases the decision as to whether particular answers, or answers on particular topics, would constitute relevant admissible evidence was primarily a matter for the foreign court and as a general rule English courts should, therefore, accede to letters of request issued by foreign courts if they could properly do so; but that it would not be proper to do so where the burden imposed on the intended witness was oppressive."

123.  Sir Richard Scott at page 1167F-G cited Lord Woolf 's judgment in *State of Minnesota* at §18.

> "because of the need to hold the balance between the requesting court and the witnesses who are to be examined, if the request is given effect, the court will not allow uncertain, vague or other objectionable requests to be implemented. A witness is entitled to know within reasonable limits the matters about which he or she is to be examined".

124.  In *Gredd -v- Busson* Stanley Burnton J. said at §27(9):

> "The fact that the evidence sought is described in wide or general terms is not inconsistent with its being sought for the trial. There will be occasions where the subject matter of the testimony sought is so extensive as to preclude specification. However, where that is the case, the court in the exercise of its discretion may refuse to make an order on the basis that it would be oppressive to the witness to require him to prepare himself to give evidence and to require him to give evidence without sufficient identification of the matters to be addressed. See *State of Minnesota -v- Philip Morris Incorporated & Ors.* , a decision of the Court of Appeal of 30th July 1997."

125.  The topics for questioning are not vague and uncertain but they are, in my judgment, wide and far-ranging far beyond what appears to be required by the limited ambit of the Florida proceedings, for all the reasons advanced on behalf of Mr Steele, and to that extent, in the particular circumstances of this case, (to which I refer in more detail below) I have concluded that, as originally drafted, they are so wide as to constitute a fishing expedition. I reach that conclusion by reference to all the evidence and all the circumstances of this case.

*General Considerations in relation to Oppression*

126.  This is an unusual, and probably unique, case, where the witness is in many respects in the same position as a whistle-blower, because of the actions taken by him after the 2016 Presidential election, in sending the December memorandum to Senator McCain and to a senior government national security official, and in briefing sections of the US media.

© 2020 Thomson Reuters.

*Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)*

127.  I consider that the comments of Mrs Justice Andrews in *Rio Tinto v Vale* at §37 to 38, although made in the different context of the confidentiality of journalists' sources, and the protection of whistle blowers, are apposite in this case:

> "37.  Nevertheless, it seems to me that in this rather different context, the court may take judicial cognizance of the truism that even in a democratic society such as this jurisdiction or the United States, whistle-blowers may be castigated for speaking out and suffer prejudice to themselves or their families, whether or not they act within the four corners of the law and whether or not they are exposing wrongdoing. Human nature is such that those who engage in corruption, particularly if they are in positions of power, do not take kindly to their wrongdoing being exposed. There are many corners of the globe where journalists are targeted and even imprisoned for fair and impartial reporting, or accused of being spies. This jurisdiction expressly recognizes the importance of keeping confidential the identity of journalists' sources (indeed there is legislation to protect them) and I accept Mr George's submissions that there is a degree of public policy overlap between that situation and this, especially in the light of the evidence that some of the sources concerned are sources of information provided to journalists, who may themselves be Associates of Livingstone.

> "38.  There is no reason to suppose that any of the sources in this case have acted unlawfully, but that does not mean that they have nothing to fear if their identities come to light. I am persuaded that much of what is said by Mr Huband and Ms O'Connor rings true, although some of the sources may face more serious risks than others. It is in the public interest that they should not be discouraged from speaking out or from providing intelligence of this nature."

128.  See also comments made in *Sanoma* at §65 and §71, relating to breach of Article 10 in the context of confidentiality of journalists' sources, again by analogy.

129.  As a result of the information provided to the media, Mr Simpson's evidence to Congress and the US Defendants' publication of the dossier, much of the information in the dossier is likely now be in the public domain (not least perhaps by an event that occurred following the hearing, namely the investigation launched by US Justice Department Special Counsel Robert Mueller, involving a number of indictments against Russian businesses and individuals). A search of Mr Steele's name on the internet reveals the extent of media interest in the issues the subject of the dossier, and one can readily understand why a view might be taken that the purpose of the Request might be for a wide ranging inquiry rather than simply for evidence in defamation proceedings relating to one paragraph in one memorandum of the dossier. No explanation has been advanced by the US Plaintiffs as to why they sought the topics for examination to extend so far beyond what would generally be expected for such proceedings, and they have not sought to explain why there was no attempt to demonstrate the relevance of each area of questioning in the Request, and the original formulation of Schedule A, to the issues in the case. The US Defendants, although they did not apply for the Request, and say they are neutral as to whether it be set aside or not, still seek to maintain part of the examination extending to the entirety of the dossier, in circumstances where there is no suggestion that Mr Steele had anything to do with their decision to publish the same.

*Confidentiality and National Security*

130.  Those issues of confidentiality which can be protected can be dealt with by pre- conditions in an amended order, if I conclude that is permissible. I note that the US Plaintiffs have agreed to limit questions in relation to Mr Steele's former employment with the FCO. In so far as national security concerns are in issue, I have no details of these and if, as a result of the order I make on this application the FCO decide that a section 3(3) Certificate should be issued they will no doubt list their application.

*Confidentiality of Sources*

131.  Again, provided the pre-conditions and the deletion of inappropriate questions can be dealt with in the order, this is a concern which can be addressed, and in so far as it is not addressed, a section 3(3) Certificate can be issued.

*Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)*

132.  In the circumstances peculiar to this case, which I am permitted to consider in the exercise of the court's discretion, I do conclude that the November 2017 order is oppressive, and unless I conclude that it can be limited in a way which is permissible by law, so as to render it not oppressive, it will be set aside on such ground. However, if the order is capable of being narrowed appropriately, within the limits of what is permissible, so that its oppressive elements are removed, then the issue of oppression would not constitute a ground for setting aside the November 2017 order. I consider this in Paragraphs 133 onwards below.

## Whether the Order of 17th November 2017 should be varied

*Discussion*

133.  For ease of reference Schedule A to the November 2017 order is included as an Annex to this judgment.

134.  The basis of on which I can consider amending the topics for examination requested by the requesting court are either:-

i)  The amendments are agreed by the parties and the witness, or;
ii)  where the court considers that deletions or restrictions to those topics are appropriate because the topics for examination would otherwise contravene *section 2(3)* of the 1975 Act, namely the burden imposed on the intended witness would be oppressive and/or the Request would constitute impermissible fishing: see *State of Norway* at 484E-F, 491F; *State of Minnesota* at §18; *US v Philip Morris* at §76; *Refco Companies* at §32; *Gredd -v- Busson* at §27(3) and (4) and (10).

135.  I have concluded that the form of the Request <u>in its original format</u> as set out in the order of November 2017:

i)  goes beyond what is required for the US proceedings; and
ii)  in its breadth appears to be a fishing exercise; and
iii)  is oppressive.

