**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 17-cv-60426-UU**

ALEKSEJ GUBAREV, XBT HOLDING S.A.,
AND WEBZILLA, INC.

    Plaintiffs,

vs.

BUZZFEED, INC. AND BEN SMITH,

  Defendants.

_____/


**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO SUPPLEMENT THE**
**RECORD WITH THE HOROWITZ REPORT AND FOR AN INDICATIVE RULING**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Nathan Siegel
Adam Lazier
Alison Schary
1251 Avenue of the Americas, 21st Floor
New York, New York 10020

BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
Roy Black
Jared Lopez
201 So. Biscayne Boulevard
Miami, Florida 33131

*Attorneys for Defendants*

Defendants respectfully submit this Opposition to Plaintiffs' Motion to Supplement the Record with the Horowitz Report (the "Report") and for an Indicative Ruling, Dkt. 446 ("Mot.")

## PRELIMINARY STATEMENT

This motion seeks an extraordinary remedy in the absence of extraordinary circumstances.  Plaintiffs' motion is the result of a remand by the Eleventh Circuit "for the limited purpose of permitting Plaintiffs to move the district court for relief that would allow the District Court to supplement the record with the Horowitz Report."  Now that their motion has been filed here, its own arguments make clear why it should be denied.  The motion asks this Court to add newly-discovered evidence to the record and then indicate it would alter its judgment on the basis of that evidence.  So despite Plaintiffs' efforts to call it something else, it is a Rule 60(b)(2) motion that the Federal Rules of Civil Procedure require to be brought within one year of judgment – a deadline Plaintiffs could have, but simply failed to meet.

 Even if this motion was timely, it should make no difference because Plaintiffs also fail to satisfy *any* of the substantive criteria courts use to decide whether judgments should be reconsidered based on newly-discovered evidence.  Plaintiffs cannot demonstrate reasonable diligence, because they made *no* effort to discover anything about the government's receipt or use of Report 166 when they had the opportunity.  To the contrary, they insisted such facts were wholly irrelevant and tried to obstruct Defendants' discovery on that subject.  Nor, in any event, would the Report affect the result here.  The Report does not, nor does it even purport to, contradict the declaration from then-Assistant FBI Director E.W. Priestap.  And in any event, it is well-established that newly-discovered information that is merely proffered to purportedly impeach testimony in the original record is not a basis to disturb a judgment.

Finally, even if the Report did contradict the Priestap declaration, it would not affect the application of the fair report privilege here, for either of two reasons.  First, other evidence in the record speaks to other members of the intelligence community involved in advising and briefing the President possessing Report 166, evidence Plaintiffs fail to even mention.  But even if that were not so, the Report makes abundantly clear just how central Christopher Steele's Dossier reports were to the government's investigation of and decision-making about Russian interference in the 2016 election – starting in the summer of 2016 and continuing into 2017 for long after BuzzFeed published them.  The Report further makes clear that Report 166 was written by Steele for the same reasons, was made available to the FBI and other government

officials through some of the same channels, and was actually investigated by the FBI in the same way as the other sixteen Dossier reports were. The primary purpose of the fair report privilege is to enable the public to assess government conduct, and the very fact that the Inspector General thought it important to release a 476-page Report to assess the propriety of government conduct with the Dossier, including Report 166, further reinforces why the Court was correct when it held that its publication was protected by that privilege.

This Court should therefore reject the efforts of Plaintiffs and their *amici* to reargue summary judgment in this case and deny the motion to supplement.

## FACTUAL BACKGROUND

In the fall of 2017, as part of discovery, Defendants brought a motion to compel against several government agencies and two former officials, seeking admissible evidence in support of their fair and true report defense. On August 3, 2018, Judge Mehta of the D.C. federal district court granted the motion to compel. *See BuzzFeed, Inc. v. Dep't of Justice*, 318 F. Supp. 3d 347 (D.D.C. 2018). He ordered that the government "produce a sworn affidavit that is responsive" to three questions. In response to that decision, the government produced a declaration from E.W. Priestap, who was then the Assistant Director of the FBI's Counterintelligence Division, charged with "directing the conduct of FBI counterintelligence investigations." D.E. 214-11 (the "Priestap Declaration") ¶ 1. Among other items, the declaration stated:

> (U) **Revised Narrowed Topic No. 3(A):** Prior to 5:20 p.m. EST on January 10, 2017, did the FBI possess the two-page memorandum contained within the Dossier dated December 13, 2016, i.e., Report 2016/166?
>
> 1.     (U) **Response to Revised Narrowed Topic No. 3(A):** Yes.

D.E. 214-11 ¶ 6(a) (internal footnote omitted). Pursuant to 28 U.S.C. § 1746, Assistant Director Priestap "declare[d] under penalty of perjury that the foregoing is true and correct." *Id*. at 3.

This Court entered summary judgment for Defendants on December 19, 2018, D.E. 389, holding that BuzzFeed's publication was protected by New York's fair and true report privilege. The Court's 23-page order mentioned the Priestap Declaration's evidence that the FBI possessed Report 166 twice, along with evidence in the record about other agencies or public officials, like the National Security Council, who also possessed it. D.E. 388 at 6, 15. The Court noted that "although the FBI admitted that it had a copy of Report 166 prior to BuzzFeed's publication of the full Dossier, the record does not reveal what, if any, official action was taken with respect to

it," *id.* at 15, but went on to hold that the privilege nonetheless applied because "Report 166 discusses two issues that were indisputably the subject of official action," including "allegations of cooperation between Trump's 'team' and Russian operatives." *Id.* at 17.

On December 9, 2019, the Department of Justice's Office of the Inspector General released the redacted public version of a report entitled *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, the result of that office's review of "certain actions by the [FBI] and the Department during an FBI investigation ... into whether individuals associated with the Donald J. Trump for President Campaign were cooperating, wittingly or unwittingly, with the Russian government[]." Report at 1. The portions of the 476-page Report that discuss the Dossier detail just how central it was to official activity and decision-making regarding Russian interference in the 2016 election, even more so than was known at the time this Court entered summary judgment – and starting many months before BuzzFeed published the document and continuing for many months afterwards. The Report also states that the FBI actually investigated the allegations in Report 166 that "anti-Clinton hackers" were paid by Michael Cohen, which would include Plaintiffs. Report at 176.

