# EXHIBIT 11

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

CASE NO. 18-15295-JJ, 19-10261

ALEKSEJ GUBAREV,
WEBZILLA, INC.,
and XBT HOLDING, S.A.

   Plaintiffs-Appellants-Cross-Appellees,

v.

BUZZFEED, INC. and
BEN SMITH,

   Defendants-Appellees-Cross-Appellants.

**APPELLANTS' MOTION FOR LEAVE TO SUPPLEMENT THE RECORD
WITH THE DECEMBER 9, 2019 REPORT OF
THE OFFICE OF THE INSPECTOR GENERAL**

## STATEMENT OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Webzilla, Inc.'s parent corporation is Plaintiff-Appellant XBT Holding, S.A. Plaintiff-Appellant XBT Holding, S.A. does not have a parent corporation and is not a publicly held corporation.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, counsel for the Appellants, Aleksej Gubarev, Webzilla, Inc., and XBT Holding, S.A, verify that the persons listed below have or may have an interest in the outcome of this case:

1.   ABC, Inc.

2.   Abrams, Floyd

3.   Abrutyn, Stephanie

4.   Advance Publications, Inc.

5.   American Society of News Editors

6.   The Associated Press

7.   The Associated Press Media Editors

8.   Association of Alternative Newsmedia

9.   AT&T, Inc. (NYSE: T)

10.   Aven, Petr

11.   Bailen, Mark

12.   Baker & Hostetler LLP

13.    Ballard Spahr LLP

14.    Barr & Camens

15.    Bernstein, Richard

16.    Bertsche, Robert

17.    Black, Roy

18.    Bolger, Katherine M.

19.    Bralow, David

20.    Brown, Bruce

21.    BuzzFeed, Inc.

22.    Cable News Network, Inc.

23.    Cahill Gordon & Reindel LLP

24.    Californians Aware

25.    Camens, Barbara

26.    Carter Ledyard & Milburn LLP

27.    Ciampa Fray-Witzer, LLP

28.    Cobb, Brady

29.    Comcast Corporation (CMCSA)

30.    Conti, Jason

31.    Covington & Burling LLP

32.    Cregan, James

33. Davis Wright Tremaine LLP

34. Donnellan, Johnathan

35. Dow Jones & Company, Inc.

36. Due, Johnita

37. Dunn, Matthew

38. The E.W. Scripps Company (Nasdaq: SSP)

39. First Look Media Works, Inc.

40. Fisher, Lauren

41. Fletcher, Heald & Hildreth, PLC

42. Francke, Terry

43. Fray-Witzer, Evan

44. Fridman, Mikhail

45. Fulop, Dylan

46. Giles, David

47. Goldberg, Kevin

48. Goldstein, Jacob

49. Gubarev, Aleksej

50. Gurvits, Valentin

51. Hearst Corporation

52. Home Box Office, Inc.

53. Homer Bonner Jacobs, P.A.

54. Ibarguen, Diego

55. The Inter American Press Association

56. The International Documentary Association

57. The Investigative Reporting Workshop

58. Kahn, German

59. Kaiser, Karen

60. Kelly, Chelsea T.

61. Kirby, Kathleen

62. Kurtzberg, Joel

63. Lazier, Adam

64. Lewis, Alan S.

65. Lopez, Jared

66. Malyshev, Alexander G.

67. McCraw, David

68. McDonough, Theodore Y.

69. The Media Institute

70. MPA- The Association of Magazine Media

71. The National Press Club

72. The National Press Club Journalism Institute

73. The National Press Photographers Association

74. NBCUniversal Media LLC

75. Nemon, Jacob H.

76. New England First Amendment Coalition

77. New England Newspaper and Press Association, Inc.

78. The New York Times Company (NYSE: NYT)

79. News Corporation (Nasdaq: NWS)

80. The News Guild- CWA

81. Nguyen, Lan

82. The Online News Association

83. Osterreicher, Mickey

84. Prince Lobel Tye LLP

85. Radio Television Digital News Association

86. The Reporters Committee for Freedom of the Press

87. Reporters Without Borders

88. Ruby Newco, LLC

89. Sanford, Bruce

90. Satyendra, Indira

91. Schary, Alison

92. Schwartz, Adam

93.   Shayefar, Matthew

94.   Siegel, Nathan

95.   Sitwala, Ravi

96.   Smith, Ben

97.   The Society of Environmental Journalists

98.   Society of Professional Journalists

99.   Tobin, Charles

100.  Townsend, Katie

101.  Univision Communications, Inc.

102.  The Honorable Ursula Ungaro

103.  Vigilante, David

