# EXHIBIT 2

# District of Columbia
# Court of Appeals

**No. 18-CV-919**

F I L E D
JUN 18 2020
DISTRICT OF COLUMBIA
COURT OF APPEALS

MIKHAIL FRIDMAN,
PETR AVEN AND GERMAN KHAN,

                                        Appellants,

        v.                                                      **CAB2667-18**

ORBIS BUSINESS INTELLIGENCE
LIMITED AND CHRISTOPHER STEELE,

                                        Appellees.


On Appeal from the Superior Court of the District of Columbia
Civil Division


BEFORE:  Blackburne-Rigsby, Chief Judge, and Fisher and Beckwith, Associate Judges.

# J U D G M E N T

        This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

        ORDERED and ADJUDGED that the judgment of the Superior court which granted appellees' special motion to dismiss is affirmed.

                        For the Court:

                        *Julio A. Castillo*
                        JULIO A. CASTILLO
                        Clerk of the Court

Dated: June 18, 2020.

Opinion by Associate Judge Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

FILED 6/18/2020
District of Columbia
Court of Appeals
*Julio A. Castillo*
Julio Castillo
Clerk of Court

No. 18-CV-919

MIKHAIL FRIDMAN, PETR AVEN, AND GERMAN KHAN, APPELLANTS,

v.

ORBIS BUSINESS INTELLIGENCE LIMITED AND CHRISTOPHER STEELE, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-2667-18)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued November 21, 2019                    Decided June 18, 2020)

*Alan S. Lewis*, with whom *John J. Walsh*, *Madelyn K. White*, and *Kim Hoyt Sperduto* were on the brief, for appellants.

*Christina Hull Eikhoff*, with whom *Kristin Ramsay* and *Kelley C. Barnaby* were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and FISHER and BECKWITH, *Associate Judges*.[1]

---

[1]   Associate Judge McLeese was a member of the panel at the time of oral argument. He later recused himself and was replaced by Chief Judge Blackburne-Rigsby.

FISHER, *Associate Judge*:   Appellants challenge an order of the Superior Court which granted appellees' special motion to dismiss, brought under the District of Columbia Anti-SLAPP Act.   D.C. Code §§ 16-5501-5505 (2012 Repl. & 2019 Supp.).   Appellants present three primary arguments: (1) the Anti-SLAPP Act does not apply to the facts of this case; (2) assuming that the Anti-SLAPP Act does apply, appellants have demonstrated that their claim is likely to succeed on the merits; and (3), in any event, the court erred by granting the special motion to dismiss without allowing appellants to conduct targeted discovery.   Finding appellants' arguments unpersuasive, we affirm the trial court's judgment dismissing the case.

## I.  Factual and Procedural Background

According to appellants' complaint, in advance of the 2016 presidential election, Washington, D.C.-based Fusion GPS hired appellees Christopher Steele and his company Orbis Business Intelligence Limited ("Orbis") to conduct opposition research about then-candidate Donald J. Trump.   While appellees were initially hired by Mr. Trump's Republican opponents, once it became clear that he would be that party's nominee, appellees began working for the Democratic National Committee and Hillary Clinton's campaign.   Beginning that summer,

appellees investigated what if any connections Mr. Trump and his campaign might have to Russia and Russian President Vladimir Putin, and compiled the results of their investigation into Company Intelligence Reports ("CIRs").  The complaint states that by the end of October 2016 appellees had created seventeen CIRs, which collectively became known as the Steele Dossier.

Appellants Mikhail Fridman, Petr Aven, and German Khan are "ultimate beneficial owners" of Alfa Group ("Alfa"), a "Russian business conglomerate." They claim that one of the reports in the Steele Dossier, CIR 112, defamed them. CIR 112 is a two-page report entitled "RUSSIA/US PRESIDENTIAL ELECTION: KREMLIN-ALPHA GROUP CO-OPERATION."[2]  The report mentions each appellant by name and refers to an alleged relationship among appellants, their company Alfa Group, and President Putin.  The report begins with a three-bullet summary which states:

- Top level Russian official confirms current closeness of Alpha Group-PUTIN relationship.  Significant favours continue to be done in both directions and FRIDMAN and AVEN still giving informal advice to PUTIN, especially on the US

---

[2]  CIR 112 consistently refers to appellants' company as Alpha Group, but appellants represent that the proper spelling is Alfa Group.

- Key intermediary in PUTIN-Alpha relationship identified as Oleg GOVORUN, currently Head of a Presidential Administration department but throughout the 1990s, the Alpha executive who delivered illicit cash directly to PUTIN

- PUTIN personally unbothered about Alpha's current lack of investment in Russia but under pressure from colleagues over this and able to exploit it as lever over Alpha interlocutors

Following the summary, the report contains three numbered paragraphs marked "[d]etail."  In relevant part, this section states that, "[s]peaking to a trusted compatriot in mid-September 2016, a top level Russian government official" discussed the relationship between Putin and "the Alpha Group of businesses led by oligarchs Mikhail FRIDMAN, Petr AVEN and German KHAN."  These "leading figures in Alpha" are on "very good terms with PUTIN," and "[s]ignificant favours continue[] to be done in both directions, primarily political ones for PUTIN and business/legal ones for Alpha."  According to the report, in the 1990s Fridman and Aven relied upon Govorun, who at the time was "Head of Government Relations at Alpha Group," to act as "the 'driver' and 'bag carrier' used by FRIDMAN and AVEN to deliver large amounts of illicit cash to the Russian president, at the time deputy Mayor of St. Petersburg."  The report concludes by stating that "Alpha held 'kompromat' on PUTIN and his corrupt business activities from the 1990s," but at the same time, "the Russian president

5

was able to use pressure . . . from senior Kremlin colleagues as a lever on FRIDMAN and AVEN to make them do his political bidding."