136.  The question is whether, notwithstanding such conclusions, this court is able assist the US court by restricting the topics requested for examination, and introducing safeguards for Mr Steele in the order. The authorities are clear that there cannot be a wholesale rewriting of the order to rescue it. See authorities referred to above. I take into account particularly the words in the judgment of Lord Woolf in *State of Minnesota* at §18, also cited in *Refco* LJ Waller's at §32:

> "Because of the general approach, to which I have drawn attention, when the court has to choose between either giving effect to a Letter of Request or refusing to do so, it will take into account any limitations, corrections or conditions which the party seeking the order is willing for the court to take into account. It will, if appropriate, be prepared to give the request an amended effect."

137.  My comments and conclusions on the proposed amendments of Mr Steele and the parties to Schedule A and the order are as follows.

*Schedule A*

138.  Topic 1 Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications):

i)  The US Plaintiffs and the US Defendants propose to add the words "(in general terms)" to emphasise that this is intended only to be an introductory area of questioning to inform the Florida court. Mr Steele seeks to delete from the words "employment history" and "(to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privilege content of such communications)."
ii)  I do not consider that it is appropriate delete the words suggested by Mr Steele, because I cannot conclude that the questions on the proposed deleted matters are for an impermissible purpose or oppressive. The paragraph is intended to be a general introductory paragraph as is normal in witness statements so the court will have the context in which the evidence is given. I note the comments in *First American* at page 1164F:

"In framing questions to ask a witness from whom no proof has been taken, the questioner can be expected to ask a number of preliminary questions in order to feel his way in."

iii)  Any attempts by the parties' legal representatives to question Mr Steele on issues relating to his employment history which would breach the conditions which could be imposed in the order will be protected by intervention by Mr Steele's legal representatives. Although I have no evidence on the matter, I assume that evidence as to any contact Mr Steele has had with the parties, their lawyers, insurers or representatives excluding privilege communications would be limited in time and scope and would not be oppressive or for an impermissible purpose being again general introductory material.
iv)  I propose to introduce conditions which will offer further protection to Mr Steele.
v)  I consider that the words proposed to be inserted by the US Plaintiffs and US Defendants are acceptable, provide further reassurance to Mr Steele, and do not involve redrafting to an impermissible extent.

139.  Topics 2-7

2.  The instructions given to Mr Steele and his company to prepare the dossier and the reasons for the preparation of the dossier.

3.  The payments made to Mr Steele and his company for the dossier.

4.  The steps Mr Steele took to obtain information for the dossier.

5.  Mr Steele's preparation of the dossier.

6.  Mr Steele's solicitation of information for the dossier.

7.  Mr Steele's sources of information for the dossier.

i)  All parties agreed to the deletion of Topics 2, 3 and 7. Mr Steele proposes that all Topics 2-7 are deleted. The US Plaintiffs and the US Defendants wish to retain Topics 4, 5 and 6. The US Plaintiffs agree to limit the examination in those Topics to paragraph 3 of the December Memorandum (described as paragraph 3 of Company Report 2016/166 of the dossier for precision), and the US Defendants do not oppose such restriction.
ii)  I consider that topics 4, 5 and 6 should be deleted. The US Plaintiffs have focused on the issue of Mr Steele's verification of the allegedly defamatory statements in Paragraph 3 of the December Memorandum, which is the subject of Paragraph 8, and the US Defendants on the reasons and justification for publication. There has been no satisfactory explanation as to why these topics are relevant to the issues identified. These areas of questioning for Topics 4, 5 and 6 would, in my judgment, be areas of questioning that would be likely to risk identification of sources through the 'jigsaw effect' identified by Mr Millar in his submissions. Although the order can include a prohibition on questions that will risk identity of the sources, there is likely to be considerable difference of opinion between the parties' representatives as to whether any particular question would fall into that category in questioning on these topics, and it would be unfair and oppressive to Mr Steele to be put in that position.

140.  Topic 8 - Mr Steele's efforts (or lack of efforts) to verify allegations in the dossier

i)  Mr Millar for Mr Steele proposes that it be amended to read "the steps taken by Mr Steele to verify the information regarding the Plaintiffs contained in paragraph 3 of Company Report 2016/166, a copy of which is attached".
ii)  The US Plaintiffs have agreed to amend the paragraph to "Mr Steele's efforts to verify the allegations in paragraph 3 of Company Report 2016/166 of the dossier (excluding the final sentence)".

© 2020 Thomson Reuters.

iii)  The US Defendants oppose the restriction of Topic 8 to paragraph 3 of the December Memorandum, but agree to delete the words "(or lack of efforts)".

iv)  I consider that the US Plaintiffs formulation is appropriate and does not involve substantial redrafting, merely a limitation of the ambit of questioning. Mr Millar's formulation does involve redrafting, and although it may be better drafting, I do not consider that I am able to simply redraft in that way.

v)  There is in my judgment no good reason why this area of questioning should extend beyond the paragraph complained of in the Florida proceedings, given the relevance of the US Defendants' evidence as to the key issues for which the evidence is required. With regard to the relevance of Mr Steele's evidence to the defences of the US Defendants, it may well be that were informed by the whole of the dossier in their decision to publish, but there has been no suggestion that any actions Mr Steele took in relation to the whole dossier informed that decision. Neither is Mr Steele's evidence relevant to the US Defendants' state of mind when it decided to publish. The Florida court will have the ability to have before it a copy of the contents of the dossier as a whole, so will be able to see paragraph 3 of the December memorandum in its context. I consider that questioning on this topic in relation to the dossier as a whole would be oppressive because it would involve a wide-ranging examination of Mr Steele over the entirety of the dossier, only a small part of which is complained of in the Florida proceedings.

141.  Topic 9 - Mr Steele's work to verify allegations in the dossier.

Topic 10 - Mr Steele's clients with respect to the dossier.

All parties have agreed to delete Topics 9 and 10.

142.  Topic 11 - The provision of the dossier to Fusion GPS.

Topic 12 - The provision of the dossier to media outlets.

Topic 13 - The provision of the dossier to other third parties.

i)  Mr Steele seeks to amend Topic 11 to read: "The provision of Company Report 2016/166 to Fusion GPS". That is agreed by the US Plaintiffs.

ii)  Mr Steele seeks to delete Topics 12-13. That is not agreed, but the US Plaintiffs agree to restrict these topics to "Company Report 2016/166" and again insert the words "the version of".

iii)  The US Defendants do not agree and also consider that the original wording should remain, save that they also propose that the wording should be amended to: "The provision of the version of the dossier to …".

iv)  I consider that these topics should be limited as proposed by the US Plaintiffs. I do not consider that in that form they are oppressive to Mr Steele. This information is partly given by Mr Steele in his defence in the QB proceedings, (at paragraph 21) **[2/11/130]** . In that regard I note the evidence of Mr Loble that the parties are unable to rely on the QB statements of case in the Florida proceedings. The topics concern evidence which appears to be in the public domain so far as media outlets are concerned, and the examination on these topics is likely to be very limited in scope. The topics are clear, limited and easily identifiable, and the issues as to distribution of the December memorandum are relevant to the issues pleaded in the defence in the Florida proceedings.

143.  Topic 14 - Mr Steele's communications with others concerning the dossier and the allegations contained therein

i)  All parties agree to delete Topic 14. The US plaintiffs seek to add an alternative Topic 14, namely "Payments made (or offered) to media outlets to publish Company Report 2016/166 of the dossier to write about it." They submit that this is just an explanatory topic within the ambit of Topics 11-13.

ii)  The new iteration as drafted by the US Plaintiffs cannot be included. It was not in the Request and this court cannot add to or redraft the subject matters for examination unless all parties wish the court to do so.