The release of the Report on December 9, 2019 came as no surprise to anyone, as it had been widely anticipated for months and it instantly made headlines around the world. Exs. 1-7. Tellingly, *the day after the Report was released*, counsel for the plaintiffs in related litigation in New York state court emailed Defendants' counsel to inquire about modifying the summary judgment briefing schedule in that case to address the Report. Ex. 8. On December 16, 2019, the plaintiffs in that case filed a reply brief and accompanying affirmation which attached and discussed the Report. Exs. 9-10. Those plaintiffs had also filed two *amicus* briefs in the Eleventh Circuit supporting the appeal of Plaintiffs in this case, and they have now re-filed those briefs on this motion as well. D.E. 449-1, 449-2.

When the Report was released, Plaintiffs had ten more days to file a motion under Rule 60(b)(2) to seek the relief they seek now, but they took no action in this Court. Rather, they waited three weeks to bring, on December 30, 2019, a "time-sensitive" motion directly in the Eleventh Circuit requesting leave to supplement the record on appeal with the Report or, in the alternative, that the Eleventh Circuit "remand the case for a determination, within two months, of the limited question of whether, in the District Court's view, the Horowitz Report is cause for reversal of the grant of summary judgment for Defendants on the issue of privilege." Ex. 11 at

3

11-12.  In other words, Plaintiffs asked the Eleventh Circuit to do two things: first, to supplement the record with the Report, and, second, to then either consider the Report "in the first instance" or, alternatively, remand the case to the district court for no more than two months "for limited reconsideration of a grant of summary judgment in light of the supplementation." *Id.* at 27.

On March 13, 2020, the Eleventh Circuit issued an order that did not grant the relief Plaintiffs had requested.  Specifically, the Court did not grant their motion to supplement, nor did it remand the case to this Court to require it to consider the record as supplemented.  To the contrary, the order emphasized that the Court "takes no position on whether the record should be supplemented."  D.E. 443 at 1.  Rather, the Court ordered that the case be remanded to this Court "for the limited purpose of permitting Plaintiffs *to move the district court for relief* that would allow the district court to supplement the record with the Horowitz Report."  *Id*. at 1 (emphasis added).  The Court further instructed that "[i]f the district court issues an order stating that the record should be supplemented and the Horowitz Report would alter the court's previously issued summary judgment order, the parties shall seek a full remand of this case."  *Id*. at 2.

## ARGUMENT

Many of Plaintiffs' arguments simply express their disagreement and dissatisfaction with various aspects of this Court's summary judgment ruling.  *See, e.g.*, Dkt. 446 at 5 ("this Court (at Defendants' urging) largely considered the 17 separately-dated reports as if they constituted a unified whole"); *id.* at 14 ("the wobbly factual leg" upon which this Court's ruling ostensibly rested).  But when they turn to the only questions the Eleventh Circuit directed this Court to address, their arguments rest entirely on three basic premises.  First, as a procedural matter they assert they are "not constrained here by Rule 60(2)(b)."  *Id.* at 8.  Second, they contend that this Court's summary judgment ruling turned on "the factual conclusion that the FBI possessed Report 166 at the time of" BuzzFeed's publication, *id.* at 6, and, third, they maintain that two sentences within the Report "conflict" with that conclusion and would necessitate submission of that question to a jury.  *Id.* at 7-8, 14.  None of those premises is correct, and their Motion should be denied accordingly.

## I.      PLAINTIFFS' MOTION IS SUBJECT TO RULE 60(b)(2)

Quoting Fed. R. Civ. P. 60(b)(2), Plaintiffs acknowledge that the Report constitutes "newly discovered evidence" which they maintain "Plaintiffs could not, with reasonable

diligence, have discovered prior to" this Court's entry of summary judgment.[1]  Indeed, Plaintiffs acknowledge that this is a Rule 60(b)(2) motion in all but name, and even urge the Court to analyze their motion under the Rule 60(b)(2) framework – except for its time limits.  *See* Mot. at 8 ("Though not constrained here by Rule 60(b)(2), it may be useful for the Court to consider the policies expressed by that rule here…"); *id.* at 10 (arguing that they acted with reasonable diligence "[e]ven under Rule 60(b)(2)").  They claim, however, that this Court "is not constrained here by Rule 60(b)(2)" because this motion "is governed by the explicit order of the Eleventh Circuit." *Id.* at 8.  But a remand order does not exempt Plaintiffs from the Federal Rules of Civil Procedure.  *See Jackson v. Los Lunas Comm. Program*, 880 F.3d 1176, 1205 n.8 (10th Cir. 2018) ("Of course, on remand, the district court is free to perform a Rule 60(c)(1) timeliness analysis …").  Nor does anything in the Eleventh Circuit's remand order suggest that Plaintiffs have some unique right or this Court has some unique jurisdiction to ignore the Federal Rules once the case was remanded.  To the contrary, the remand order simply allows Plaintiffs to "move the district court for relief that would allow the district court to supplement the record with the Horowitz Report."  D.E. 443 at 1.

The only avenue available to Plaintiffs to do that is to file a motion under Rule 60(b)(2).  Once the deadline for Rule 59 motions has passed, Rule 60(b)(2) is the *only* post-judgment motion available to a party who wishes to seek relief from a judgment based on "newly-discovered evidence." *Gonzalez v. Sec'y for Dep't of Corr.*, 366 F.3d 1253, 1276 (11th Cir. 2004) ("[T]he procedure for obtaining relief from a judgment at the district court level is set out in Rule 60(b)."), *aff'd on other grounds sub nom. Gonzalez v. Crosby*, 545 U.S. 524 (2005); *see also United States v. Real Prop. & Residence Located at Route 1, Box 111, Firetower Rd., Semmes, Mobile City*, 920 F.2d 788, 791 (11th Cir. 1991) (Rule 60(b)(6) "applies only to cases

---

[1] This term "refers to evidence of facts in existence at the time of the trial of which the aggrieved party was excusably ignorant." *NLRB v. Jacob E. Decker & Sons*, 569 F.2d 357, 364 (5th Cir. 1978).  Because Plaintiffs seek to rely on the Report to establish what the FBI possessed in January 2017 – almost two years prior to judgment – the fact the Report itself was created after judgment makes no difference. *See, e.g.*, *Chilson v. Metro. Transit Auth.*, 796 F.2d 69, 70-72 (5th Cir. 1986) (audit report created post-judgment was "newly discovered evidence" for purposes of Rule 60(b)(2) where the facts documented in the audit existed at the time of trial); *Peacock v. Bd. of Sch. Comm'rs of City of Indianapolis*, 721 F.2d 210, 214 (7th Cir. 1983) ("[N]ew affidavits from witnesses who could testify to prior events" fell under Rule 60(b)(2) because they "pertain[ed] to facts in existence at the time of trial").