104.  Vox Media, Inc.

105.  Walsh, John J.

106.  The Walt Disney Company (NYSE: DIS)

107.  Webzilla, Inc.

108.  White, Madelyn K.

109.  Wiley Rein LLP

110.  Wimmer, Kurt

111.  XBT Holding, S.A.

112.  Zucker, John

## **INTRODUCTION**

On December 9, 2019, the United States Office of the Inspector General

("OIG") released a report entitled "Review of Four FISA Applications and Other

Aspects of the FBI's Crossfire Hurricane Investigation," a comprehensive and

extensive review of the genesis and methods of the FBI's investigation into

President Trump's relationship with Russia and the FBI's subsequent efforts to

support a warrant to surveil former Trump campaign advisor Carter Page (the

"Horowitz Report").[1]  As part of the Horowitz Report, the OIG sought to

determine the relevance of a series of privately-produced opposition-research

memoranda created by Christopher Steele, a former British spy who was operating

---

[1] This thorough review included materials previously-unavailable to the public, including interviews with (among others) then-Assistant Director of the FBI's Counterintelligence Division, E.W. "Bill" Priestap (who submitted an affidavit in this case, as discussed below), former-FBI Director Comey, Department of Justice attorney Bruce Ohr, and Christopher Steele.  More specifically, according to the Horowitz Report, "the OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, former DAG Rod Rosenstein, former Acting AG and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies.... [The OIG was] given broad access to relevant materials by the Department and the FBI.  In addition, [the OIG] reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation."  Horowitz Report, p. i.

his own private for-profit business research firm.  A true and accurate copy of

Horowitz Report, as publicly released by the United States Government, is

attached hereto as **Exhibit 1**.

Some of the Horowitz Report's newly-released conclusions constitute

significant and persuasive evidence that conflicts with a key factual claim upon

which the District Court based its finding below – namely that, in publishing the

defamatory accusations about Plaintiffs contained in Steele's Report 166,

Defendant-Appellees made a "fair report" of "official proceedings," and are

therefore immune from suit for defamation.

That mixed law/fact determination is what is now before this Court for *de

novo* review.[2]  More specifically, the District Court concluded that Defendants met

their burden of proving by a preponderance of the evidence that publishing Report

166 was a "fair and accurate" "report" of an "official proceeding" simply by

presenting evidence that the FBI *possessed* Report 166 at the time that Defendants

published.[3]  By necessity, the District Court must also have concluded that no

_____

[2] *See*, *e.g.*, *Rodgers v. AWB Indus.*, 762 F. App'x 1015, 1021 (11th Cir. 2019) ("We
review the district court's ruling on a motion for summary judgment *de novo*,
applying the same legal standards that bound the district court....  We 'view all
evidence and factual inferences reasonably drawn from the evidence in the light
most favorable to the nonmoving party'—here, Plaintiff." (citations omitted)).
[3] The only evidence presented by Defendants that the FBI even *possessed* Report
166 when they published was an affidavit signed *only* by FBI's then-Assistant
Director, Bill Priestap.  As is discussed in more detail below, the OIG interviewed

reasonable jury could find otherwise (since the privilege question must be
submitted to a jury if underlying facts are in dispute).

But, as the Court will see, the Horowitz Report concluded that the FBI had
***not***, in fact, received Report 166 before Defendants published it.  *See* Horowitz