According to appellants' complaint, Steele personally briefed members of the media about the dossier.  After these alleged briefings, news articles began circulating which described some of the contents of the dossier.  A writer for *Mother Jones* magazine interviewed Steele and wrote an article entitled "A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump," which was published on October 31, 2016.  The author stated that he had "reviewed" the early reports in the dossier, from which the article quoted.

Appellants also allege that, in addition to contacting the media, Steele met with various politicians to discuss the dossier.  On separate occasions in September 2016, appellants claim, Steele briefed an official from the State Department and another from the Department of Justice.  He also met with an individual affiliated with Senator John McCain and, in November 2016, delivered a copy of the dossier "for redelivery and further publication to Senator McCain in D.C."

On January 10, 2017, after Mr. Trump won the presidential election, BuzzFeed, Inc. ("BuzzFeed"), published the Steele Dossier in its entirety on the internet. Along with the dossier, BuzzFeed published an article entitled "These Reports Allege Trump Has Deep Ties to Russia."

Appellants initiated this lawsuit in the Superior Court on April 16, 2018, alleging that CIR 112 included "facially defamatory statements." The lawsuit claimed that appellees "did not know the unverified, anonymous, inherently harmful accusations in CIR 112 about [appellants] to be true" when they "intentionally" published that information to the individuals and entities discussed above. In response, appellees filed a special motion to dismiss pursuant to § 16-5502 of the District of Columbia Anti-SLAPP Act and a motion to dismiss under Super. Ct. Civ. R. 12(b)(6).

The Honorable Anthony C. Epstein granted appellees' special motion to dismiss and denied the Rule 12(b)(6) motion as moot. Judge Epstein determined that appellees had made a prima facie showing that the Anti-SLAPP Act applied to the conduct at issue because it involved a right of advocacy on an issue of public interest. Regarding the right of advocacy, Judge Epstein held that, "[e]ven if Mr.

7

Steele did not meet with the media in a public place or forum, he engaged in expression involving communicating information to members of the U.S. public through the media." Indeed, the court explained, "Plaintiffs challenge Mr. Steele's provision of his dossier to the media precisely because he expected and intended the media to communicate the information to the public in the United States and around the world."

The court commented that the fact that the dossier contained so-called "raw intelligence" did not make the Act inapplicable because "the public is interested in facts as well as opinions," and "[t]he First Amendment protects not only statements of pure opinion but also statements of fact and of opinions that imply or rely on provably false facts, unless the plaintiff proves that the statements are false and that the defendant's fault in publishing the statements met the requisite standard." On the question of whether the expressive conduct concerned an issue of public interest, Judge Epstein found that CIR 112 addressed not just the possibility of Russian interference in the 2016 presidential election but also "relations between the United States and Russia more generally." He determined that the "involvement of Russian international businessmen in Russian foreign policy, specifically including Russian foreign policy toward the United States, involves an

issue of public interest in the United States, regardless of whether it relates to a particular election."

Next, the judge concluded that appellants had not offered evidence from which a reasonable jury could return a verdict in appellants' favor.  In reaching that determination, Judge Epstein found that appellants were limited-purpose public figures who had failed to meet the constitutionally required standard of showing that appellees acted with actual malice.  Finally, Judge Epstein denied appellants' request for targeted discovery, holding that appellants had failed to show that discovery would be "likely to uncover clear and convincing evidence that, for example, Mr. Steele fabricated any information provided in CIR 112 or had solid intelligence that his source(s) fabricated it."  This appeal followed.

## II.  Discussion

"A 'SLAPP' (strategic lawsuit against public participation) is an action 'filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view.'"  *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (quoting Council of the District of Columbia, Report

9

of Comm. on Public Safety and the Judiciary on Bill 18-893, at 1 (Nov. 18, 2010)

("November Report")).   In enacting the Anti-SLAPP Act, the Council of the

District of Columbia took into consideration research showing that SLAPPs:

> [H]ave been increasingly utilized over the past two
> decades as a means to muzzle speech or efforts to
> petition the government on issues of public interest.
> Such cases are often without merit, but achieve their
> filer's intention of punishing or preventing opposing
> points of view, resulting in a chilling effect on the
> exercise of constitutionally protected rights.

November Report at 1.   To mitigate "the amount of money, time, and legal

resources" that defendants named in such lawsuits must expend, the Anti-SLAPP

Act created substantive rights which accelerate the often lengthy processes of civil

litigation.  *Id*.  These rights include a special motion to dismiss which provides for

the expeditious dismissal of a complaint, *see* D.C. Code § 16-5502(a), and the

ability to stay discovery until that motion has been ruled upon, *id*. § 16-5502(c).

The party filing a special motion to dismiss must first show that the Act

applies.  *Id*. § 16-5502(b); *see Mann*, 150 A.3d at 1232.  Once applicability has

been established, the burden then shifts to the non-moving party to show "that the

claim is likely to succeed on the merits."  D.C. Code § 16-5502(b).  If the non-

moving party fails to meet that standard, then the motion must be granted and the case will be dismissed with prejudice. *Id.* § 16-5502 (b), (d).