144.  Schedule A will accordingly be amended as indicated.

*Amendments to the November 2017 Order*

145.  The parties and Mr Steele have agreed certain additional provisions in the amended order, namely:

i)  No questions are to be asked which go to the identity of Mr Steele's sources;

*Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)*

ii) Mr Steele is to be permitted to have legal representation at the examination for the purpose of taking proper objection to questions that might be put to him in the course of examination should he so wish.

I approve these additions.

146. With regard to the body of the Order, apart from Schedule A, I consider that the following additional provisions should be added to provide further protection to Mr Steele:

i) No questions may be asked that would require the disclosure of any information that would in the ordinary course:

   a) require the consent of Mr Steele's former Crown employer before disclosure;
   b) increase the existing risk of confidential intelligence sources being identified;
   c) risk disclosure of information concerning processes of intelligence gathering known to Crown servants;

ii) A list of questions for each topic in Schedule A is to be provided to Mr Steele's solicitors a reasonable period of time before the examination. This will not be prescriptive. It will obviously be permitted that if the answers to any questions lead to other questions exploring that line of questioning these will be permitted (subject to any appropriate objections from Mr Steele's legal representatives or ruling by the Examiner). The parties' US and English legal representatives would have to prepare this in any event, as part of the preparation for the examination, and Mr Steele's legal representatives should have an opportunity to consider the lines of questioning to be addressed in each topic, so they can prepare and give appropriate advice. It is likely to be of benefit to the US Plaintiffs and the US Defendants if Mr Steele is able to improve his recollection of the areas of questioning before the examination by reference to particular questions.

147. With regard to the length of time to be included for the examination, I consider that the seven hours agreed between the US Plaintiffs and US Defendants is an appropriate time for the examination and is not oppressive. I agree to this not because I consider that the questioning on the now very limited topics is likely to last that length of time, and I would hope that it should not, but I recognise the point made by each of the US parties' counsel that lawyers will be attending from the United States for the examination at some cost, so it would not be appropriate to restrict the time available further. This time leaves a reasonable margin for any objections to be made, submissions on the same, and opinions by the Examiner, if needed (see CPR PD 34A paragraph 4.5). This is a standard time for examination in many Letters of Request. A limit for the examination to one day is a reasonable period of time to avoid considerable disruption to a person's professional and/or personal life. Mr Steele will have the protection of his own legal advisors to ensure that the hearing should involve questioning only on the topics permitted.

148. Both the US Plaintiffs and the US Defendants seek an order that their respective English counsel and solicitors be permitted to attend the examination to advise the parties' US attorneys and make any submissions to the examiner in respect of disagreement between the parties on the scope of questioning permitted or on issues of English procedure.

149. It is the general rule in examinations ordered pursuant to letters of request outside the EU Evidence Regulation, that where proceedings are to be conducted according to English rules of procedure (which is the norm, unless a special procedure is requested and acceded to) that if foreign lawyers are permitted to attend and carry out the questioning, that English lawyers instructed by those parties are permitted also to be present at the examination. The reason is so that they can advise the foreign lawyers on any disputed issues of English law and procedure that may arise, and make appropriate submissions to the examiner where the examiner is asked to give an opinion. I see no reason to depart from that general rule in this case. It would be unfortunate if there were to be an objection raised by Mr Steele's English legal representatives and the parties' US attorneys were not in a position to take advice and make informed submissions in response. There are also issues of rights of audience in relation to questioning being conducted by US attorneys if English representatives were not also present, which might have implications for the validity of the examination, if challenged (see *Cockerill: The Law and Practice of Compelled Evidence in Civil Proceedings* 2011 at §8.21).

150. I note that confirmation has been given by Leading Counsel for the US Plaintiffs that their English legal representatives present at the examination will not include any of those who are involved in the QB proceedings.

151. The US Plaintiffs and the US Defendants seek to include a provision in the Order that notice of documents, and copies of the same, that they intend to refer to Mr Steele during questioning, be provided 21 days before the examination. I consider that this is appropriate and will assist the parties. Rule 34.9(1) provides that the examination must be conducted in the same way as if the witness were giving evidence at trial. That would include the witness being referred to relevant documents to assist them in giving their evidence. This would not involve any extension of the scope of the examination, as this will be limited by the provisions of the Order, including the topics for questioning in Schedule A.

Gubarev v Buzzfeed Inc, 2018 WL 01411208 (2018)

152.  I consider that it will be helpful for both Mr Steele and his legal representatives to know in advance which documents he is likely to be referred to, and it is apparent from the nature of the Florida proceedings that there would not be the same expectation of large numbers of documents as there would be in a commercial dispute. A list of and copies of documents, combined with a list of questions, may assist them in considering any risk that questioning may go beyond what is permitted by the amended order.

*Generally*

153.  In considering this court's jurisdiction and its powers to exercise discretion in this area of the law, it would have been of considerable assistance to this court if the US Plaintiffs had identified the relevance of each of the topics sought for examination to the issues in the Florida proceedings. The fact that has not been done, and that this court's primary position is that it seeks to accept without investigation the foreign court's confirmation of relevance in a letter of request, put this court in a difficult position. I refer to the pertinent comments of Mrs Justice Andrews in *Vale* at paragraphs 37-38 cited in Paragraph 127 above. This case, it seems to me involves a similar complex balancing exercise. I have done my best to balance the interests of Mr Steele with the requirements of the Florida court, against the background of very unusual circumstances.

**Conclusion on the applications of Mr Steele and the US Defendants**

154.  Having come to the conclusion that Mr Steele does have relevant evidence to give for trial in the US proceeding, and that the topics in Schedule A are capable of being amended in such a way that does not constitute redrafting of the Letter of Request, and appropriate protections for Mr Steele included in the order, I do not conclude that the November 2017 order should be set aside in its entirety, but that it should be varied as set out above. Accordingly Mr Steele's application to set aside the November 2017 order is dismissed. His application to vary the order is granted in part. The US Defendants' application to vary the order if not set aside, is granted in part and dismissed in part.

**Annex to Judgment**

*Schedule A*

In this Schedule, references to "the dossier" are to the dossier mentioned in paragraph 7 of the letter of request:-

1.  Mr Steele's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts the witness may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2.  The instructions given to Mr Steele and his company to prepare the dossier and the reasons for the preparation of the dossier.