that do not fall into any of the other categories listed in parts (1)-(5) of Rule 60(b)"); *Sneed v. Pan Am Hosp.*, 435 F. App'x 839, 841 n.3 (11th Cir. 2011) ("In any event, because Sneed's motion was based on newly discovered evidence, it cannot be construed as a Rule 60(b)(6) motion."). And regardless of the label a party may put on its post-judgment motion, if it "was filed for the reasons set out in Rule 60(b)(2)" and "seeks Rule 60(b) relief in substance," the motion will be construed as a Rule 60(b)(2) motion. *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 966, 973 (11th Cir. 2016) (*per curiam*) (construing motion as Rule 60(b)(2) motion "because [it] was filed for the reasons set out in Rule 60(b)(2)"); *Albert v. Ameris Bank*, 517 F. App'x 900, 904 n.4 (11th Cir. 2013) ("Although Albert's first motion to reopen did not reference Rule 60(b), it sought Rule 60(b) relief in substance, and, therefore, we construe it as a Rule 60(b) motion.").

Moreover, the Eleventh Circuit's order simply directs the parties and the Court to follow the very procedure this Circuit has long held must be followed for Rule 60(b)(2) motions filed during the pendency of an appeal. Like most Circuits, the law in this Circuit is that a district court retains jurisdiction for the limited purpose of considering Rule 60(b) motions while an appeal is pending. *Mahone v. Ray*, 326 F.3d 1176, 1180 (11th Cir. 2003); *see also Lairsey v. Advance Abrasives Co.*, 542 F.2d 928, 931 (5th Cir. 1976). Its jurisdiction is constrained, however, in that a district court may only "deny the motion or indicate its belief that the arguments raised are meritorious. If the district court selects the latter course, the movant may then petition the court of appeals to remand the matter so as to confer jurisdiction on the district court to grant the motion." *Mahone*, 326 F.3d at 1180. That is the same procedure the Eleventh's Circuit's order contemplates here. Dkt. 443 at 2 ("If the district court issues an order stating that the record should be supplemented and the Horowitz Report would alter the court's previously issued summary judgment order, the parties shall seek a full remand of this case.").[2] Thus, Plaintiffs' motion should be treated for what it plainly is, a Rule 60(b)(2) motion seeking to reverse this Court's judgment on the basis of newly discovered evidence.

## II.    PLAINTIFFS' MOTION SHOULD BE DENIED AS UNTIMELY

Turning to the requirements of that Rule, a request for relief from judgment based on newly discovered evidence "is an extraordinary motion and the requirements of [Rule 60(b)(2)]

---

[2] In response to Plaintiffs' Motion to Supplement in the Eleventh Circuit, Defendants likewise maintained that the Motion was in substance a Rule 60(b)(2) motion that should have been filed in the district court in the first instance, and that it would be time-barred if properly filed.

must be strictly met." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1309 (11th Cir. 2003) (citation omitted). As an initial matter, Plaintiffs' motion should be denied because they filed it more than one year after judgment. A Rule 60(b)(2) motion must be brought within "a reasonable time," and no later than one year of judgment. Fed. R. Civ. P. 60(c)(1). Courts have no discretion to extend that deadline. Fed. R. Civ. P. 6(b)(2). The Eleventh Circuit routinely rejects Rule 60(b)(2) motions brought more than a year after judgment as untimely. *See, e.g.*, *Imperato v. Hartford Ins. Co.*, 2020 WL 486776, at *2 (11th Cir. Jan. 30, 2020) (*per curiam*); *Weiss v. Warden*, 703 F. App'x 789, 792 (11th Cir. 2017) (*per curiam*); *N. Am. Clearing, Inc.*, 656 F. App'x at 973; *Lillo v. Bruhn*, 522 F. App'x 508, 509 (11th Cir. 2013); *Bradford v. Unum Life Ins. Co. of Am.*, 224 F. App'x 937, 938 (11th Cir. 2007).

Here, the long-anticipated Report was released on December 9, 2019, so Plaintiffs still had ten days to bring a timely Rule 60(b)(2) motion. This gave them more than enough time, as illustrated by the fact that their own *amici curiae* contacted the undersigned counsel the next day and filed a brief addressing the Report on December 16. But Plaintiffs instead chose to wait three weeks, and then rather than bring what would have been an untimely Rule 60(b)(2) motion here they tried to bypass this Court and go straight to the Eleventh Circuit. Now that the issue has been properly joined in this Court, there is no authority outside of Rule 60(b)(2) that would permit this Court to grant a motion for post-judgment relief on the basis of newly-discovered evidence.[3] Because Plaintiffs failed to seek relief within a year of judgment, their motion must be denied.[4]

---

[3] The fact that Plaintiffs are forced to cite cases where courts supplemented the record *before* judgment only serves to illustrate that. *See* Mot. at 8; *see, e.g.*, *Paul v. William Morrow & Co.*, 380 F. App'x 957, 959 (11th Cir. 2010) (district court "lacked jurisdiction to grant relief under … Rule 60(b)(2) because [movant] did not file her motion within the applicable time limit").

[4] In the Eleventh Circuit, Plaintiffs argued it was "impractical" to expect them to file a motion addressing the 476-page Report in only ten days. That argument is both irrelevant, and wrong. It is irrelevant because the one-year deadline is not bounded by considerations of practicality. And it is wrong because not only do lawyers routinely digest such materials in far less time, but Plaintiffs' Motion primarily concerns just two sentences which anyone familiar with this case could have located a few minutes after downloading the Report from Department of Justice's website. The primary sentence Plaintiffs point to is located within a sub-section that is just two pages long and is clearly titled, both in the Table of Contents and the document, as "The FBI Receives Additional Steele Reporting Post-Election." Likewise, both sentences Plaintiffs rely on can easily be found instantly by searching the Report using obvious terms like "Buzzfeed" or "166," which only appear a handful of times. There was nothing impractical about filing a

### III.    PLAINTIFFS ARE NOT ENTITLED TO RELIEF FROM JUDGMENT ON THE MERITS

In addition to being time-barred, Plaintiff's motion should be denied on its merits. As noted above, Plaintiffs acknowledge that Rule 60(b)(2) provides at least a relevant guidepost. A party seeking relief under that rule must satisfy five requirements:

(1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result.