---

Mr. Priestap extensively, and reviewed his contemporaneous notes as part of its
investigation, yet still concluded that the FBI did ***not*** have Report 166 at the time
Defendants published the defamatory materials.  And, as Plaintiffs have argued on
appeal, even if the FBI *had* possessed Report 166 at the time of publication, that
was not sufficient, in itself, to satisfy Defendants' burden to prove: (1) that the FBI
was then "investigating" claims in Report 166 (and, more specifically, accusations
concerning Plaintiffs); and (2) that Defendants knew (i.e. relied upon) that fact in
their reporting.  Plaintiffs have explained that neither the District Court, nor
Defendants, nor their *amici*, cited any New York case in which §74 privilege was
afforded to the purported content of any "investigation" that was not explicitly
identified as relevant to that investigation by some specific record, report,
memorandum, or other official statement or document; or by a culminating public
action accusing the plaintiff, such as a firing or arrest; and Plaintiffs are unaware of
any such case. *See* Appellants' Reply Brief, p. 47.  But, now that the Horowitz
report has revealed findings regarding relevant and previously-classified matters, it
would risk a miscarriage of justice for the Court not to recognize that the Horowitz
Report's findings conflict with Mr. Preistap's affidavit.  Indeed, because the FBI
could not have investigated the claims of a memo it did not yet have, and
Defendants could not have known of any investigation which did not exist, this
Court's consideration of the Horowitz Report's findings could obviate the need for
an analysis of whether Defendants had met burdens (1) and (2) above.
Furthermore, the Horowitz Report's findings might even obviate the Court's
inquiry into whether reports of classified proceedings are privileged (as Plaintiffs
argue on appeal), since Defendants' privilege could be deemed defeated for an
alternate reason.

Report, p. 94, n. 215; pp. 175-176, fns. 317, 319, and 320; p. 176; *compare* DE

208-8 (memoranda as published by Buzzfeed), attached as **Exhibit 2**.

Accordingly, to achieve justice and judicial economy, this Court should

recognize the Horowitz Report as evidence that significantly undercuts the District

Court's key factual conclusion, and which therefore requires entry of summary

judgement for Plaintiffs on the question of privilege; or, at a minimum, as evidence

requiring jury determination of privilege, thereby precluding summary judgment

for either party.  *See*, *e.g.*, *Wexler v. Allegion (UK) Ltd*., 374 F.Supp.3d 302, 311-

12 (S.D.N.Y. 2019) ("It is for the Court to determine as a matter of law if a

publication is a 'fair and true' report under section 74, unless the Court determines

that an issue of fact remains....  In the latter instance, the question becomes one for

the jury.").

Plaintiffs therefore move that this Court take judicial notice of an official

U.S. government report (the Horowitz Report), affording Plaintiffs leave to

supplement the Record Appendix with that Report.  In the alternative, Plaintiffs

respectfully request that this Court remand the case for a determination, within two

months, of the limited question of whether, in the District Court's view, the

Horowitz Report is cause for reversal of the grant of summary judgment for

Defendants on the issue of privilege, either because the preponderance of evidence

now demonstrates that the FBI did not, in fact, have Report 166 when Buzzfeed

published; or because a disputed question of a fact crucial to determination of

privilege has been presented, such that the question of privilege must be

determined by a jury.  In further support of this motion, Plaintiffs state as follows.

## **BACKGROUND**

I.    **The District Court's Findings**

On January 10, 2017, Defendants Buzzfeed, Inc. and Ben Smith published

an article entitled *These Reports Allege Trump Has Deep Ties to Russia*, along

with 17 separate and distinct reports authored by Christopher Steele.  Included in

this collection of reports – which Buzzfeed dubbed the "Dossier," was Steele's

Report 166, dated December 13, 2016.

Report 166, the only one of Steele's reports produced *after* the 2016

Presidential election, contained raw information that Steele himself categorized as

"unsolicited" and needing verification.  D.E. 234-5, Ex. 66, p.42.  Report 166 was

also the only report to mention the Plaintiff-Appellants and contained the

defamatory statements concerning Plaintiffs which are the subject of the

underlying action.

On December 19, 2018, the District Court allowed Defendants' Motion for

Summary Judgment, issuing an Order and Judgment dismissing Plaintiffs'

Complaint.  D.E.388 [the "Summary Judgment Order"]; D.E.390.  The District

Court based its dismissal on its choice of New York's privilege law and,

more specifically, New York Civil Rights Law, §74 (a choice which Plaintiffs have

disputed, both below and on appeal).[4]

As the District Court noted, it was undisputed that the FBI received certain

specific Steele Reports at various times and from different sources.  However, in

its Summary Judgment Order, the District Court (at Defendants' urging)

considered the 17 separately-dated reports as if they constituted a unified whole,

such that investigation of any information in any of them was deemed to constitute

investigation of *all* of the information in *every* report.  Throughout its Summary

Judgment Order, the District Court applied the Buzzfeed-coined term "Dossier" to

the collection of 17 reports that Buzzfeed had received from David Kramer, a

private individual who had received the documents from Steele (who created the

---

[4] Section 74 provides that:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

> This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

Plaintiffs note that they dispute the choice of New York privilege law and have argued on appeal that, if the District Court had properly selected Florida privilege law, no privilege at all would apply as Florida law affords no privilege in reporting non-public proceedings.

reports as part of a private opposition-research project that he and his private

company had been paid (by another private company) to compile for the benefit of

a political rival to then-candidate Trump).