### A. Prima Facie Showing That the Anti-SLAPP Act Applies

We first address whether appellees have made a prima facie showing that the claims at issue fall under the protection of the Anti-SLAPP Act — do the claims "aris[e] from an act in furtherance of the right of advocacy on issues of public interest"? *Id.* § 16-5502(a). Appellants do not challenge that the "content of CIR 112 includes 'an issue of public interest.'" However, the parties do dispute whether the publication of CIR 112 met the "act in furtherance of the right of advocacy" requirement of the Act. *Id.* Although our opinion in *Doe No. 1 v. Burke*, 91 A.3d 1031, 1041-44 (D.C. 2014), addressed the definition of an "issue of public interest," none of our published opinions to date has construed "in furtherance of the right of advocacy."

The Anti-SLAPP Act defines an "act in furtherance of the right of advocacy on issues of public interest" as:

(A)  Any written or oral statement made:

(i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

(ii)In a place open to the public or a public forum in connection with an issue of public interest; or

(B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

D.C. Code § 16-5501(1).  The parties agree that § 16-5501(1)(A)(i) does not apply to the facts at hand.  This leaves us to determine whether appellees' actions should be considered a written or oral statement made "in a place open to the public or a public forum in connection with an issue of public interest," *id*. § 16-5501(1)(A)(ii), or expression "that involves . . . communicating views to members of the public in connection with an issue of public interest," *id*. § 16-5501(1)(B). As discussed in detail below, we conclude that appellants' conduct falls within § 16-5501(1)(B).  We therefore do not discuss the meaning or application of § 16-5501(1)(A)(ii).

12

In order for Subsection B to apply, there must be evidence that appellees "communicat[ed] views to members of the public." *Id.* at § 16-5501(1)(B). Although the complaint alleges that Steele met with members of the media in private, it is reasonable to infer that Steele expected and intended that the media in turn would communicate this information to the public. However, appellants challenge the application of Subsection B by asserting that CIR 112 "expresse[d] no views." According to appellants, the phrase "communicating views" applies only to beliefs or opinions and cannot be "stretched to encompass the compiling and conveyance of 'raw intelligence.'" They argue that "views mean views — not facts," and that any other reading of the word "views" is contrary to its "well understood meaning." Relying upon language from the trial court's order, appellees, on the other hand, contend that the statutory language encompasses not "only pure opinion speech" but also factual statements and "raw intelligence."

To determine whether a particular statement meets this definition of advocacy, we think it helpful to look to defamation law for guidance. Our law recognizes that speech is capable of conveying different meanings depending upon the context in which it occurs. *See Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) (requiring the court to look at the publication "as a whole, in the sense it would be understood by the readers to whom it was addressed" to determine

13

whether speech is capable of defamatory meaning) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)).  Indeed, it is quite possible that speech may have a defamatory meaning in some circumstances, but not in others.  *See Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998) (holding that statements that "an attorney is often out of the office during normal working hours, . . . could reasonably be construed, in context, as a reflection on her professional performance"); *see also Southern Air Transp., Inc. v. American Broadcasting Companies, Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989) (considering statements that a company "engaged in dealings with the government of South Africa" capable of defamatory meaning because at the time, there was "intense antipathy felt by a great number of Americans towards South Africa").  Thus, courts must look to the context of the challenged speech to determine whether it was "capable or susceptible of a defamatory meaning."  *Klayman*, 783 A.2d at 614.

Similarly, whether expressive conduct communicates a view depends not solely on the words spoken, but also upon the circumstances surrounding the speech, including when, where, why, and how the words were uttered, as well as the characteristics of the speaker and the audience.  It is certainly possible that statements of fact not overtly couched as an opinion can communicate a view when considered in context and as a whole.

According to appellants' complaint, Steele and his company were hired by Mr. Trump's political opponents to conduct "opposition research" into possible dealings Mr. Trump and his campaign had with Russia. The complaint itself alleges that the Steele Dossier in general, and CIR 112 in particular, were created "to publicly discredit its target," an action that was "[c]onsistent with the intended purpose of 'oppo research.'" Given the background detailed in the complaint, CIR 112 communicates the view that Fridman, Aven, and Khan have had a longstanding close and influential relationship with President Putin — a relationship which includes illicit acts. In discussing appellants' ability to influence Putin (or to do his bidding) "on foreign policy, and especially about the U.S.," CIR 112 further communicates the view that appellants are powerful figures who can affect relations between Russia and the United States. By publishing CIR 112 to the media, appellees communicated this view to members of the public. Appellees have therefore made a prima facie showing that the publication of CIR 112 falls within the protection of the Anti-SLAPP Act.

## B. "Likely To Succeed on the Merits"

Since appellees' conduct qualifies for the protections of the Anti-SLAPP Act, the burden shifts to appellants to show "that the[ir] claim [of defamation] is likely to succeed on the merits." D.C. Code § 16-5502(b). Our role is "to test the legal sufficiency of the evidence to support the claims." *Mann*, 150 A.3d at 1240. We must affirm a ruling granting a special motion to dismiss if the "claimant could not prevail as a matter of law, that is, after allowing for the weighing of evidence and permissible inferences by the jury." *Id*. at 1236 (emphasis omitted).