3.  The payments made to Mr Steele and his company for the dossier.

4.  The steps Mr Steele took to obtain information for the dossier.

5.  Mr Steele's preparation of the dossier.

6.  Mr Steele's solicitation of information for the dossier.

7.  Mr Steele's sources of information for the dossier.

8.  Mr Steele's efforts (or lack of efforts) to verify allegations in the dossier.

9.  Mr Steele's work to verify allegations in the dossier.

10.  Mr Steele's clients with respect to the dossier.

11.  The provision of the dossier to Fusion GPS.

12.  The provision of the dossier to media outlets.

13.  The provision of the dossier to other third parties.

14.  Mr Steele's communications with others concerning the dossier and the allegations contained therein.

Crown copyright

# Exhibit
# 3

# Buzzfeed Inc and another v Aleksej Gubarev and others, Christopher Steele

 **Positive/Neutral Judicial Consideration**

**Court**
Queen's Bench Division

**Judgment Date**
18 May 2018

Case No: QB/2018/0074

High Court of Justice Queen's Bench Division

**[2018] EWHC 1201 (QB), 2018 WL 02269751**

Before: Mr Justice Jay

Date: 18/05/2018

Hearing date: 14th May 2018

**Representation**

Alex Bailin QC and Ben Silverstone (instructed by Taylor Wessing ) for the Appellants.
Hannah Brown QC (instructed by W Legal ) for the First Respondents.
Gavin Millar QC and Edward Craven (instructed by RPC ) for the Second Respondent.
Julian Blake (instructed by GLD ) for the FCO (as intervenor).

**Judgment Approved**

Mr Justice Jay:

**Introduction**

1.  The parties to this appeal and application for permission to appeal are:

    (1)  BuzzFeed Inc and Ben Smith, who are the defendants in proceedings for defamation brought in the United States District Court for the Southern District of Florida (Miami Division) ("the Florida Court"). Although they are the Appellants/Applicants in the proceedings before me, I will describe them as "the US Defendants".
    (2)  Aleksej Gubarev, XBT Holdings SA and Webzilla Inc, who are the plaintiffs in the defamation proceedings and the First Respondents to this appeal/application. They take a neutral position before me. I will describe them as "the US Plaintiffs".
    (3)  Christopher Steele, who is the subject of a Letter of Request from the Florida Court issued on 10th August 2018 at the instance of the US Plaintiffs and formally directed to the Senior Master of the Queen's Bench Division. It is said that he can give relevant evidence by way of oral examination in this jurisdiction pursuant to section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 . He is the Second Respondent to this appeal and has actively opposed it. I will describe him as "Mr Steele".

© 2020 Thomson Reuters.

2.  The appeal and application relate to parts of the Order of the Senior Master given on 16th March 2018 following the handing down of her detailed and lengthy judgment ([2018] EWHC 512 (QB)) in this case.

3.  The background is lengthy and complex, and has been comprehensively set out in the Senior Master's judgment. It is unnecessary for me to repeat all of this. I will provide a much shorter narrative, concentrating on certain key features of the evidence as highlighted by the parties. The Senior Master's judgment is available online and repays careful reading.

4.  The appeal has been expedited by Warby J to accommodate the timetable set down by the Florida Court leading to trial in November. Mr Steele's oral examination will take place on 18th June but, pending the outcome of this appeal, the ground-rules remain in a state of flux. I had intended to deliver an extempore judgment in this case, but the quality and interest of the oral arguments delivered by Mr Alex Bailin QC for the US Defendants and Mr Gavin Millar QC for Mr Steele has forced me to adopt this present course. For similar reasons, I have decided to grant the US Defendants permission to appeal on Grounds 1 and 2.

**Essential Factual Background**

5.  Mr Steele, a former civil servant with expertise in Russian affairs, set up Orbis Business Intelligence Ltd after he left the FCO. Between June and November 2016 Orbis was engaged by Fusion GPS, a consultancy based in Washington DC, to prepare a series of confidential memoranda based on intelligence concerning alleged Russian efforts to influence the US Presidential election, including possible links between the Russians and the Republican candidate, Mr Donald Trump. 16 such memoranda were prepared. They were provided by Orbis to Fusion on a confidential basis, on terms that there should be no disclosure to third parties without the agreement of Orbis and/or Mr Steele.

6.  After Mr Trump's election in November 2016, Mr Steele continued to receive intelligence on the same topic. His Defence in defamation proceedings brought by certain of the US Plaintiffs in this jurisdiction is that this intelligence was "unsolicited" by him. Mr Millar placed emphasis on this adjective but I am not convinced that much turns on it. A reasonable inference is that Mr Steele's source or sources continued to provide him with information on the not unreasonable assumption that he had not lost interest in the topic.

7.  On or about 13th December 2016 Mr Steele prepared a memorandum or report which he labelled "Company Report 2016/166". I will call this "the December memorandum". All 17 memoranda have been called "the dossier". This is a convenient moniker but its use should not obscure the practical difference between the pre-election and the post-election phase. The December memorandum was prepared by Mr Steele on his own initiative and outside the scope of Orbis' contract with Fusion.

8.  Meanwhile, in late November 2016 Mr Steele, through an intermediary, agreed to provide the pre-election memoranda to Senator John McCain on a confidential basis. The intermediary asked that Senator McCain be supplied with any further intelligence. After 13th December (the precise date is unclear and matters not), Mr Steele provided the December memorandum to a senior UK government national security official, as well as a copy to Fusion via encrypted email, with an instruction to Fusion to provide a hard copy to Senator McCain through the offices of the intermediary. The same conditions of confidentiality applied.

© 2020 Thomson Reuters.

9.  Mr Steele's pleaded case is that he did not provide copies of the dossier to anyone else. He accepts that he conducted some "off the record" briefings of journalists. He also accepts that the FBI has received the dossier.

10.  The US Defendants do not accept Mr Steele's case on this issue. The Senior Master was shown various media reporting which indicates that the dossier has found its way into the hands of third parties, including media outlets. David Corn, writing in "Mother Jones" on 13th January 2017, has said that he spoke with "the former spy" and "I was also able to review the memos the spy has written". However, Mr Corn does not state in terms that Mr Steele showed him the dossier, and it is obvious that their entry into the semi-public domain before the US Defendants decided to publish them online could have resulted from a leak from a number of sources. Even so, the possibility that Mr Steele was the cause of the leak cannot be excluded.

11.  Mr Corn further explains that he did not "post the memos, as BuzzFeed did this week, because the documents contained information about the former spy's sources that could place people at risk". This issue has been expounded in the witness statement of Mr Edward Lucas.

12.  Thus, the US Defendants were not the sole recipients of the dossier. On 10th January 2017 they published online an article, "These Reports Allege Trump has Deep Ties to Russia", accompanied by a hyperlink to the entire dossier with some redactions. The Florida proceedings relate only to paragraph 3 of the December memorandum, the terms of which have been set out in the Senior Master's judgment [12].

13.  The article claims that the dossier "has been circulating among elected officials, intelligence agents, and journalists for weeks". Later in the same piece it is asserted that "the documents have circulated for months". The article states in terms that the allegations are unverified although they have not been falsified. The stated reason for publication was:

> "Now BuzzFeed News is publishing the full document [hyperlinked] so that Americans can make up their own minds about allegations about the president-elect that have circulated at the highest levels of government."

14.  Mr Steele's evidence is that he was horrified by what the US Defendants have done. The dossier comprises raw intelligence reports and sources could be compromised.

15.  The US proceedings were commenced on 3rd February 2017. Mr Steele is not named as a defendant and does not feature in the pleaded cases of the parties.

16.  The case of the US Plaintiffs is that paragraph 3 of the December memorandum contains defamatory statements which were made negligently or recklessly, either with knowledge of their falsity or without reasonable care as to their truth or falsity.