*Waddell*, 329 F.3d at 1309. Likewise, the Eleventh Circuit has applied similar criteria when considering whether to use its equitable powers to grant a motion to supplement the appellate record. *See, e.g.*, *Shahar v. Bowers*, 120 F.3d 211, 213 (11th Cir. 1997) (denying a motion to supplement because the moving party "made no motions to compel the discovery of [those facts]" in the district court.); *Animal Legal Def. Fund v. USDA*, 789 F.3d 1206, 1221 n.9 (11th Cir. 2015) ("We also decline to admit the letter pursuant to our equitable powers because its admission would not establish beyond any doubt the proper resolution of the pending issues."); *CSX Transp., Inc v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000) (considering "whether acceptance of the proffered material into the record would establish beyond any doubt the proper resolution of the pending issue."). Apart from proffering "newly discovered evidence", Plaintiffs cannot satisfy any of the other four requirements.

### A.    Plaintiffs Failed to Act With Due Diligence

The relevant inquiry is whether Plaintiffs demonstrated "due diligence in obtaining the *substance* of [the] information" they now seek to put before the Court. *Waddell*, 329 F.3d at 1309 (emphasis added). Here, what is at issue is information from the government about the FBI's receipt and/or use of Report 166, in addition to what Defendants obtained during the discovery process. Plaintiffs' motion should be denied because not only did they fail to seek any evidence about that subject during discovery, they affirmatively avoided every opportunity to do so and sought to thwart Defendants' efforts to obtain such information.

---

timely motion for post-judgment relief within ten days, nor would anything have prevented Plaintiffs from seeking leave to file any supplemental briefing supporting that motion if they thought that was warranted under the circumstances. In fact, after the *Fridman* plaintiffs filed a brief addressing the Horowitz Report on December 16, the parties there did just that by agreement and both filed additional briefs to address it.

As Plaintiffs' motion acknowledges, Defendants made extensive efforts to try to discover information about the government's use of the Dossier.  By contrast, Plaintiffs made a tactical decision not to participate or even appear in the Defendants' litigation against the government, which sought exactly the information they now say is so central to the case.  Instead, they repeatedly argued to this Court that no matter what Defendants sought from the government, it was all irrelevant.[5]  And on that basis, they actually tried to stymie Defendants' efforts by opposing the discovery extension Defendants needed while waiting for a decision on their motion to compel.  *See, e.g.*, D.E. 174 at 3.  Indeed, even as they now argue in this motion that this evidence is crucial to the case, Plaintiffs cannot let go of this position – they *still* claim that "the vast majority of Defendants' requests [from the government] were irrelevant to Defendants' defenses," and approvingly quote the Department of Justice's *losing* arguments opposing Defendants' motion to compel.  Mot. at 9-10.  Having actively opposed obtaining "the new evidence" in the ordinary course, Plaintiffs cannot now claim to have been diligent in seeking it.  *See Waddell*, 329 F.3d at 1310 (refusing to grant plaintiffs' motion for relief based on newly discovered testimony from key witness because "[b]efore summary judgment was granted, it was only Defendants who were complaining about insufficient information from [the witness]," and "Plaintiffs never indicated dissatisfaction with the information they had in hand from" him).

Plaintiffs' only response is to try to turn the tables by baldly misrepresenting the course of Defendants' litigation with the government.  They assert that Defendants' "fail[ed] to secure most of what they requested" and so any effort by Plaintiffs to obtain information "would have been futile."  Mot. at 9.  Even on its face, this a strange argument – that because Defendants were

---

[5] *See* D.E. 78 at 15:25-16:2 ("[T]hey're seeking to subpoena the entire spy world of the United States and they're making the case, I feel, larger than it really is."); D.E. 109 at 40:6-11 ("[A]ll of these subpoenas and third party motion practice to the CIA, to every government agency possible, the DNC, is all fishing for some information about items that were contained in there that relate to Trump and everything else.  None of that is directed to Aleksej Gubarev."); D.E. 154 at 23:24-24:2 ("[W]e think that a large portion of the third-party discovery that the defendants are trying to take in D.C. is really kind of irrelevant to the case."); D.E. 145 at 4 ("Plaintiffs contend that third party subpoenas and the letters of request issued by Defendants are futile because they are inconsistent with applicable law and will therefore result in an unnecessary delay of these proceedings."); D.E. 186 at 5 ("It is Plaintiffs' contention that, even if the Department of Justice complies with Judge Mehta's Order, it will not provide the Defendants with the facts needed to succeed on a Fair Report defense, given that there will still be no evidence that President Obama was briefed on either the allegations concerning the Plaintiffs or the December memo as a whole.").

supposedly overly diligent, Plaintiffs should be excused from exercising any diligence.  In any event, Plaintiffs' characterization of those proceedings is flatly wrong.  Judge Mehta's order granted Defendants' motion to compel *in its entirety*, and the actual course of that litigation makes clear why Plaintiffs' refusal to participate and active efforts to obstruct it weighs against granting the relief they now seek two years later.

While Defendants initially served multiple subpoenas, they narrowed the scope of what they sought in their initial motion to compel, just as any party involved in a discovery dispute is encouraged to do.  *See BuzzFeed, Inc. v. Dep't of Justice*, 318 F. Supp. 3d 347, 354 (D.D.C. 2018).  Moreover, shortly before the motion to compel was actually heard, the government declassified and released almost all of the Nunes report and other public records concerning the Dossier.  As a result, both Defendants and Judge Mehta agreed that the public release of that information effectively mooted most of the motion to compel – not because the discovery sought was irrelevant, but because the information had been just made publicly available.  Defendants thus narrowed their motion further, and Judge Mehta's order compelled the government to answer *all* of the few remaining items that were actually at issue by that point. *Id.* at 355, 364-65.