The District Court found, however, that "prior to Buzzfeed's publication of

the full Dossier, the FBI also possessed Report 166." D.E.388, p. 6. It presumably

made this finding based upon the only evidence in the record to that effect,

submitted by Defendants – an affidavit signed by FBI Assistant Director Priestap.

And, according to the District Court, the mere possession of Report 166 by the FBI

at the moment of Buzzfeed's publication was what was sufficient to bring that

report within the scope of the claimed "official proceedings," which the District

Court defined as the FBI's investigation of allegations contained in Steele's

Reports and related summary briefings provided to Presidents Trump and Obama

concerning, generally, some of the allegations contained in some of the Steele

Reports.

## II.  __The Report of the Office of the Inspector General__

On December 9, 2019, the Office of the Inspector General released the

Horowitz Report. Given that the Horowitz Report was not released until

December of 2019 (and had not even been created until after a year after summary

judgement was granted), it could not have been discovered by Plaintiffs' counsel

by the time the District Court granted summary judgement, nor could it have been presented to, or considered by, the District Court below.

But, the Horowitz Report contains factual conclusions, with significant implications for the matters decided below, which are now before this Court for determination, including the OIG's conclusion that the FBI did not, in fact, possess Report 166, ***until it was published by Buzzfeed.***

Specifically, on page 94, in discussing Steele's reporting, the Horowitz Report states that Steele had created a number of different reports, some of which:

> he provided to the FBI and… others that were provided to the FBI by third parties, as described in Chapter Six.

At the end of that sentence appears footnote 215, which includes the following:

> One report that was not provided to the FBI directly [i.e. by Steele] or via third parties was published by *BuzzFeed.*

Later, in the referenced "Chapter Six," and in describing the "other[]" reports "that were provided to the FBI by third parties," the OIG identifies the only three people from whom the FBI received Steele Reports (other than Steele himself): *Mother Jones* Reporter David Corn; Senator John McCain; and DOJ attorney Bruce Ohr.  And, more specifically, footnotes 317, 319 and 320 on pages 175 and 176 establish (by process of elimination) that the relevant "[o]ne report" mentioned at footnote 215 – the one "not provided to the FBI" by *any* source – was

Report 166, since every other report published by Buzzfeed appears in footnotes

317, 319, and 320.[5]

Indeed, this process of elimination is hardly necessary given that, on p. 176,

the Horowitz Report straightforwardly states:

> Finally, by early January 2017, *BuzzFeed* had obtained copies of some
> of the Steele election reports during a meeting with the McCain Institute
> staff member and published them as part of an article titled "These
> Reports Allege Trump Has Deep Ties to Russia." ***Included in this
> collection was Report 166, another report that previously had not
> been shared with the FBI.***

Horowitz Report, p. 176 (emphasis added).

The OIG reached this conclusion from having "examined more than one

million documents that were in the Department's and FBI's possession and

conducted over 170 interviews involving more than 100 witnesses" including

---

[5] The Steele Reports published by Buzzfeed were Reports Nos. **80, 86, 94, 95, 97,
100, 101, 102, 105, 111, 112, 113, 130, 134, 135, 136,** and *166*.  The report
numbers have been placed in numerical order here for the Court's convenience.
The reports listed in **bold** are those that the Horowitz Report identify as having
been provided to the FBI by ***some*** source – ***any*** source – prior to Buzzfeed's
publication of the same.  *See* D.E. 208-8.   *Compare with* Horowitz Report, p. 175,
fn. 317 ("The nine Steele reports [provided to the FBI by a *Mother Jones* reporter]
were Reports 80, 94, 95, 97, 105, 111, 112, 134, and 136. The FBI had not
previously obtained Reports 97, 105, and 112 from Steele.")**;** fn. 319 (Indicating
that the Reports received by the FBI from Senator John McCain "were Steele
Reports 80, 86, 94, 95, 97, 100, 101, 102, 105, 111, 112, 113, 130, 134, 135, and
136. FBI records show that the FBI had not previously received Reports 86, 97,
105, 112 and 113 from Steele.").