## 1. Public Figure Determination

### a. Legal Framework

"To succeed on a claim for defamation, a plaintiff must prove: '(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement met the requisite standard; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Id.* at 1240

(quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)) (footnotes omitted). On appeal, the parties focus on the third element (the standard of fault).[3]

The standard against which we measure the defendant's fault in publishing turns upon whether the plaintiff is a public or a private figure. *See Moss v. Stockard*, 580 A.2d 1011, 1022 (D.C. 1990). Given their "ready access . . . to mass media of communication, both to influence policy and to counter criticism of their views and activities," *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring), public figures are required "to prove greater fault by a greater degree of factual certainty than private plaintiffs," *Moss*, 580 A.2d at 1029.

The term "public figure" can be broken down into two categories: general purpose public figures and limited-purpose public figures. *See Gertz v. Welch, Inc.*, 418 U.S. 323, 345 (1974). Because of their "positions of such persuasive power and influence," general purpose public figures "are deemed public figures

---

[3] For purposes of this analysis, we assume without deciding that the nearly identical affidavits each appellant submitted, which assert that the statements in CIR 112 regarding illicit activities and a "quid pro quo" relationship with President Putin were false, are enough to make the first element of a defamation claim a question for the jury to decide.

for all purposes." *Id.* at 345. "[L]imited-purpose public figures, who assume roles 'in the forefront of particular public controversies in order to influence the resolution of the issues involved,'" are only considered public figures in relation to the particular controversy (or controversies) in which they have involved themselves. *Moss*, 580 A.2d at 1030 (quoting *Gertz*, 418 U.S. at 345).

"The task of determining whether a defamation plaintiff is a limited-purpose public figure is a difficult one, requiring a highly fact-intensive inquiry." *Doe No. 1*, 91 A.3d at 1041. The ultimate determination is a question of law, however. *See Moss*, 580 A.2d at 1030-31. To aid in this process, the D.C. Circuit devised a three-part test in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-97 (D.C. Cir. 1980). We adopted the *Waldbaum* test in *Moss*. 580 A.2d at 1030-32. Under this framework, the trial court first must "decide whether there is a public controversy, and determine its scope." *Id.* at 1030. This inquiry is backward-looking and requires us to decide "whether the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation." *Id.* Next, the court asks "whether 'a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Id.* (quoting *Waldbaum*, 627 F.2d at 1297).

After the controversy is defined, we look at "the plaintiff's role in it." *Moss*, 580 A.2d at 1031. To be a limited-purpose public figure, "[t]he plaintiff must have achieved a special prominence in the debate, and either 'must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution.'" *Id.* (quoting *Waldbaum*, 627 F.2d at 1297). "Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome." *Waldbaum*, 627 F.2d at 1298; *see Moss*, 580 A.2d at 1033. In those instances, "[u]nless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand." *Waldbaum*, 627 F.2d at 1298.

Finally, if both of the previous elements are satisfied — "there is a preexisting public controversy which the plaintiff undertakes to influence" — we consider "whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Moss*, 580 A.2d at 1031.

**b. When Do We Conduct the Public Figure Analysis?**

As a preliminary matter, appellants assert that the Superior Court erred in conducting a public figure analysis at the special motion to dismiss stage of this litigation.  They argue that unless a plaintiff concedes his status as a public figure, he need only present a prima facie case of negligence in publishing to defeat a special motion to dismiss, rather than meet the heightened "actual malice" standard that applies to both general and limited-purpose public figures.  Appellants complain that "a plaintiff cannot be required to prove something that he is not required to plead," and urge us to recognize that "whether a plaintiff is a public figure is an affirmative defense."  Therefore, according to appellants, a plaintiff's status as a public figure should have no bearing upon the Anti-SLAPP Act's requirement that he "demonstrate[] that the claim is likely to succeed on the merits."  D.C. Code § 16-5502(b).

To support their argument, appellants point to two unpublished district court opinions: *Fridman v. Bean LLC*, No. 17-2041, 2019 WL 231751 (D.D.C. Jan. 15, 2019), and *MiMedx Grp, Inc. v. DBW Partners, LLC*, No. 17-1925, 2018 WL 4681005 (D.D.C. Sept. 28, 2018).  Both cases were decided after the Superior Court issued its opinion in this matter and therefore were not addressed below.  In

*Fridman*, which is a companion case to the current litigation and involves a similar challenge to CIR 112, the district court denied the defendants' Rule 12(b)(6) motion, concluding that it was premature to resolve the question of whether plaintiffs were public figures.  2019 WL 231751, at *4.  The court reasoned that the plaintiffs were not required to plead sufficient facts to show that the defendants published CIR 112 with actual malice because the heightened fault standard would only be raised "as an affirmative defense to defeat plaintiffs' defamation claim." *Id*.  The court further stated that the plaintiffs had no obligation to overcome that affirmative defense because "resolution of an affirmative defense is proper on a motion to dismiss only if the facts required to establish the defense are apparent on the face of the complaint (or if the plaintiff concedes public figure status or the facts that establish it)."  *Id*.


Likewise, the district court denied the defendants' Rule 12(b)(6) motion in *MiMedx* because it determined that the defamation plaintiff had no "obligation to anticipate in its complaint the need to plead facts to defend against defendants' assertion that it is a public figure."  2018 WL 4681005, at *6.  Although the court opined that the plaintiff "may later be deemed a public figure or limited-purpose public figure, . . . its failure to allege actual malice" did not require dismissal on Rule 12(b)(6) grounds.  *Id*.