17.  The case of the US Defendants is that they "lack sufficient information to form a belief as to the truth or falsity of the allegations". They therefore deny that the allegations are false and contend that the US Plaintiffs must prove their falsity at

© 2020 Thomson Reuters.

trial. This is common ground between the parties in Florida. Further or alternatively, the US Defendants plead "fair report privilege" and "neutral report privilege".

18. By a motion filed on 9th August 2017 the US Plaintiffs sought the issue of a request for international assistance to the Senior Master of the Queen's Bench Division, requiring Mr Steele to give evidence by oral examination on 14 specified topics for the purposes of the Florida proceedings. The motion included a draft of the Request sought. The US Defendants indicated to the Florida Court that they did not object to the relief sought, but if the Letter of Request were granted they reserved their right to cross-examine Mr Steele. In my view, it was clear that the US Defendants more or less accepted that Mr Steele could give relevant evidence, at least in principle. However, I take Mr Millar's point that there was no cross-motion, and that the Florida Court was considering the issue solely within the context and parameters of the US Plaintiffs' motion.

19. On 10th August Judge Ungaro issued the Letter of Request in the precise terms of the draft. I have examined the terms of the Request. It is clear that Judge Ungaro satisfied herself that Mr Steele could give relevant evidence but, given that there were no submissions to the contrary or maybe in any event, did not focus on the detail of the 14 topics. In particular, she did not explain how and why Mr Steele could give relevant evidence on each of these topics; her consideration was more general. I imagine that this is standard practice in this sort of case, particularly where the opposing party adopts a neutral position.

20. The Senior Master concluded that "the requesting court has not in fact considered the question of the relevance of the individual topics for examination to the issues between the parties independently, but has accepted the list of topics requested by the US Plaintiffs without question" [111]. Mr Millar submitted that the US Defendants have not put that finding in issue. Although Mr Bailin did seek to assail it in oral argument, I consider that the Senior Master was entitled to conclude as she did. I will need to return to this point when examining Mr Bailin's submissions.

21. On 10th August 2017 Mr Steele filed a non-party motion of intervention in the Florida proceedings objecting to the issue of the Letter of Request. Multiple grounds were relied on, including the co-existence of libel proceedings in this jurisdiction. Many of these have now fallen away. On 15th August Judge Ungaro refused Mr Steele's motion, stating that she "presumed" that the Senior Master would limit the scope of the Request pursuant to domestic law, if so advised.

22. On 4th November 2017 the US Plaintiffs issued a without notice application in this Division for an order that Mr Steele's evidence be taken for use in the Florida proceedings in accordance with the Letter of Request. On 9th November the Senior Master made an order on the basis sought, directed to the same 14 topics.

23. By email dated 22nd November 2017 Mr Loble on behalf of the US Plaintiffs proposed to Mr Steele's representatives a narrower list of 9 topics for his questioning at the examination. As the Senior Master noted, this was stated to be for pragmatic reasons. Mr Steele did not accept the proposal. On 1st December 2017 he applied to set aside, alternatively to vary, the without notice order. The bases of the application were multifarious, but focusing on what is relevant for present purposes Mr Steele contended that the Letter of Request sought irrelevant evidence, was oppressive, amounted to a fishing expedition, and would compromise his source or sources. Alternatively, Mr Steele argued that the topics for questioning should be limited to the steps taken to verify paragraph 3 of the December memorandum, and the US Defendants' acquisition of that document; and that protections should be emplaced to safeguard the confidentiality of his source or sources.

24. Mr Steele's application was supported by the witness statements of Nicola Cain, a barrister employed as a legal director in RPC, and Edward Lucas, a respected journalist and expert in Russian affairs. Ms Cain's evidence does not in my view

take matters any further. Insofar as it contains matters of legal argument, she should in my view have left those for written skeleton submissions. She is not qualified to address matters of Florida law and does not purport to do so.

25.   On 9th January 2018 the US Defendants issued an application notice by which they sought their own variations to the without notice order in the event that they failed to have it set aside in its entirety. I will come to the detail in due course.

26.   The Senior Master also had evidence in the form of a second witness statement from Mr Loble which explained from the perspective of the US Plaintiffs how and why Mr Steele could give relevant evidence. According to paragraph 26(iv)(2) of his witness statement, the saliency of Mr Steele's evidence covered:

> "How [Mr Steele] came to make the allegations in the December memorandum/whether the allegations were verified. This evidence will go to whether the allegations are true [items 4-6 and 8 of the Schedule on the original numbering]"

and, according to paragraph 26(iv)(3):

> "the circumstances of the provision of the dossier to various parties identified in [items 11-13] including whether cautions were given to such parties about the unverified nature of the allegations in the dossier and warnings were given not to publish the same without independent verification. This evidence will go to the lack of care exhibited by BuzzFeed."

27.   Mr Millar sought to make something of the point that Mr Loble's evidence was solely directed to the issue of saliency from the point of view of the US Plaintiffs; it did not advance the case of the US Defendants. In my judgment, this point leads nowhere. If Mr Steele's evidence could assist the case of the US Plaintiffs in discharging the burden of proof which was on them to establish falsity, and it was also relevant to any enhancement of the culpability of the publishers, the US Defendants would obviously seek to neutralise that evidence if they could; and, perhaps, to build a positive case – that the December memorandum was true - on the back of what Mr Steele had to say. On the other hand, items 11-13 in the Schedule as originally numbered went to the issue of BuzzFeed's culpability, if any, rather than the truth or otherwise of the intelligence in the December memorandum. I think that it is obvious from all the surrounding circumstances, as the US Defendants well appreciated, that the December memorandum contained intelligence, not evidence, and that – putting the matter at its lowest – it had not been independently verified. The article under scrutiny states in two places that the allegations are unverified.

28.   The US Defendants rely on the witness statement of Ms Katherine Bolger who is a partner in a New York law firm. Ms Bolger makes clear that her clients have no intention of exposing or jeopardising Mr Steele's sources. Paragraph 34 of her witness statement has been carefully examined by Counsel, and I therefore set out relevant parts:

> "Further, the Defendants are entitled, in the Florida proceedings, to defend themselves based on their decision to publish the whole dossier as opposed solely to paragraph 3 of [the December memorandum]. Although the parties dispute whether New York or Florida substantive law applies to the Florida proceedings, under either body of the law relevant issues will include: (a) whether the

publication of the dossier is a fair and true report of an official proceeding, see [relevant authority] …; (b) whether the Defendants acted with "actual malice", gross irresponsibility, or negligence in publishing the dossier, see [relevant authority] …; and (c) whether the publication of the dossier as a whole is protected by neutral reportage, see [relevant authority]"

29.  I was taken to a selection of the relevant jurisprudence by Mr Bailin. If I may say so, *Ortega v Post-Newsweek Stations, Florida, Inc. 510 So.2d 972* and *Konikoff v Prudential Ins. Co. of Am., 234 F.3d 92* provide thin support for the defences relied on in these particular circumstances. However, I have had to remind myself that I am not qualified to opine on questions of US law; and Mr Millar did not seek to persuade me that I should. His measured, and well-aimed, submission was that paragraph 34 of Ms Bulger's witness statement does not explain how and why Mr Steele could give relevant evidence on these defences. To the extent that he could give relevant evidence in relation to her point (b), this issue clearly overlaps with that identified by Mr Loble.