Had Plaintiffs elected either to subpoena the government themselves, or at least to participate in the litigation over the scope of any resulting discovery, they would have been free to argue to Judge Mehta that the Priestap Declaration was inadequate, or that they should have had a right to conduct some limited cross-examination regarding its contents, or make any other argument that opposing parties routinely make regarding the scope of discovery sought from a non-party.[6]  Nor can it be said that such efforts would necessarily have been futile, given that the government ultimately withdrew its classification objection, *id.* at 356, and Judge Mehta rejected the government's remaining arguments opposing any discovery.  In short, having tactically eschewed every opportunity to seek information about the government's treatment of Report 166 and instead dismissed it as an irrelevant "fishing" expedition, D.E. 109 at 40:6-11, Plaintiffs have failed to show "due diligence on the part of the movant to discover the new evidence" they now wish to rely on.  *See Shahar*, 120 F.3d at 213 (refusing to admit newly-discovered evidence for lack of diligence because movant "agreed to forego" seeking it during discovery).

---

[6] For example, although Plaintiffs subpoenaed Christopher Steele, Defendants fully participated in the resulting litigation in the U.K. and sought the right to ask questions about specific topics.

Case 0:17-cv-60426-UU Document 453 Entered on FLSD Docket 04/06/2020 Page 12 of 23

Plaintiffs could also have sought more information about the government's use of Report 166 from Christopher Steele. Here too, Plaintiffs misrepresent the circumstances. Plaintiff's counsel asked Steele at his deposition whether he had provided Report 166 to the FBI, the CIA, and/or the Department of Justice. D.E. 446-7 Ex. B at 121:5-126:17. The presiding officer found the question to be properly within the scope of the deposition the UK courts had ordered, but Steele still refused to answer – the *only* time during the deposition Steele refused to answer questions the examiner ruled were properly put to him. But Plaintiffs never sought to compel him to comply with that ruling. This too shows a lack of diligence. *See, e.g.*, *Shahar*, 120 F.3d at 213 (denying motion to supplement appellate record for lack of diligence because moving party "made no motions to compel the discovery" of the information at issue).[7]

Finally, Plaintiffs argue in their motion that they had no obligation to exercise *any* diligence because "it was *Defendants'* burden to prove every element of their Fair Report Privilege affirmative defense." Mot. at 9. That is a rather frank admission that they did not exercise any diligence, but in any event that is not how litigation works. Parties can and routinely do seek evidence both to support their own claims and defenses and to rebut those of their adversaries. For example, Defendants expended considerable resources to discover evidence relevant to elements of Plaintiffs' defamation claim like falsity and damages, both issues on which Plaintiffs bear the burden of proof. But if a party makes tactical decisions to forego discovery, it must accept the consequences and may not change its mind post-judgment. *See, e.g.*, *Brown v. Petrolite Corp.*, 965 F.2d 38, 50 (5th Cir. 1992) (holding that defendant was not entitled to relief from judgment in defamation case based on newly-discovered evidence on issue of falsity because it "could have discovered it earlier by exercising due diligence").

### B. The Two Sentences in the Report At Issue Are, at Most, Impeachment Evidence

Next, Plaintiffs also cannot meet the requirement that "the evidence must not be merely cumulative or impeaching." *Waddell*, 329 F.3d at 1309. While Plaintiffs' motion often refers to

---

[7] Plaintiffs attach a declaration from their U.K. counsel, Mr. Loble, in an effort to show that seeking to compel further testimony from Mr. Steele would have been "an expensive fool's errand." Mot. at 10; D.E. 446-8. But read carefully, the declaration establishes no such thing. Rather, it states that the first, and potentially most significant, step in the process would have simply been for Mr. Steele to ask his former UK government employer whether it wished to issue a certificate objecting to the testimony. D.E. 446-8 ¶¶ 15-17. But Plaintiffs did not even set in motion that initial step.

4848-9432-8249v.7 0100812-000009

the "Report" as a whole, most of the Report would be merely cumulative because it lays out in greater detail than the evidence already in the record just how central the Dossier was to government activity.  The Report describes months of government activity involving the Dossier, including an extensive FBI investigation and a major inter-agency debate about how to include its content in presidential briefings, and the close relationship between the FBI and Christopher Steele whereby "as a practical matter" Steele continued to function as an FBI source well into 2017 because the FBI continued to solicit and receive his reporting for "months" after the 2016 election.  *See* Report at 95-104, 108-20, 175-96, 203.

The crux of Plaintiffs' motion is that one sentence and one footnote in the Report supposedly "conflict with Priestap's declaration in this case that the FBI 'possess[ed]' Report 166 'prior to 5:20 p.m. EST on January 10, 2017.'"  Mot. at 7-8.  As set out below, Plaintiffs are reading these tea leaves in the Report for much more than they are worth – the Report does not in fact contradict the Priestap Declaration.  Even if it did, however, newly-discovered evidence offered because it purportedly "conflict[s] with" an existing affidavit is classic impeachment evidence, and it cannot justify relief from judgment under Rule 60(b)(2).  *See, e.g.*, *McGhee v. Georgia*, 204 F. App'x 809, 810-11 (11th Cir. 2006) (refusing to grant relief from judgment that relied on coroner's report based on newly-discovered report "challenging the veracity of the coroner's report" because the newly discovered report "is cumulative and, at most, impeaching"); *Sellers v. Mineta*, 350 F.3d 706, 716 (8th Cir. 2003) (newly-discovered employment records did not justify relief from plaintiff's judgment on sexual harassment claim because "even if the records showed that [plaintiff] did not work the night of [the first alleged harassment], the records would be relevant to the claims … only as impeachment evidence" of her sworn testimony that she did work then); *Diaz v. Methodist Hosp.*, 46 F.3d 492, 494-96 (5th Cir. 1995) (in negligence action that "turned on" whether hospital could have done blood tests over the weekend, newly-discovered affidavit that the hospital could do the test on the weekend did not support Rule 60(b)(2) relief because it "at best, impeaches [earlier] testimony that [the test] could not be performed over the weekend").  Because even under Plaintiffs' characterization of it the Report is being offered, at most, to impeach Assistant Director Priestap's testimony, it cannot justify the extraordinary remedy Plaintiffs seek here.

C.     **The Report is Not Material Evidence and Would Not Produce a New Result**

Plaintiffs also cannot satisfy the fourth and fifth requirements for relief from judgment – that the portions of the Report they seek to rely on would be evidence material to the application of the privilege, and they would probably produce a different result even if they were material.

### 1.    The Report does not contradict the Priestap Declaration

The Report does not "conflict with" the Priestap Declaration.  To claim it does, Plaintiffs try to put words in the mouth of the Inspector General that are not simply not there.  But when the actual words of the Report are considered, Plaintiffs are incorrect.