interviews with the then-Assistant Director of the FBI's Counterintelligence

Division, E.W. "Bill" Priestap, and reviews of Priestap's contemporaneous notes –

the very same Priestap who was the sole signatory to the FBI affidavit submitted

by Defendants below.  *See*, *e.g.*, Horowitz Report, pp. iii and 278.  More

specifically, the report details some of its methodology and the information it

reviewed, including as follows:

> [T]he OIG was given broad access to highly classified information. In
> July 2018, the FBI's then Assistant Director (AD) for the
> Counterintelligence Division (CD), E.W. "Bill" Priestap, briefed the
> OIG regarding the FBI CHSs [Confidential Human Sources] and UCEs
> [Undercover Employees] who provided information for the Crossfire
> Hurricane investigation.  This briefing was based on CD's knowledge
> of the Crossfire Hurricane investigation as well as searches of the FBI's
> Sentinel and Delta databases.  In this briefing, Priestap described the
> FBI's operational use of CHSs other than Steele and his subsources,
> and use of UCEs in the Crossfire Hurricane investigation.
>
> Separately, the OIG reviewed emails, text messages, and instant
> messages of the FBI agents, analysts, and supervisors working on the
> Crossfire Hurricane investigation, as well as contemporaneous
> handwritten notes, to identify references to CHSs and UCEs.

Horowitz Report, p. 306.

And, although the OIG's findings and conclusions conflict with Priestap's

prior declaration, in which Priestap stated that the FBI "possess[ed]" Report 166

"prior to 5:20 p.m. EST on January 10, 2017" (D.E. 214-11, p. 3), it bears

repeating that the OIG reached its conclusions after an exhaustive investigation

that included extensive interviews with Priestap himself and a review of his

contemporaneous notes. Priestap's declaration, on the other hand, contains no information as to the basis of his knowledge with respect to this specific issue.

Additionally, the Horowitz Report called into question the methodology, veracity, and credibility of Steele's Reports and sources, not to mention the unwillingness of the FBI and CIA to rely on such Reports, supporting Plaintiffs' argument that the accusations against them contained in Report 166 are not true, and therefore opposing Defendants' argument that they are entitled to summary judgment on the merits. *See*, *e.g.*, Horowitz Report, p. 178 ("The Supervisory Intel Analyst explained that the CIA believed that the Steele election reporting was not completely vetted and did not merit inclusion in the body of the report. The Intel Section Chief stated that the CIA viewed it as 'internet rumor.'"); p. 186 ("Steele relied on a primary sub-source (Primary Sub-source) for information, and this Primary Sub-source used a network of sub-sources to gather the information that was relayed to Steele; Steele himself was not the originating source of any of the factual information in his reporting."); pp. 186-187 ("[T]he FBI's interview with Steele's Primary Subsource ... raised doubts about the reliability of Steele's descriptions of information in his election reports.... [T]he Primary Sub-source told the FBI that he/she had not seen Steele's reports until they became public that month, and that he/she made statements indicating that Steele misstated or exaggerated the Primary Sub-source's statements in multiple sections of the

reporting."); p. 188 ("[T]he Primary Sub-source said he/she made it clear to Steele
that he/she had no proof to support the statements from his/her sub-sources and
that 'it was just talk.'...  [T]he Primary Sub-source explained that his/her
information came from 'word of mouth and hearsay;' 'conversation that [he/she]
had with friends over beers;' and that some of the information, such as allegations
about Trump's sexual activities, were statements he/she heard made in 'jest.'").

## **ARGUMENT**

### I.   **This Court Has the Inherent Power to Supplement the Record on Appeal with Evidence Not Reviewed Below in the Interests of Justice and Judicial Economy.**

Although federal appellate courts "do not often supplement the record on
appeal with evidence not reviewed by the court below, it is clear that the authority
to do so exists."  *Dickerson v. Alabama*, 667 F.2d 1364, 1367 (11th Cir. 1982).
*See*, *also*, *First Alabama Bank v. Parsons Steel, Inc.*, 825 F.2d 1475, 1487 (11th
Cir. 1987) ("This Court has the discretionary power to supplement the record on
appeal, even to include evidence not reviewed by the court below."); *Hinson v.
Edmond*, 192 F.3d 1342, 1344 n.2 (11th Cir. 1999) ("Although the contract was
not reviewed by the district court below, we have the inherent power to supplement
the record with materials not submitted to the district court.").