We are not bound by these unpublished opinions from the federal district court. More importantly, we emphasize, the judges in both *Fridman* and *MiMedx* were not purporting to apply the Anti-SLAPP Act. The Anti-SLAPP Act was not at issue in *MiMedx*, and the trial judge in *Fridman* declined to apply the Act in federal court. *See Fridman*, 2019 WL 231751, at *2.[4]

The standards for adjudicating a special motion to dismiss and a Rule 12(b)(6) motion are materially distinct. In ruling on a Rule 12(b)(6) motion, a court looks at whether the *complaint* "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). There is no requirement that a plaintiff offer any evidence to defeat the motion. *In re Estate of Curseen*, 890 A.2d 191, 193 (D.C. 2006).

---

[4] Citing the D.C. Circuit's decision in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1334-37 (D.C. Cir. 2015), the judge denied the defendant's special motion to dismiss, concluding that "a federal court sitting in diversity must apply Federal Rules of Civil Procedure 12 and 56 rather than D.C.'s Anti-SLAPP law." *Fridman*, 2019 WL 231751, at *2.

However, in opposing a special motion to dismiss, the plaintiff must shoulder the burden of showing that his claim is likely to succeed on the merits. In *Mann*, we explained that this requirement "mandates the production or proffer of evidence that supports the claim." 150 A.3d at 1233. Because the "standards against which the court must assess the legal sufficiency of the evidence are the substantive evidentiary standards that apply to the underlying claim and related defenses and privileges," plaintiffs are required to present more than the mere allegations in the complaint. *Id.* at 1236. The process in essence accelerates the consideration of available defenses. Thus, "[t]he precise question the court must ask [in ruling on a special motion to dismiss] is whether a jury properly instructed on the law, *including any applicable heightened fault and proof requirements*, could reasonably find for the claimant on the evidence presented." *Id.* (emphasis added). *See Doe No. 1*, 91 A.3d at 1045 (concluding that a special motion to quash subpoena should have been granted; appellee, a public figure, had failed to show a likelihood of success on the merits because she could not show actual malice). This fundamental difference in procedure makes the reasoning in *Fridman* and *MiMedx* inapplicable to a special motion to dismiss.

Rather than disposing of a meritless lawsuit "early in the litigation," as the Act intends, *see Mann*, 150 A.3d at 1238, appellants' reading of the statute would

prolong the litigation process and render the special motion to dismiss ineffective when it comes to public figures, who would be required to prove actual malice at trial, but could defeat the special motion with a lesser showing of fault. *Id*. at 1238. The trial court properly conducted a public figure analysis prior to ruling on the special motion to dismiss.

### c. Application to the Facts at Hand

The Superior Court identified a real, public controversy, which it defined as "Russian oligarchs' involvement with the Russian government and its activities and relations around the world, including the United States." This definition of a preexisting public controversy was supported by the record. Moreover, we agree with the trial court that the "U.S. public today continues to have a strong interest in Russia's relations with the United States and in the political and commercial relationships between Russian oligarchs and the Russian government." Notably, when faced with a similar issue, our sister courts in the District of Columbia have concluded that "there can be no doubt [that] a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 142 (D.D.C. 2017). *See also OAO Alfa*

*Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 43 (D.D.C. 2005) (holding that

"[t]he rise of the oligarchs and the decline of the Russian economy into what one

observer described as a 'criminal-syndicalist state'" was a public controversy

because it was the topic of "intense discussion" throughout the United States and

the world).[5]


Appellants argue that the trial court misidentified the controversy and assert

that it should be defined instead as "Donald J. Trump's ties to Russia and Vladimir

---

[5]   In determining that appellants were limited-purpose public figures, Judge Epstein referred to *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005), a prior defamation case.  That case was brought by appellants Fridman and Aven and their companies and involved a challenge to statements from a public interest organization alleging that the plaintiffs had connections to organized crime in Russia.  *Id*. at 23.  The trial court in *OAO Alfa Bank* held that appellants were limited-purpose public figures.  *Id*. at 47.  On appeal in the current case, appellants maintain that Judge Epstein improperly "import[ed] the *OAO* limited public figure finding into this case."  They assert that Judge Epstein's mention of *OAO Alfa Bank* was "an invalid shortcut"— an improper use of issue preclusion.  We disagree.  Although Judge Epstein relied upon quotes from *OAO Alfa Bank*, we do not read his opinion as impermissibly applying issue preclusion to determine appellants' public figure status.  Rather, the quotations serve as evidence that appellants have been the subject of international discussion for years, and correspondingly have "enjoy[ed] access to the channels of effective communication that enable them to respond to any defamatory statements and influence the course of public debate."  *Id*. at 45 (internal quotation marks omitted).  Judge Epstein explained why, based upon the documents submitted by appellees in this case, the "findings in *OAO Alfa Bank* are valid today."  The opinion does not, as appellants suggest, simply adopt the finding of *OAO Alfa Bank* without conducting an independent analysis.

Putin."  In advancing that conclusion, appellants contend that the Supreme Court's decision in *Gertz* stands for the proposition that "[c]ourts should not base their decision on how to define the controversy on *the content* of the defamatory statement . . . but rather, on the issue or dispute that triggered the making of the defamatory statements."   Following that reasoning, appellants maintain that because the Steele Dossier was created in order to investigate "Donald J. Trump's ties to Russia and Vladimir Putin," the controversy "giving rise" to the allegedly defamatory statements was "the controversy surrounding Donald Trump's presidential campaign."  At its core, appellants' argument urges us to focus on why CIR 112 was published.