## The Judgment of the Senior Master

30.  In my judgment, the Senior Master has delivered a clear, comprehensive and impressive judgment. I agree with Mr Millar that it is necessary to identify her general approach before examining her narrower analysis of the specific matters in dispute.

31.  At [105], the Senior Master held that Mr Steele could give relevant evidence "in a jurisdiction where the Plaintiffs have to prove that the allegations are false". She recognised that it would be invidious for her to attempt to assess the relevance of Mr Steele's evidence to the pleaded defences of the US Defendants, and she therefore refrained from doing so, "save that if I decide that the order should not be set aside but varied".

32.  At [108], the Senior Master stated: "[i]t is indeed unfortunate that such a wide-ranging request was sought, combined with the fact that in none of the documents in the Florida proceedings is there any analysis of how each topic for examination relates to and is relevant to the issues in the trial". In my judgment, this is entirely correct. I have already commented on the lack of analysis in paragraph 34 of Ms Bolger's witness statement. The Senior Master had examined the documents in the Florida proceedings which enabled her to reach the conclusion she did.

33.  Furthermore, at [111] the Senior Master held that the requesting court had not independently addressed the question of the relevance of the individual topics for examination of Mr Steele in connection with the pleaded issues (or, I would add, at all). By implication, the Senior Master directed herself on the basis that she should apply the test laid down by Simon J in *CH (Ireland) Inc v Credit Suisse Canada [2004] EWHC 626 (QB)* at [14] and [17].

34.  At [112], the Senior Master placed some weight on the terms of Judge Ungaro's Order dated 15th August 2017. I think that she was wrong to do so, because Judge Ungaro was probably referring to free-standing issues under domestic law such as any arising under Article 6 of the Convention; but nothing turns on that.

35.  At [125] the Senior Master concluded that the topics for questioning as originally drafted "are so wide as to constitute a fishing-expedition": in other words, the request was oppressive. Mr Millar submitted that the US Defendants have not sought to assail this conclusion. On my understanding of his submissions, Mr Bailin did not attack [125]. He made the

overarching submission, in the context of the pared down Schedule, that the receiving court should strive to uphold the request for assistance sought by the Florida Court.

36.  [129] contains an important holding:

> "No explanation has been advanced by the US Plaintiffs as to why they sought the topics for examination to extend so far beyond what would generally be expected for such proceedings, and they have not sought to explain why there was no attempt to demonstrate the relevance of each area of questioning in the Request, and the original formulation of Schedule A, to the issues in the case. The US Defendants, although they did not apply for the Request, and say they are neutral as to whether it be set aside or not, still seek to maintain part of the examination extending to the entirety of the dossier, in circumstances where there is no suggestion that Mr Steele had anything to do with their decision to publish the same."

The US Defendants have not pleaded in the Florida proceedings that they relied on anything Mr Steele told them.

37.  At [135], the Senior Master set out a summary of her conclusions that the request in its original format went beyond what was required in the US proceedings, amounted to a fishing expedition, and was oppressive. She then went on to consider whether she was able nonetheless to assist her American counterparts by restricting the topics for examination and introducing appropriate safeguards. I do not understand Mr Bailin to be objecting to this approach, at least in principle. If he were to have done, that objection would have proved too much.

38.  The Senior Master then proceeded to address the 14 topics individually on the basis of the submissions advanced to her. In this regard it is important not to lose sight of the respective cases of the US Plaintiffs, the US Defendants and Mr Steele. I will disregard the topics which are no longer at issue.

*Topics 4, 5 and 6*

39.  These were, respectively, "the steps Mr Steele took to obtain information for the dossier" [4], "Mr Steele's preparation for the dossier" [5] and "Mr Steele's solicitation of information for the dossier" [6]. Mr Steele's position before the Senior Master was that these topics should be deleted; the position of the parties to the litigation was that these should be retained albeit limited to the December memorandum.

40.  The Senior Master acceded to Mr Steele's submissions in these terms [139(ii)]:

> "I consider that topics 4, 5 and 6 should be deleted. The US Plaintiffs have focused on the issue of Mr Steele's verification of the allegedly defamatory statements in paragraph 3 of the December memorandum, which is the subject of paragraph 8, and the US Defendants on the reasons and justification for publication. There has been no satisfactory explanation as to why these topics are relevant to the issues identified. These areas of questioning … would … be likely to risk identification of sources through the 'jigsaw effect' identified by Mr Millar in his submissions. Although the order can include a prohibition on questions that will risk identity of the sources, there is likely to be considerable difference of opinion between the parties' representatives as to whether any particular question would fall into that category … and it would be unfair and oppressive for Mr Steele to be put into that position."

© 2020 Thomson Reuters.

41.  Topic 8 is not the subject-matter of this appeal, but I have noted the Senior Master's reasons for disallowing questioning on the issue of verification beyond the ambit of the December memorandum. She held that there is no suggestion that any actions Mr Steele took in relation to the whole dossier informed the US Defendants' decision to publish, and that wide-ranging questioning on the entire dossier would be oppressive [140(v)].

*Topics 11, 12 and 13*

42.  These were, respectively, "the provision of the dossier to Fusion GPS" [11], "the provision of the dossier to media outlets" [12] and "the provision of the dossier to third parties" [13]. Mr Steele accepted the validity of only topic 11, subject to the subject-matter being limited to the December memorandum. The US Plaintiffs agreed to restrict the subject-matter of all three topics to the December memorandum. The US Defendants submitted that the original wording (i.e. the wording I have set out and which was in the Letter or Request) should be retained.

43.  The Senior Master accepted the submissions of the US Plaintiffs in these terms [142(iv)]:

> "I consider that these topics should be limited as proposed by the US Plaintiffs, I do not consider that in that form they are oppressive to Mr Steele. This information is partly given by Mr Steele in his defence in the QB proceedings. In that regard I note the evidence of Mr Loble that the parties are unable to rely on the QB statements of case in the Florida proceedings. The topics concern evidence which appears to be in the public domain so far as media outlets are concerned, and the examination on these topics is likely to be very limited in scope. The topics are clear, limited and easily identifiable, and the issues as to distribution of the December memorandum are relevant to the issues pleaded in the defence in the Florida proceedings."

44.  The Senior Master imposed various conditions and safeguards in relation to Mr Steele's examination, some with the agreement of the parties, so as "to provide further protection to Mr Steele" in relation to his source or sources. She also ordered that he be given advance notice of the questions to be asked, and that he be permitted to have legal representation at the examination for the purpose of taking proper objection to any questions posed.

**The Appeal**

45.  By their appeal the US Defendants seek to reinstate topics 4, 5 and 6 (limited to paragraph 3 of the December memorandum), and the original wording of topics 11-13. There are three Grounds of Appeal, the first two covering topics 4, 5 and 6, and the last topics 11-13. Ground 1 is that the Senior Master erred on the issue of relevance; Ground 2 is that she did so on the issue of oppression. Ground 3 is that the Senior Master erred on the issue of oppression, although in oral argument submissions were advanced on the issue of oppression. She granted permission to appeal on Ground 3 because she considered that there was a reasonable prospect of success on the argument that "all of the reasons [the Senior Master] advanced in support of the conclusion that questions about the provision of the December memorandum to Fusion GPS [etc.] also applied to questions about the provision of the dossier to those parties".