Then-FBI Assistant Director E.W. Priestap unambiguously stated in his declaration that the FBI "possess[ed]" Report 166 prior to the time it was published by BuzzFeed.  Priestap is also a primary, if not the primary, source of information in the Report.  The Report explains that Priestap personally approved the opening of the "Crossfire Hurricane" investigation, Report at iii, and his name appears in the Report more often than former Director James Comey (more than 150 times).  But the Report never suggests that Priestap previously provided false testimony about this point or any other.  Nor does the Report ever state the FBI did not possess Report 166 prior to its publication by BuzzFeed.

Rather, by its own terms the Report focused solely on a more specific issue:  whether or how the FBI received Steele's reports either "directly" from Steele himself, or from "third parties" who were not themselves working with the FBI on any Russia-related election matters – specifically Senator John McCain, Bruce Ohr, and *Mother Jones* reporter David Corn.  *See* Report at 94, 103-04, 116-17, 175-76.  The Report answers those questions, including by noting in one portion of a footnote that "[o]ne report that was not provided to the FBI directly or via third parties was published by BuzzFeed," Report at 94 n.215, and more than 80 pages later it repeats that Report 166 "was another report that had not been shared with the FBI."  *Id.* at 176.  The only thing that might be inferred from the Report, therefore, is that the Inspector General did not find that the FBI received Report 166 either from Steele or the type of outside "third party" it discusses prior to BuzzFeed's publication of the Dossier.

Otherwise, the Report expressly disclaims any intent to try to document all the specifics of how Steele's reports may also have been provided *to* or were circulating *within* all members of the US intelligence community.  *See* Report at 12 n.18 ("In this review, we also did not seek to assess the actions taken by or information available to U.S. government agencies outside the Department of Justice, as those agencies are outside our jurisdiction.").  Moreover, the Report

explains that by December 2017 the FBI was participating in a large, multi-agency task force under the direction of the ODNI to assess information about Russian interference in the election, Report at 177-81, and notes that other agencies like the CIA and NSA conducted their own analysis of Steele's reporting that was discussed within the task force, including with the FBI. *Id.* at 178. That is consistent with the summary judgment record in this case, which includes the declaration of Edward Gistaro, a Deputy Director at ODNI, who on behalf of ODNI, NSA, and CIA confirmed those agencies had a document responsive to a FOIA request seeking "a two-page synopsis [which] included allegations derived from a 35-page Dossier" subsequently published by BuzzFeed. D.E. 214-40 ¶¶ 11-14. The record here also establishes that Report 166 was given to the official principally responsible for Russia-related matters at the National Security Council well before BuzzFeed published it, D.E. 214-16 at 117:12-122:11. And even focusing on the FBI alone, the Report never purports to assert that no one in the FBI ever saw, possessed, or was aware of Report 166 at any point during the course of all of that activity, and certainly contains no hint that testimony previously provided by Priestap on this point under penalty of perjury should be discredited. For this reason as well, Plaintiffs' motion should be denied.

> 2. <u>The two sentences of the Report at issue are not admissible for the truth of their contents</u>

Even if the Report did contradict the Priestap Declaration, however, the two sentences at issue would not be admissible here for the truth of their contents. Plaintiffs claim that the Report is subject to judicial notice "as a U.S. government document." Mot. at 11. Certainly the Court may take judicial notice of the fact that the Report was issued by the Inspector General's office. Moreover, if not cumulative then many, perhaps even most, of the factual statements within the Report might be admissible for their truth, at least where they are consistent with other evidence that has emerged about these events. But the fact that some or most facts within a public report may be admissible does not mean that the whole report is, or that all factual statements within it are. *See, e.g.*, *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988).

Indeed, that principle is exactly what guided Defendants when they asked this Court to admit only certain specific factual statements within the Nunes and Schiff memos. Plaintiffs misleadingly imply that Defendants sought the admission of, and the Court admitted, the entire memos. Mot. at 11-12 & n.11. Not so. Rather, Defendants only relied on, and the Court only admitted, specific discrete facts within those memos that were either common to both or not

14

disputed between them, and Defendants certainly did not seek the admission of anything disputed by other sworn testimony.  That is because Defendants explicitly recognized that statements in government documents, including factual statements, cannot be admitted for their truth if it can be shown that "the source of information or other circumstances indicate a lack of trustworthiness."  D.E. 243 at 2 n.1 (quoting Fed. R. Evid. 803(8)).

Applying the same criteria here, regardless of whether Plaintiffs are asking the Court to admit the two sentences at issue under Fed. R. Evid. 201 (its power to take judicial notice of adjudicative facts) or Fed. R. Evid. 803(8) (the hearsay exception for public records and documents), their request should be denied.  "Indisputability is a prerequisite" to judicial notice, *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (citation omitted), even for government documents and reports.  *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (holding that district court erred when it "took judicial notice of *disputed* facts stated in public records.").  If the Report somehow does say that the FBI did not possess Report 166, that claim is certainly not indisputable – Plaintiffs themselves claim it contradicts testimony made upon personal knowledge on penalty of perjury.

The same is true under Rule 803(8).  If, for example, the Report had purported to investigate whether the Priestap Declaration was mistaken, concluded that it was and explained why, that might constitute the indicia of trustworthiness that is a prerequisite for admissibility.  But the Report does not remotely purport to do that.  Rather, the two isolated sentences in the Report relied on by Plaintiffs are entirely unsourced and never address the Declaration, and thus lack the clarity and indicia of trustworthiness that could support admissibility for the purpose of impeaching sworn testimony based on personal knowledge, especially in these circumstances.[8] *See, e.g.*, *Smith v. Pena*, 1998 WL 164774, at *12 (D.D.C. Mar. 31, 1998) (finding statements in government report to be untrustworthy because they conflicted with sworn testimony from key subjects); *Humane Soc'y of United States v. Hanor Co. of Wisc., LLC*, 289 F. Supp. 3d 692, 715 (E.D.N.C. 2018) ("Accordingly, while the 2017 EPA Office of Inspector General Report does itself serve as evidence of the Office of Inspector General's findings, conclusions, and

_____

[8] It bears noting that the Priestap Declaration was made in response to a court order in a closely watched case raising politically sensitive issues, in which DOJ attorneys answerable to the court selected Priestap as the declarant, produced the Declaration, and had no interest in or incentive to provide information potentially helpful to Defendants – if anything, quite the opposite.

recommendations made in 2017, the statements attributed to unspecified and unidentified 'EPA managers' are not, without more, admissible for the truth of the matter asserted."); *cf. Gess v. United States*, 952 F. Supp. 1529, 1534 n.8 (M.D. Ala. 1996) (finding report to be trustworthy partly because "it was never contradicted by the United States Government").  Indeed, the Report has already been subject to *two sets* of corrections and revisions since it was issued.  *See* Ex. 12.