The decision of whether to supplement the record on appeal with materials
not before the District Court is made on a case-by-case basis.  *Schwartz v. Millon*

*Air, Inc.*, 341 F.3d 1220, 1225 n.4 (11th Cir. 2003).  *See*, *also*, *CSX Transp. Inc. v.
City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000) ("We do, however,
have the inherent equitable power to allow supplementation of the appellate record
if it is in the interests of justice....  We decide on a case-by-case basis whether a
particular appellate record should be supplemented.").

　　Nevertheless, this Court has articulated some of the circumstances under
which it has found such supplementation to be appropriate.  *See*, *e.g.*, *Young v. City
of Augusta ex rel. DeVaney*, 59 F.3d 1160, 1168 (11th Cir. 1995) ("Factors we
have considered in deciding to grant a motion to supplement include whether the
additional material would be dispositive of pending issues in the case[,] and
whether interests of justice and judicial economy would thereby be served....
However, these are only guidelines for exercising our discretion.  Even when the
added material will not conclusively resolve an issue on appeal, we may allow
supplementation in the aid of making an informed decision."); *Schwartz*, 341 F.3d
at 1225 n.4 ("Even when the added material will not conclusively resolve an issue
on appeal, we may allow supplementation in the aid of making an informed
decision."); *CSX Transp*, 235 F.3d at 1330-31 ("A primary factor which we
consider in deciding a motion to supplement the record is whether acceptance of
the proffered material into the record would establish beyond any doubt the proper
resolution of the pending issues....  'The rules of practice and procedure are

devised to promote the ends of justice, not to defeat them....  Orderly rules of

procedure do not require sacrifice of the rules of fundamental justice.'"); *Hinson*,

192 F.3d at 1344 n.2 (treating a motion to remand for addition of a contract to the

record as, instead, a motion to supplement the record with the relevant contract,

because doing so would result in a "record that will allow us to decide the

immunity question fairly").

## II.    **This Court Can and Should Take Judicial Notice of the Horowitz Report and the Findings Contained Therein**

This Court may take judicial notice of the Horowitz Report as a U.S.

government document.  *See*, *e.g.*, *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d

1041, 1047-48 (11th Cir. 2019) (Carnes, CJ., concurring) (taking judicial notice of

Cruise Line Incident Reports compiled and published by the Department of

Transportation pursuant to Fed. R. Evid. 201(b), (d)); *Terrebonne v. Blackburn*,

646 F.2d 997, 1000 n.4 (5th Cir. June 1981) (en banc) ("Absent some reason for

mistrust, courts have not hesitated to take judicial notice of agency records and

reports."); *Corrie v. Caterpillar*, 503 F.3d 974, 978 n.2 (9th Cir. 2007) (taking

judicial notice of government publication and citing cases for the same); *Okoi v. El*

*Al Isr. Airlines*, 378 F. App'x 9, 11 n.1 (2d Cir. 2010) (rejecting a motion to

supplement the record for documents offered by appellant ***except*** "for the final

three pages, which contain excerpts of a government publication of which this

Court may take judicial notice.").

Indeed, in reaching its decision (and at the urging of Appellees), the District Court in this case took judicial notice of competing memos written by Congressmen Devin Nunes and Adam Schiff.[6] *See* D.E. 388, p. 4, fn. 5 (finding such documents admissible under FRE 803(8)(A)(iii) and self-authenticating under FRE 902(5)); D.E. 243, p. 2, fn. 1 (arguing admissibility and self-authentication under the same sections).

And, as this Court has held:

> We may take judicial notice of matters that the district court did not. *See* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *United States v. Greer*, 440 F.3d 1267, 1272 (11th Cir. 2006) (taking judicial notice of a fact even though the district court did not); *Coney v. Smith*, 738 F.2d 1199, 1200 (11th Cir. 1984) (noting that although the matter was "not made a part of the record before the district court, we may take judicial notice of the same").

*Royal Caribbean Cruises*, 931 F.3d at 1047-48 (Carnes, CJ., concurring).