This argument is unconvincing.  While *Gertz* furnishes the language "giving rise to the defamation," it does not supply a framework for analyzing how to define the controversy.  418 U.S. at 352.  In the nearly fifty years since *Gertz* was decided, cases such as *Waldbaum* and *Moss* have done so.  *Waldbaum* itself recognizes that multiple relevant controversies may exist at the same time, and that "a narrow controversy may be a phase of another, broader one."  627 F.2d at 1297 n.27.

In light of *Waldbaum*, appellants' assertion that the Steele Dossier was created to investigate candidate Trump's ties to Russia is not incompatible with the Superior Court's definition of the controversy.  While gathering information about Mr. Trump and his connections to Russia may have been the motivation behind creating the dossier, CIR 112 focuses on the preexisting controversy surrounding Russian oligarchs and their influence upon the Russian government.  This discussion might well have provided important background information related to the election.  Nevertheless, the motivation leading to the creation of the Steele Dossier does not compel us to define the controversy differently than the Superior Court did.

Our next step is to analyze appellants' role in the controversy.  *See Waldbaum*, 627 F.2d at 1297.  "The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution."  *Id.* Amassed in the record before us are hundreds of pages of news articles discussing appellants' status as Russian oligarchs and their ties to Vladimir Putin. Furthermore, as the record shows, in the years prior to the publication of CIR 112, there were thousands of internet search hits for each appellant, showing appellants' involvement in the controversy prior to September 2016.  Included in these search

hits are news articles detailing meetings each appellant has had with President Putin as well as personal interviews the appellants have willingly given to the media.  These interviews have spanned a wide range of subjects, from discussions of appellants' hobbies and interests to statements regarding their businesses and connections to the Kremlin.

The involvement appellants and their businesses had in litigation over a decade before the election shows that they have been participating in a debate on the world's stage for quite some time.  *See OAO Alfa Bank*, 387 F. Supp. 2d at 23. In the interim appellants have not been shy about giving interviews and putting forth their own views about their role with respect to the Russian government. Even if their celebrity in this matter was a vestige of a previous era, it is evident that appellants still "remain[] able to reply to attacks through the press, which is continuing to cover [them]."  *Waldbaum*, 627 F.2d at 1295 n.18.  Based on this record, we have no trouble upholding Judge Epstein's conclusion that appellants "have assumed special prominence in [the] controvers[y]."

Finally, we conclude that the challenged speech contained in CIR 112 was germane to appellants' participation in the controversy.  *See Waldbaum*, 627 F.2d

at 1298.  At its core, CIR 112 discusses appellants' relationship with President Putin and the influence appellants have over the Russian government and its "foreign policy . . . especially about the US."  These statements are directly related to the public controversy identified by Judge Epstein.  Since all three prongs of the *Waldbaum* test are satisfied, we agree with the trial court that appellants are limited-purpose public figures with respect to the speech at issue.

### 2.  Did Appellees Publish with Actual Malice?

As limited-purpose public figures claiming they were defamed, appellants are held to heightened proof requirements.  Even at the special motion to dismiss stage, appellants must proffer evidence capable of showing by the clear and convincing standard that appellees acted with actual malice in publishing CIR 112. *See Mann*, 150 A.3d at 1236.  This constitutional standard "is a daunting one" which very few public figures can meet.  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).  To succeed in establishing actual malice, appellants must show "that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not."  *Thompson v.*

*Armstrong*, 134 A.3d 305, 311 (D.C. 2016) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  Merely "show[ing] that [the] defendant should have known better" than to believe the truth of his publication does not suffice. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Rather, the plaintiff must offer evidence showing that "the defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant*, 390 U.S. at 731, or acted "with a 'high degree of awareness of . . . probable falsity,'" *id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

Appellants have not done so.  They argue that the truth of the challenged speech can be doubted if the information was learned from an "unverified and anonymous" source and if bias was shown in its publication.  They proffer three pieces of evidence which they claim adequately support "an inference" of actual malice.

Appellants first contend that the source of the statements "contained in CIR 112 was not merely unknown to readers, but more importantly, unknown to Steele."  For this proposition, they rely upon language in CIR 112 which states:

"[s]peaking to a trusted compatriot in mid-September 2016, a top level Russian government official commented on the history and current state of relations between President [Putin, appellants, and Alfa Bank]."   Based solely on that statement and the fact that CIR 112 did not identify a source, appellants assume that Steele learned the information in the document from an "unverified and anonymous" source.   Building on this assumption, appellants assert that the "evidence" supports an inference of actual malice under *St. Amant*, 390 U.S. at 731.


Appellants are mistaken.   In *St. Amant*, the Supreme Court stated that a defamation plaintiff is likely to meet the actual malice standard when the defendant's "story . . . is based wholly on an unverified anonymous telephone call."   *Id*.   But, although CIR 112 does not name a source, there is no reason to expect that it would.[6]   Appellants have identified nothing in the record to suggest

---

[6] Intelligence reports, like the Steele Dossier, and even newspaper articles, are often designed to conceal the identity of their source or sources.  Nothing in *St. Amant* or subsequent cases makes a defendant's decision not to publicly name a source the equivalent of actual malice.  Moreover, without more, actual malice would not be a reasonable inference even if Steele himself did not know the identity of the speaker.  The Supreme Court has recognized "that a public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's [biased] motive in publishing a story . . . cannot provide a
(continued…)

that Steele learned the information he published through an anonymous tipster. Nor have appellants identified anything showing that Steele did not test the veracity of the intelligence he gained, assuming that it did derive from a source unknown to him.  Instead, appellants simply assert that appellees have failed to rebut the contention that the source was unverified and anonymous because "[t]here is no indication in CIR 112 or elsewhere that Steele knew the identity of the anonymous Russian official who spoke to the unidentified 'trusted compatriot.'"