46.  As I have said, I have decided to grant permission to appeal on Grounds 1 and 2. Logically, these Grounds do not all stand or fall together, but the issues arising are very similar.

**The Submissions for the Us Defendants**

47.  Mr Bailin advanced two submissions on Ground 1. The first was that the Senior Master failed to follow the well-established principles as to how the court should approach questions of relevance under section 2 of the 1975 Act. It is

complained that either she should have deferred to the Order of the Florida Court, which predicated that the request sought was relevant to the US proceedings, or she should have applied a low threshold in line with the judicial guidance laid down by Simon J in *Credit Suisse* . Mr Bailin's second submission was that there is an internal inconsistency or illogicality in the Senior Master's reasoning. Whereas the steps that Mr Steele took to verify the information contained in the December memorandum were relevant on her analysis, any steps taken at the anterior stage relating to information obtaining and gathering were apparently not. It is complained that there is no real distinction between these two stages, and an absence of reasoning from the Senior Master on this issue.

48.   As for Ground 2, Mr Bailin's submission was that the Senior Master overlooked the safeguards in her Order which would afford the very protection necessary to avoid the vice she had identified. Mr Steele would be given advance notice of the questions to be asked, and his legal representative could object on the day. Further, questioning relating to the issue of verification also carried with it the same risk, if it was a risk, as regards source identification.

49.   Mr Bailin advanced three submissions in developing Ground 3. His first was that the Senior Master asked herself the wrong question: rather than considering whether questioning on the topics as originally formulated was oppressive, she focused on whether questioning on a narrower formulation would be. However, the very issue to be decided was the former not the latter. Secondly, and I have already referred to this point at paragraph 45 above, the Senior Master's reasons for absence of oppression in relation to the narrower formulation were equally applicable to the wider. Thirdly, Mr Bailin submitted that there was uncontested evidence from Ms Bulger to the effect that dissemination of the entire dossier was relevant to the pleaded defences of the US Defendants. The final sentence of the Senior Master's reasons on this topic should apply not just to the December memorandum. The BuzzFeed article itself made clear that the publishers took into account the fact that the whole dossier had been circulating widely in certain quarters.

## Discussion and Conclusions

50.   Given that I broadly accept the submissions advanced by Mr Millar, albeit not in their entirety, it is unnecessary for me to set these out.

51.   In *MicroTechnologies LLC v Autonomy Inc [2016] EWHC 3268 (QB)* Morris J emphasised the limited scope for an appellate court to interfere with the Senior Master's exercise of discretion in respect of orders made under the 1975 Act [63]:

> "It is not a *de novo* rehearing of the matters placed before her. In this regard, before interfering with the Senior Master's decision, it must be shown that she had either erred in principle in her approach or has left out of account or has taken into account some feature that she should, or should not, have considered or that her decision was wholly wrong because the court is forced to come to the conclusion that she has not balanced the various factors fairly in the scale …"

These considerations carry much greater weight in relation to Mr Bailin's submissions grouped under the rubric of oppression than to his submissions under the banner of relevance. The former raise discretionary considerations; as for the latter, points of principle may well arise, although the Senior Master in my view should be accorded an appropriate margin of appreciation as regards matters of evaluative judgment.

52.   The starting-point of this court in relation to Letters of Request issued by a foreign state to which the 1975 Act applies is that they should be given effect to so far as is possible: see *Rio Tinto Zinc Corporation v British Westinghouse Electric*

© 2020 Thomson Reuters.

*Corporation [1978] AC 547* . In *In re State of Norway's Application [1987] 1 QB 433* Kerr LJ held that "[t]he court should strive to give effect to the request of the foreign court unless it is driven to the clear conclusion that it cannot properly do so" [page 470B].

53.  Consistent with this approach, the House of Lords has warned against the domestic court second-guessing issues of relevance arising under the law of the requesting state. In *In re Asbestos Insurance Coverage Cases [1985] 1 WLR 331* , Lord Fraser stated:

> "It would be quite inappropriate, even if it were possible, for this House or any English court to determine in advance the matters relevant to the issues before the Californian courts on which each of these witnesses is in a position to give evidence." [page 1165B-C]

54.  No possible issue arises if it is clear that the requesting court has given some consideration to the issue of relevancy in terms of the generality and specificities of the request. As I have already said (see paragraph 33 above), the Senior Master held that the requesting court did not examine the relevancy of the individual topics for examination. Her reasons for this conclusion were:

> "… because there is no evidence in those court documents that she has done so, and neither of the parties to the Florida proceedings sought to suggest otherwise. Further, it appears that much of the evidence sought in the topics for examination is not in fact relevant to the issues in the US proceedings …" [111]

55.  The Senior Master clearly took into account the view of Stanley Burnton J in *Gredd v Busson [2003] EWHC 3001 (QB)* that:

> "… orders for letters of request are normally made by the US judge without any real scrutiny. The order is normally made in the terms sought by the applicant without any (or any significant) amendment and without the judge being informed of the significant differences between US federal procedure and of these courts."

I apprehend that this conclusion was based on Stanley Burnton J's considerable experience in this area of the law.

56.  In my judgment, the Senior Master was entitled to reach the conclusion she did at [111] of her judgment. It follows that what Mr Bailin characterised as the "strict approach", based on judicial comity and deference to the assessment by a foreign court of the ends of justice, should be tempered. The issue arises as to what extent.

© 2020 Thomson Reuters.

Buzzfeed Inc v Gubarev, 2018 WL 02269751 (2018)

57.  That issue was addressed by Simon J in *Credit Suisse* . In that case the question arose of whether a dictum of Sir Richard Scott V.-C in *First American Corporation v Zayed [1999] 1 WLR 1154* could be reconciled with the line of high authority I have summarised. The Vice-Chancellor had said that the first issue was "whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics mentioned in the amended schedule". Simon J's neat solution to the apparent contradiction was as follows:

> "It seems to me, however, that [Counsel] is correct in his submission that the approach of the court will depend on whether the requesting court has itself considered questions of relevance. If it has, then it is hardly in the interests of comity that the court to whom the request is made should embark on a close consideration of questions of relevance on what is likely to be limited material and a less clear understanding of the issues than the requesting court. If, on the other hand, the requesting court has plainly not considered the question of relevance or it is clear, even on a broad examination, that the evidence is not relevant then the Vice-Chancellor's first question must be addressed." [15]

58.  If the position is that the requesting court plainly has not considered the question of relevance, it must fall on the receiving court to undertake that exercise. In Simon J's view, the test to be applied in such circumstances is the Vice-Chancellor's. Mr Bailin described that test as importing a low threshold, and I agree. However, an issue arises as to exactly what the test – can the intended witnesses reasonably be expected to have relevant evidence to give on the specified topics? – amounts to or requires. Often, questions of relevance can be answered by applying a straightforward logic to the issues in the case. Sometimes, however, questions of relevance engage matters of foreign law. In the present case, it may be said that pleaded defences of the US Defendants raise questions which may be superficially familiar to an English lawyer but are strictly speaking outside his experience and qualifications. In circumstances where the court has evidence from a lawyer with experience and qualifications in the requesting state, and that evidence stands uncontradicted, considerable deference must be given to it. I do not think that it follows that the evidence of the foreign lawyer must be accepted, and difficult questions could arise if both parties have submitted competing evidence, but in circumstances such as these appropriate caution must be shown.