Finally, for much the same reasons those two sentences may also be excluded solely on the basis of Rule 403, in that their probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, [and] misleading the jury."  Fed. R. Evid. 403.  Even if the accuracy of the Priestap Declaration was potentially dispositive in this case, which for the reasons discussed below it is not, Plaintiffs' position is that a jury should be asked to choose between two pieces of paper, one a simple and direct declaration made under penalty of perjury and the other two isolated sentences that appear 80 pages apart from each other within a 476-page report.  On its face, it is difficult to see how a jury could find that exercise anything other than hopelessly confusing.  Moreover, in order to even attempt to do that, as the arguments herein illustrate a jury would likely need to read most of the Report's remaining 476 pages in order to understand the full context in which those isolated sentences are presented.  But that would surely be prejudicial and misleading, as the Report is full of cumulative or irrelevant information, hearsay, and otherwise inadmissible material.  Finally, these circumstances further underscore why it would be inequitable to reward Plaintiffs' decision to bypass a discovery process that might have produced information more fully informing the contents of the Priestap Declaration – all of which they *still* maintain is actually immaterial and irrelevant to the fair report privilege – and allow them to instead to use an enigmatic and highly confusing snippet of a lengthy report after judgment has been entered.

      3.    <u>In any event, Defendants would still be entitled to summary judgment</u>

          a.    <u>The Fair Report Privilege</u>

Finally, even if the two sentences at issue were admitted and construed as Plaintiffs urge, they still would not "produce a new result" in this case.  Indeed, it is striking that much of the argument in Plaintiffs' motion challenges supposed errors in this Court's reasoning on summary judgment that have nothing to do with new evidence.[9]  Their motion even incorporates by

---

[9] *See* Mot. at 3 n.3 ("And, as Plaintiffs have argued on appeal, even if the FBI *had* possessed Report 166 at the time of publication, that was not sufficient, in itself, to satisfy Defendants'

reference their entire Eleventh Circuit briefs, filed months before the Report was released.  *See* Mot. at 10 n.10.[10]  But Plaintiffs may not use this motion to "ask[] this Court to reconsider its ruling with respect to [their] claims, notwithstanding the 'new evidence.'"  *Stevens v. Lynch*, 2016 WL 10950435, at *3 (N.D. Ga. Feb. 29, 2016), *aff'd*, 877 F.3d 1293 (11th Cir. 2017); *see, e.g.*, *Am. Bankers Ins. Co. of Fla. v. Nw. Nat'l Ins. Co.*, 198 F.3d 1332, 1338 (11th Cir. 1999).

When not essentially seeking reconsideration, the central premise of Plaintiffs' motion is that the Report's statements about Report 166 "undercut[] a key factual finding made by this Court" in its summary judgment decision because it "has fully kicked out the wobbly factual leg upon which the Court decided that Report 166 might somehow have been part of an official proceeding."  Mot. at 12-14.  While we are inclined to leave it to the Court to interpret its own summary judgment order, Defendants respectfully maintain that summary judgment would be warranted, and would be consistent with the Court's prior reasoning, regardless of whether the Priestap Declaration were to be considered – and all the more so if the Inspector General's Report were to be considered, for either of two reasons.

First, as discussed above, the record contains unrebutted evidence that other members of the IC involved in advising and briefing the President about Russian election interference had Report 166 before Buzzfeed published it, so whether or not the FBI was among them would make no difference to the application of the privilege.[11]  Second, even if that evidence was also

---

burden" to establish the privilege); *id.* at 5 ("[I]n its Summary Judgment Order, the Court (at Defendants' urging) largely considered the 17 separately-dated reports as if they constituted a unified whole, such that it deemed investigation of *any* information in *any* of them to be akin to investigation of *all* of the information in *every* report"); *id.* at 10 (arguing that evidence on summary judgment "failed to actually establish the facts *Defendants* needed to meet their burden"); *id.* at 14 (referring to "the wobbly factual leg upon which the Court decided that Report 166 might somehow have been part of an official proceeding").

[10] As if to prove the point, Plaintiff's *amici* – the plaintiffs in the related New York action – have re-filed their Eleventh Circuit briefs here as well.  *See* D.E. 449-1, 449-2.  Those briefs also long predate the Report, so their only conceivable purpose here is to urge reconsideration of this Court's original summary judgment order.  Moreover, their *amici* briefs just repeat the same arguments that were rejected in their case against BuzzFeed by the New York trial and appellate court, and they even further invite this Court to rule those New York courts were "incorrect." D.E. 449-2; *see also Fridman v. BuzzFeed, Inc.*, 172 A.D.3d 441 (N.Y. App. Div. 2019).

[11] Notably, in their Motion to the Eleventh Circuit Plaintiffs argued the Report should change the result here because "Report 166 clearly could not have been part of any 'official proceeding' if no government agency even knew about it at the time of publication. The only evidence that the District Court could have relied on in finding that any government agency even possessed Report

ignored, the record establishes that Steele drafted Report 166 specifically for "US investigative authorities," to be sent to them via Senator McCain, because Steele knew the Senator played a major role in national security affairs.  D.E. 214-19 at 98:23-99:4, 133:12-136:13; D.E. 214-20 at 148:5-150:18, 156:2-11, 178:15-179:2.  The Inspector General's Report also makes it clear that at the very time he wrote Report 166, Steele "as a practical matter" was still functioning as an FBI source.  Report at 177-81.  Report 166 by its own terms was merely a follow-up to reports Steele had previously written and provided to the FBI, including through Senator McCain, related to alleged activities of President Trump's former attorney, Michael Cohen.  So Steele sent a copy for that purpose (via Fusion GPS) to David Kramer (and a British national security official), only because he understood Kramer to be acting as "the nominated intermediary of Senator McCain."  D.E. 214-19 at 133:12-136:13, 138:22-25.  In doing so, Steele used the same route to provide the FBI with his reporting that he had just taken a couple of weeks earlier – via Kramer and Senator McCain, after the former Senator had specifically asked Kramer to travel to the UK and obtain it.  D.E. 214-16 at 26:19-25, 35:14-24, 42:23-43:11, 86:23-87:18, 94:5-95:4.