---

[6] The District Court found it appropriate to take judicial notice of the facts asserted in the Nunes and Schiff memos even though the memos took partisan positions and often reached directly contradictory conclusions. D.E. 388, p. 4. The Horowitz Report, on the other hand, is a comprehensive report of a factual investigation by the non-partisan Office of the Inspector General.

III.   **The Court Should Supplement the Record to Include the Horowitz
Report in the Interests of Justice and Judicial Economy.**

A.   **The Horowitz Report Will Aid This Court in Making an Informed
Review, and May Dispose of an Issue Before This Court, While
Obviating Inquiries Subordinate to the Determination of Whether
the FBI Possessed Report 166 at the Time Buzzfeed Published.**

It was Defendants' burden to prove every element of its affirmative defense

based on the Fair Report Privilege.  *See*, *e.g.*, *Saleh v. New York Post*, 78 A.D.3d

1149, 1151 (N.Y. App.Div. 2010) ("The privilege afforded by Civil Rights law §

74 is an affirmative defense...."); *Donawa v. United States AG*, 735 F.3d 1275,

1282 (11th Cir. 2013) ("[T]he defendant bears the burden of proving an affirmative

defense.").

The plain language of §74 excludes from protection "the report of anything

said or done at the time and place of such a proceeding which was not a part

thereof."  Defendants therefore had to prove, at a minimum, that Report 166 (and

the defamatory comments contained therein) was, in fact, part of an "official

proceeding" *at the time of* Buzzfeed's publication.  But Report 166 clearly could

not have been part of any "official proceeding" if no government agency even

knew of it at the time of publication.  The only evidence that the District Court

could have relied upon in finding that any government agency even possessed

Report 166 at the time of Buzzfeed's report was the affidavit of Priestap, stating

merely that the FBI possessed Report 166 at the time and date of Buzzfeed's

report.  The Horowitz Report, however, concluded that that was not so.  Horowitz Report, p. 176 ("Included in this collection was Report 166, another report that [prior to publication by Buzzfeed] had not been shared with the FBI."); p. 94 and fn. 215 ("One report that was not provided to the FBI directly or via third parties was published by BuzzFeed.")  *See*, *also*, Appellants' Opening Br. pp. 35-38 and 50-54; Appellants' Reply Brief, pp. 42-65.

Moreover, given the Horowitz Report (coupled with the evidence presented to the District Court), this Court should conclude that Defendants failed to meet their burden of proving that, at the time of publication, they *knew* that Report 166 was part of an "official proceeding" and had *relied on* that knowledge in deciding to publish Report 166.  *See* Appellants' Opening Br. pp. 34-36; Appellants' Reply Brief, p. 43, fn. 25; pp. 56-57, fn. 28; pp. 61-63.

Either of these conclusions – that the defamation was not part of an "official proceeding," or that Buzzfeed did not rely on knowledge of that fact in its reporting – would be dispositive of the present appeal on *de novo* review, given the necessary corollary that the Defendants would, as a matter of law, have failed to meet their burden of proving (by a preponderance of the evidence) the elements of their Fair Report defense, and that would require reversal of the District Court's grant of summary judgment.

And, at a minimum, the Horowitz Report certainly presents at least one factual question that precludes a determination on the privilege question as a matter of law, necessitating a jury trial on the issue. This, too, would be dispositive, requiring a reversal and remand to the trial court. As such, this Court should allow the record to be supplemented to include the Horowitz Report.

**B. The Horowitz Report Makes Clear That the Application of New York's Fair Report Privilege in the Present Case is Inconsistent with the Public Policy Underlying the Privilege.**

Consideration of the Horowitz Report would also permit the Court to place in greater context the important public policy concerns underlying the Fair Report Privilege. As Plaintiffs have explained (Opening Br. pp. 29-31; Reply Brief, pp. 43-47), the public policy underlying the application of the Fair Report Privilege counsels against extending it to reporting on materials that may have been provided to an investigatory body, but which were not themselves relied upon or truly investigated as part of the official activity. *See, e.g., Kelley v. Hearst Corp.*, 157 N.Y.S.2d 498, 502 (App.Div. 1956) ("The only reference to official action of any kind in the texts pleaded in the complaint as libelous are the words 'police said' in the first publication described. The narration in private to newspaper reporters by police officers of acts of other persons is not 'a public and official proceeding' coming within the range of the statute."); *Wynn v. Smith*, 117 Nev. 6, 16 (2001) (report prepared by Scotland Yard that was "unsubstantiated" was not

entitled to protections of the fair report privilege: "We conclude that this privilege should not be extended to allow the spread of common innuendo that is not afforded the protection accorded to official or judicial proceedings.").