That argument misplaces the burden, which lies with the appellants to set forth facts that would allow a jury to find actual malice.  *See Mann*, 150 A.3d at 1236.   Furthermore, under the reasoning in *St. Amant* and subsequent cases, reliance upon a single source, even an unverified and anonymous one, will amount to actual malice only if the defendant "had obvious reason to doubt" the statement's veracity.  *Jankovic*, 822 F.3d at 590 (quotation omitted).  Appellants cannot point to anything establishing that it was reasonable to infer that there were

---

(…continued)
sufficient basis for finding actual malice."  *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989).

obvious reasons for Steele to doubt the credibility of his source.  *See Mann*, 150 A.3d at 1236.[7]

Appellants' second proffer fares no better.  Appellants claim that an inference of bias must apply because Steele was hired to provide opposition research on Donald Trump.  While we have held that "bias providing a motive to defame . . . may be a relevant consideration" in evaluating whether the defendant acted with actual malice, *id.* at 1259, appellants' reliance upon this statement is misplaced.  According to the allegations in the complaint, Steele and his company were hired to conduct opposition research about candidate Trump and his presidential campaign.  Perhaps it is fair to infer that Steele was biased against Mr. Trump, whom Steele had been hired by political opponents to investigate and "publicly discredit."  However, this motivation would not necessarily extend to appellants, who were not the "target" of Steele's research and investigation.

---

[7] Appellees assert in a footnote that appellants are not entitled to permissible inferences in their favor.  However, in *Mann*, we held that, before granting a special motion to dismiss, a trial court must "allow[] for the weighing of evidence and permissible inferences by the jury."  150 A.3d at 1236.

Finally, citing a news article, appellants claim that Steele admitted after the dossier was published that up to 30% of it might prove to be inaccurate.[8]  This article, which was published over a year after the dossier was created, states that although "Steele was adamant that his reporting was credible," he "recogni[z]ed that no piece of intelligence was 100% right."  Relying solely upon statements allegedly made by Steele's anonymous "friends," the article reports that Steele "assessed that his work on the Trump dossier was 70-90% accurate."

Appellant's reliance on this single statement ignores the context of the entire twelve-page article, which quotes an associate as stating that Steele is "sober, cautious, highly regarded, professional and conservative."  Even assuming that their assertion about the dossier's overall accuracy, which ironically is supported only by anonymous sources, proved true, a jury properly instructed on the law could not reasonably infer that this evidence amounted to proof of actual malice. *See Mann*, 150 A.3d at 1232 ("[W]e conclude that in considering a special motion to dismiss, the court evaluates the likely success of the claim by asking whether a jury properly instructed on the applicable legal and constitutional standards could

---

[8]  Luke Harding, *How Trump walked into Putin's web*, THE GUARDIAN, (Nov. 15, 2017), https://www.theguardian.com/news/2017/nov/15/how-trump-walked-into-putins-web-luke https://perma.cc/7Z7Y-N8UF.

34

reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion.").  As the Superior Court rightfully noted, appellants have not maintained that Steele "subjectively believed that the 10-30% of the Steele Dossier that would ultimately turn out to be inaccurate included CIR 112."  Nor do appellants point to any evidence showing that Steele was aware at the time he published the dossier that he was relying upon inaccurate information.  Indeed, according to the same article on which appellants rely, Steele told friends that the dossier "was a thoroughly professional job, based on sources who had proven themselves in other areas."

For these reasons, even drawing reasonable inferences in appellants' favor, they have failed to proffer evidence capable of showing by the clear and convincing standard that appellees acted with actual malice.  *Mann*, 150 A.3d at 1236.

### C. Denial of Targeted Discovery

Finally, appellants challenge the trial court's denial of their request for targeted discovery.  The Act provides, as a substantive protection for defendants, that once a special motion to dismiss has been filed, all discovery proceedings

35

"shall be stayed until the motion has been disposed of."  D.C. Code § 16-
5502(c)(1).  Nevertheless, "[w]hen it appears likely that targeted discovery will
enable the plaintiff to defeat the motion and that the discovery will not be unduly
burdensome, the court may order that specified discovery be conducted."  *Id.* § 16-
5502(c)(2).

As a general rule, "the intent of the lawmaker is to be found in the language
that he [or she] has used."  *Peoples Drug Stores*, *Inc. v. District of Columbia*, 470
A.2d 751, 753 (D.C. 1983) (en banc) (quoting *Varela v. Hi-Lo Powered Stirrups,
Inc.*, 424 A.2d 61, 64 (D.C. 1980) (en banc)).  Therefore, our first step in
interpreting § 16-5502(c) is to "look at the language of the statute by itself to see if
the language is plain and admits of no more than one meaning."  *Davis v. United
States*, 397 A.2d 951, 956 (D.C. 1979).  While Subsection (c)(1) clearly and
unambiguously requires that discovery proceedings be stayed once a special
motion to dismiss is filed, the language of Subsection (c)(2) requires further
analysis.