59.  In my judgment, Mr Bailin's submission that the Senior Master did not apply a "strict approach" to topics 4, 5 and 6, and should have done, is unsound. By the time the Senior Master had reached [139] of her judgment, she had already decided that the requesting court had not given independent consideration to the merits of the US Plaintiffs' application and that the request in its original form contained irrelevant matters, was overly wide-ranging and was oppressive. Thus, the general principles enunciated in *Rio Tinto Zinc Corporation* and other cases were of little relevance. At best from the perspective of the US Defendants, the issue was whether Mr Steele could reasonably be expected to give relevant evidence on topics 4, 5 and 6. This was a matter for the Senior Master to decide, deferring where appropriate to the witness statement of Ms Bolger.

60.  Furthermore, it was the agreed position of the parties to the US litigation that these topics should be limited to the December memorandum.

61.  Viewing the underlying litigation from the perspective of the US Plaintiffs, they need to prove that paragraph 3 of the December memorandum is untrue. Whether the US Defendants took reasonable care would no doubt be relevant to the amount of damages. Viewing the underlying litigation from the perspective of the US Defendants, in the event that falsity was established, there were two pleaded defences to consider.

© 2020 Thomson Reuters.

62.   The Senior Master concluded that "there has been no satisfactory explanation as to why these topics are relevant to the issues identified", i.e. the issues I have just encapsulated. Clearly, what she meant by that was that no proper explanation had been given as to why the steps Mr Steele took, and by implication his evidence about those steps, were relevant to the parties' pleaded cases. I have little or no difficulty with this in relation to the pleaded defences of the US Defendants, and would reiterate that Ms Bolger has failed to explain how and why Mr Steele's evidence under the rubrics of these topics could assist in connection with those defences. The position is slightly more complex on the issue of falsity. The US Plaintiffs may have focused on the issue of verification (topic 8), but this issue has two sides, and the US Defendants could seek to deploy Mr Steele's evidence in support of their case that paragraph 3 of the December memorandum was in fact true. I do not perceive any inherent contradiction in the US Defendants' case which was (i) the request should be wholly set aside, but (ii) if (i) did not happen, then in the alternative individual topics should be allowed, with amendments (restricting the scope) if necessary.

63.   Even if there may be some force in the contention that the Senior Master did not examine the obverse of the US Plaintiffs' coin, I would hold that her decision on the issue of relevance cannot be impugned on this appeal. The Senior Master was entitled to take a merits-based approach. The fact remains that Mr Steele has pleaded in his defence in the QB action, backed by a Statement of Truth, that the intelligence for the December memorandum was unsolicited. The Senior Master heard Mr Millar's submission about that, and was entitled to take it into account, giving it some weight. Moreover, it is obvious to anyone with experience in this area that intelligence is just that: it is not evidence; seen in isolation, it is unverified; it needs to be handled with care. Mr Steele knew that as did the US Defendants. The steps he took to obtain information and prepare the memorandum could throw no light on the truth or otherwise of the intelligence. The steps he took to verify that intelligence could be regarded as at least capable of throwing some light on this issue.

64.   It follows that I must reject Mr Bailin's first Ground of Appeal.

65.   As for the second ground, this to my mind raises a point of discretion not of principle. The Senior Master could not have overlooked the fact that she was about to impose various conditions and constraints on the examination process. However, she remained concerned that issues could arise through the "jigsaw effect" which Mr Steele might find it difficult to deal with on the day, particularly I would add in the context of possible follow-up questions, and she was also troubled by the possibility of the forensic contests which might ensue before the examiner. Moreover, although she may not have mentioned these specifically in this context, I believe that she must have taken account of Mr Millar's submissions that (i) a witness in Mr Steele's position would be very concerned about the risk to his sources, and that concern would place him under stress, (ii) his position was tantamount to that of a whistle-blower, and (iii) the risk to the source or sources was great if anything went wrong (see Mr Lucas' evidence).

66.   I cannot accept the argument that the issue of source identification was as great in the context of verification as it was at the anterior stages. This would be true if it were suggested that Mr Steele should have asked his source or sources for confirmation that the intelligence was true. However, "verification" in this context really means, "independent verification".

67.   I cannot suppress the observation that the notion that Mr Steele should be probed about the steps he took to assess the reliability of his source or sources has an Alice in Wonderland feel to it, and offends reality and common sense. Mr Steele has made clear at all material times that this was intelligence. The US Defendants have never said that they asked Mr Steele any questions about it.

68.   Mr Bailin has failed to demonstrate that the Senior Master's exercise of discretion in relation to the issue of oppression was wrong, and I have no hesitation in rejecting Ground 2.

© 2020 Thomson Reuters.

69.  As for the Ground 3, there is superficial force in Mr Bailin's submission that if [142(iv)] of the Senior Master's ruling is examined for what it says and nothing more, she has not specifically asked and answered the question of whether topics 11-13 in their original formulation would be oppressive. It seems that the Senior Master may have been concerned about that when she decided to grant permission to appeal. However, in my judgment such concerns would have been unfounded, and Mr Bailin's point is not well made.

70.  I accept Mr Millar's submission that it is implicit in the Senior Master's judgment read as a whole that questioning ranging over the entirety of the dossier would be oppressive. Indeed, she makes that point explicitly in the final sentence of [129] of her judgment, and it also emerges strongly from [140(v)]. The Senior Master's reasons for supporting the narrowing down of these topics to the December memorandum, including the reference to the questioning being "likely to be very limited in scope" do not apply to the dossier as a whole. Further, the Senior Master was entitled to attach some weight to the modest ambitions of the US Plaintiffs, as revised, in the context of these topics. This may have been generated by pragmatism, but by the time of the hearing the issues were back in contest. In my judgment, the Senior Master's conclusion on the issue of oppression in relation to topics 11-13 is entirely supportable.

71.  The Senior Master did not address the issue of whether topics 11-13 as originally formulated could have yielded relevant evidence from Mr Steele. Strictly speaking this issue does not arise, at least in the context of what the Senior Master expressly decided. However, I would add that if the scope of my inquiry, as opposed to appellate function, could properly extend to the issue of the provision of the entire dossier to Fusion GPS and others, I would have needed some persuading on the logically prior issue of relevance. The final sentence of [142(iv)] relates only to the December memorandum.

## Conclusion

72.  Despite Mr Bailin's attractive oral argument, I have reached the clear and firm conclusion that this appeal should be dismissed on all Grounds.

73.  The parties should agree the form of Order in the light of my judgment.

74.  The FCO's intervention may need to be addressed in the light of my judgment, but I release this aspect to the Senior Master.

Crown copyright

© 2020 Thomson Reuters.