The record also makes clear that Kramer not only accepted Report 166, but planned to deliver it to Senator McCain, and had not yet done so only because the Senate was in recess.  *Id.* at 106:14-19.  In the meantime, Kramer delivered it directly to the White House official responsible for Russian affairs, as well as members of Congress.  *Id.* at 117:12-122:11; D.E. 214-19 at 83:9-16.  And the Report confirms that the FBI as part of its "Crossfire Hurricane" investigation was intensely investigating all aspects of Steele's reporting, both before and after BuzzFeed published the Dossier, Report at 102, 175, 177-79, 195-96, including at some point the specific allegations in Report 166 about Michael Cohen travelling to Prague to discuss to discuss paying "anti-Clinton hackers" – the very allegations Plaintiffs are suing over.  Report at 176.

Thus, even if the Priestap Declaration and the evidence about other members of the IC were ignored, it would be undisputed that by January 10, 2017, Report 166 had already reached the government and, at the very least, was in the process of reaching the FBI through the same channels that Steele's previous reports had travelled so that they could be included in its ongoing election investigation – and that it actually was included in that investigation.  Given the integral

---

166 at the time of Buzzfeed's report was the affidavit of Priestap . . ." Ex. 11 at 23.  Defendants' Opposition pointed to evidence that other agencies did possess the Report, and now in this Court Plaintiffs have pivoted to claiming the privilege turns solely on the FBI.

role that Steele, McCain, Kramer and multiple government agencies played in the whole course of the "official proceedings" concerning the Dossier and Russia's election interference, that is more than sufficient to satisfy the fair report privilege. Moreover, because the FBI went on to specifically include Report 166 in that investigation, the privilege applies even if were the case that Report 166 was still working its way through those channels to the FBI on January 10. Courts in analogous circumstances have applied the privilege where a discrete piece of information was clearly part and parcel of a whole course of conduct integral to an official proceeding. For example, New York courts have applied the privilege to reports of information to be included in judicial proceedings before it was actually included in a court filing, as long as it ultimately was. *See Hudson v. Goldman Sachs & Co.*, 304 A.D.2d 315, 315-16 (N.Y. App. Div. 2003) (since official proceeding had commenced, privilege applied where a party had told a newspaper its position that would be taken in pleading before it was filed in court); *Tacopina v. O'Keefe*, 2015 WL 5178405, at *4 (S.D.N.Y. Sept. 4, 2015) ("In certain circumstances, publication of legal documents that have not yet been filed may be protected by the fair reporting privilege. New York courts have held that statements to the press regarding the litigation position a party intends to take are protected by New York Civil Rights Law § 74, even where the documents containing the position have not yet been filed, so long as the party ultimately takes the position in the litigation."), *aff'd*, 645 F. App'x 7 (2d Cir. 2016); *see also Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 985 (7th Cir. 2004) (report that government blocked charity's assets based on terrorism links "was prescient, not inaccurate," because that did, in fact, happen a few months after the report was broadcast).

This Court's summary judgment analysis focused on the fact that "Report 166 discusses two issues that were indisputably the subject of official action," including "allegations of cooperation between Trump's 'team' and Russian operatives." D.E. 388 at 17. The Report further underscores that this was correct, and it therefore does not change the result here.

Finally, Plaintiffs somewhat remarkably argue that reversing summary judgment on the basis of the Report would promote New York public policies supporting the fair report privilege. While we believe their arguments mischaracterize New York policy, even on their face their arguments show why the opposite is the case. They note a concern about publishing materials that were never investigated, Mot. at 15, but the Report makes clear that the entire Dossier, including Report 166, was investigated. They also suggest the Report dismissed Steele's

19

reporting as "common innuendo" that merely "overlapp[ed]" official proceedings.  *Id.*  To the contrary, the Report dedicates hundreds of pages to explaining just how central Steele's reporting was to the FBI's investigation into the 2016 election, as well as the interactions between multiple national security agencies assessing Russian interference in the election.  And like any Inspector General's report, its principal purpose is to assess the propriety of the government's conduct concerning the Dossier and make recommendations for policy changes going forward.

As this Court has already found, "the press also provides the public with the information it needs to exercise oversight of the government, and with information concerning the public welfare," and "the fair report privilege exists to protect the press as it carries out these functions."  D.E. 169 at 11.  BuzzFeed published the Dossier as it was becoming clear that it was playing a meaningful role in government decision-making, and the Report underscores just how important that document had become by January 2017.  And ever since, the government's handling of the Dossier has been the subject of intense debate within the public and every branch of government charged with exercising oversight over official conduct.  Indeed, the very fact that three years after BuzzFeed first published the Dossier the Inspector General deemed it necessary to publish a 476-page report assessing the government's conduct with it only underscores why a privilege whose function is to provide the public with the actual document that has been at the heart of three years of debate over government conduct was properly applied here.

       b.    Other grounds for summary judgment

Finally, even if the Report was admitted and somehow changed the Court's fair report ruling, the ultimate result should still be no different because Defendants should be entitled to judgment on the other grounds raised in their summary judgment motion, which the Court did not reach.  *See* D.E. 214 at 12-20; D.E. 243 at 6-11.  Rather than repeat those grounds here, if the Court deems it necessary to consider them Defendants simply refer it to their summary judgment briefs and the corresponding portions of the summary judgment record discussed therein.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated:  April 6, 2020             Respectfully submitted,

                                 /s/ Katherine M. Bolger
                                 Katherine M. Bolger
                                 Nathan Siegel

Adam Lazier
Alison Schary
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
katebolger@dwt.com
nathansiegel@dwt.com
adamlazier@dwt.com
alisonschary@dwt.com

/s/ Roy Black
Roy Black
Jared Lopez
Black, Srebnick, Kornspan & Stumpf, P.A.
201 So. Biscayne Boulevard
Miami, Florida 33131
rblack@royblack.com
jlopez@royblack.com

*Attorneys for Defendants*

21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing, together with its exhibits, was served via CM/ECF of all counsel of record on the 6th day of April 2020.


By: /s/  Adam Lazier
Adam Lazier