Here, the Horowitz Report illuminates the wisdom of courts' wariness in extending the Fair Report Privilege to materials such as Report 166 that may have been provided to investigators but which were not themselves part of any official activity: such materials are often little more than "common innuendo" or, as the CIA Intel Section Chief classified the Steele Reports, "internet rumor."  Horowitz Report, p. 178.

Because the Horowitz Report would assist this court in determining if the public policy concerns underlying the Fair Report Privilege would be undermined by extending the privilege to cover Buzzfeed's publication of Report 166, the Court should permit the supplementation of the record to include the Horowitz Report.

## C. Because This Court's Review is *De Novo*, Judicial Economy Would Be Best Served by This Court Considering the Horowitz Report in the First Instance.

Plaintiffs filed their notice of appeal in this case more than one year ago.  It is undisputed that this Court reviews a district court's ruling on a motion for summary judgment *de novo*, viewing all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving

party, here the Plaintiff-Appellants. *Rodgers v. AWB Indus.*, 2019 U.S. App.

LEXIS 4990, at *12-13 (11th Cir. Feb. 21, 2019).  The District Court is in no better

position than this Court to determine the extent to which the Horowitz Report

influences the legal analysis of the applicability (or inapplicability) of New York's

Fair Report Privilege to the present case.  As such, judicial economy would be best

served by allowance of the present motion.

**IV.** **In the Alternative, This Court Should Order a Limited Remand to the
District Court Explicitly for a Determination, Within Two Months, to
Determine Whether its Summary Judgment Order Should Be Reversed
in Light of the Horowitz Report.**

This Court has recognized that it is sometimes appropriate to allow a motion

to supplement the record and yet still remand the matter to the District Court for

limited reconsideration of a grant of summary judgment in light of the

supplementation.  *See, e.g., CSX Transp. Inc.*, 235 F.3d at 1331 ("Under the

circumstances of this case, we conclude that the motion to supplement the record

should be granted.  Since the district court never had the opportunity to consider

what effect, if any, the City's participation in the GIRMA fund has on the City's

indemnification agreement with CSX, we shall remand the case to the district court

so that it may consider this fact....").

And, although Plaintiffs believe that this Court can (and should) consider the

relevance of the Horowitz Report in the first instance, if the Court were to remand

to the District Court, Plaintiffs would respectfully request that this Court's remand

order limit the District Court's reconsideration to a period of two months, so as not to delay this Court's consideration of Plaintiffs' appeal.

## **CONCLUSION**

For the reasons stated hereinabove, this Court should take judicial notice of the Horowitz Report and permit Plaintiff-Appellants to supplement the record with the same. In the alternative, this Court should remand to the District Court for two months to allow a determination of whether the Horowitz Report requires reversal of its grant of Summary Judgment to Defendants based on New York's Fair Report Privilege.

Respectfully Submitted,

/s/ Evan Fray-Witzer
Evan Fray-Witzer
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
617-426-0000
Evan@CFWLegal.com

/s/ Valentin Gurvits
Valentin Gurvits
Boston Law Group, PC
825 Beacon Street, Ste 20
Newton, MA 02459
617-928-1800
vgurvits@bostonlawgroup.com

/s/ Matthew Shayefar
Matthew Shayefar
Law Office of Matthew Shayefar, PC
925 N La Brea Ave
W. Hollywood, CA 90038
323-948-8101
matt@shayefar.com

Attorneys for Plaintiff-Appellants

Dated:          December 30, 2019

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limit of Fed. R. App.

P. 27 because, excluding the parts of the document exempted by Fed. R. App. P.

32(f), the document contains 5,189 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Office 365 in size 14 font of the font style Time New Roman.


/s/ Matthew Shayefar, Esq.

Attorney for Plaintiff-Appellants

Dated: December 30, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 30, 2019, I electronically served the

foregoing document on the parties participating in this case by filing it with the

Appellate CM/ECF system.


Dated:        December 30, 2019            /s/ Matthew Shayefar
                                           Matthew Shayefar