In order for discovery to be allowed, two things must "appear[] likely":  (1)
"that targeted discovery will enable the plaintiff to defeat the motion," and (2)

"that the discovery will not be unduly burdensome."  D.C Code § 16-5502(c)(2).  The limiting language found in the second clause is well known to us.  The "unduly burdensome" phrase mimics the requirement set forth in Super. Ct. Civ. R. 26(g)(1)(C) that a party seeking discovery must attest that it is "neither unreasonable nor unduly burdensome."  Both our court and the Superior Court have adjudicated discovery disputes under the unduly burdensome standard.  We need not analyze this clause further, as it is evident the legislature chose to use a "well-known term of art."  *See Mann*, 150 A.3d at 1234.

The first clause of Subsection (c)(2) requires further examination, however.  We recognize that "[t]he meaning — or ambiguity — of certain words or phrases may only become evident when placed in context."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  Therefore, "we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them."  *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 652 (D.C. 2005) (en banc).

In *Mann* we addressed the role of discovery in the statutory scheme:

> In short, the special motion to dismiss provision authorizes final disposition of a claim in a truncated proceeding, usually without the benefit of discovery, *id.* § 16-5502(c), to avoid the toll that meritless litigation imposes on a defendant who has made a prima facie showing that the claim arises from advocacy on issues of public interest.

150 A.3d at 1235.  Having recognized that special motions to dismiss usually will be decided without discovery, we characterized § 16-5502(c) as providing "a limited exception that favors the defendant."  *Id.* at 1237.  Thus, the language of § 16-5502(c) indicates that discovery normally will not be allowed.

This view is supported by the Act's legislative history.  While the vast majority of jurisdictions with Anti-SLAPP Acts permit a court to order specified discovery on a showing of "good cause," *see, e.g.*, Cal. Civ. Proc. Code § 425.16(g) (2019), the District of Columbia Council abandoned this language.  As introduced, the bill would have stayed discovery proceedings until the special motion to dismiss had been disposed of, "except that the court, for good cause shown, may order that specified discovery be conducted."  D.C. Council, Comm. On Public Safety and the Judiciary, Report on Bill 18-893 at 2 (July 7, 2010). During its testimony before the Committee on Public Safety and the Judiciary, the American Civil Liberties Union of the Nation's Capital ("ACLU") cautioned that

the "good cause" standard in the proposed bill "has the disadvantage of being completely subjective so that a judge . . . can, in effect, set the Anti-SLAPP Act aside and allow a case to proceed in the usual way." *Anti-SLAPP Act of 2010: Hearing on Bill No. 18-893 before the Committee on Public Safety and the Judiciary, Council of the District of Columbia*, Statement of Arthur Spitzer, Legal Director, ACLU at 6 (Sep. 17, 2010). After hearing this testimony, the Committee added the requirement that the proposed discovery not be unduly burdensome and replaced the "for good cause shown" test with the requirement that it must appear "likely that targeted discovery will enable the plaintiff to defeat the motion." November Report at 7.

Given the statutory language and this background, we conclude that the clause "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion" creates a standard that is difficult to meet. Discovery must be "targeted" instead of wide-ranging. A plaintiff seeking discovery must show more than "good cause," and he cannot merely argue that the evidence he seeks would be relevant or helpful. He must be able to articulate how targeted discovery will enable him to defeat the special motion to dismiss. He also must show that it is "likely" the discovery will produce that result.

Moreover, given the use of the word "may," which is "quintessentially permissive," the decision to grant or deny targeted discovery rests within the trial court's broad discretion. *In re J.D.C.*, 594 A.2d 70, 75 (D.C. 1991). "Discretion signifies choice." *Johnson v. United States*, 398 A.2d 354, 361 (D.C. 1979). Under the abuse of discretion standard, the trial judge "has the ability to choose from a range of permissible conclusions." *Id*. "The appellate court role in reviewing 'the exercise of discretion' is supervisory in nature and deferential in attitude." *Id*. at 362.

In the trial court, appellants requested targeted discovery to reveal what appellees "were thinking and doing when they compiled CIR 112 and published it, and what communications they had with their sources, their contractees and others regarding the reliability of the information they had gathered." Judge Epstein denied this request, reasoning that appellants had not "shown a likelihood that [appellees] have information that will establish actual malice by clear and convincing evidence." He cautioned, and we agree, that if courts relied solely on the premise that the defendants would have better access to what was in their minds at the time of publication, "discovery would be justified in every Anti-

SLAPP Act case."  However, as we have shown, it was the legislature's intent that discovery ordinarily would not be permitted.

Appellants' request for discovery does not necessarily raise concerns of undue burden.   However, they have not shown that it "appears likely" that information gained from deposing appellees will enable them to defeat the special motion to dismiss.  The key issue in this case is whether appellants can prove that CIR 112 was published with actual malice.[9]  As we have discussed at some length, the fact that Steele did not name his confidential source in CIR 112, the claim that he was biased because of the nature of his engagement, and the selective quotations from the news article do not support an inference of actual malice. Appellants have not shown why discovery will likely produce evidence more persuasive than what we have rejected.  It was not an abuse of discretion to deny targeted discovery.

---

[9] Appellants also assert that targeted discovery would allow them to establish that the controversy "giving rise to" the publication of CIR 112 "was not the controversy identified by the Superior Court."  They claim that if appellees were deposed, they may "acknowledge that an interest in the 'Trump-Russia' question gave rise to the creation and publication of CIR 112."  However, as we have discussed above, the controversy must have existed prior to the defamation, and identifying the motivation for publishing is not the same as defining the controversy.  Appellants have not shown that discovery targeted in this manner likely would enable them to defeat the special motion to dismiss.

### III.   Conclusion

For the reasons discussed above, we affirm the judgment of the Superior Court which granted appellees' special motion to dismiss.